UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ROBERT E. MACLAREN,

                              Plaintiff,

v.                                                                          3:25-CV-1218
                                                                            (GTS/ML)
TANNER A.R. COSTA, Chenango County
Sheriff's Deputy; and ELIZABETH S. HEALY,
Assistant (Prosecutor) District Attorney,

                              Defendants.

_____

APPEARANCES:                                                OF COUNSEL:

Robert E. MacLaren
  Plaintiff, *Pro Se*
3016 State Highway 7
Bainbridge, New York 13733

MIROSLAV LOVRIC, United States Magistrate Judge

## **ORDER and REPORT-RECOMMENDATION**

Plaintiff Robert E. MacLaren ("Plaintiff") commenced this *pro se* action against

Defendants Tanner A.R. Costa and Elizabeth S. Healy (collectively "Defendants") alleging

violations of his civil rights.  (Dkt. No. 1.)  Plaintiff did not pay the filing fee and seeks leave to

proceed *in forma pauperis* ("IFP").  For the reasons set forth below, I (1) grant Plaintiff's

amended IFP application, and (2) recommend that the Complaint be accepted in part for filing

and dismissed in part.

## I.     BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's civil rights by Defendants.  (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that on June 8, 2025, his neighbor—John Mackanesi—provided a false statement to police to effectuate the false arrest of Plaintiff.  (Dkt. No. 1 at 4.)  Plaintiff alleges that tree branches and vines on a tree owned by Mr. Mackanesi overhung into Plaintiff's property and an unknown individual "apparently trimmed the branches and vines" that hung over Plaintiff's property.  (*Id.*)  Based on the attachments to the Complaint, it appears that Plaintiff was charged with one count of trespass pursuant to N.Y. Penal Law § 140.05 and accepted an adjournment in contemplation of dismissal pursuant to N.Y. Crim. Proc. Law § 170.55.  (Dkt. No. 1 at 8-11.)

Plaintiff alleges that on August 27, 2025 at 3 a.m., Mr. Mackanesi or Defendant Costa "pound[ed] on [Plaintiff's] wooden screen door with a large hammer" and then used the hammer on Plaintiff's front living room window, which cracked the double plane glass.  (Dkt. No. 1 at 5, 12.)  Plaintiff alleges that he (and his cat) were "terrorize[d]," "scared," and "afraid," which resulted in emotional distress and trauma, humiliation, anxiety, and depression.  (*Id.* at 5)

Based on these factual allegations, Plaintiff appears to assert the following three claims: (1) a claim of false arrest pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim of unreasonable search pursuant to the Fourth Amendment and 42 U.S.C. § 1983; and (3) an unspecified claim pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983.  (Dkt. No. 1 at 3-4.)

---

[1]     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

As relief, Plaintiff seeks declaratory judgment, compensatory damages in an unspecified amount, and punitive damages in the amount of $1,000,000.00.  (Dkt. No. 1 at 5.)

## II.    PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[2]  After reviewing Plaintiff's amended IFP application (Dkt. No. 5), the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's amended application to proceed IFP is granted.[3]

## III.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief

---

[2]    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3]    Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

4

Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be accepted in part for filing and dismissed in part.

### A.    Claims Against Defendant Healy

"To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). The Second Circuit has also made clear that "there is no special rule for supervisory liability" under Section 1983. *Tangreti*, 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Tangreti*, 983 F.3d at 618).

Here, Plaintiff identifies Defendant Healy in the caption of the Complaint and in the list of parties (Dkt. No. 1 at 1-2) but does not otherwise reference Defendant Healy anywhere in the body of the Complaint. (*See generally* Dkt. No. 1; *but see* Dkt. No. 1 at 9-10 [notification from Bainbridge Town Court with "Prosecutor Elizabeth S. Healy" handwritten on the bottom].) Hence, the Complaint lacks factual allegations sufficient to allege that Defendant Healy was personally involved in conduct that violated Plaintiff's constitutional rights.

As a result, I recommend that to the extent that Plaintiff's Complaint is liberally construed as asserting claims against Defendant Healy, it be dismissed for failure to state a claim

upon which relief may be granted.[4]  *Hamza v. Kotsidis*, 25-CV-0968, 25-CV-1429, 25-CV-1506, 2026 WL 1296172, at *2-3 (N.D.N.Y. May 12, 2026) (Coombe, J.) (citing *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) (Kahn, J.) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, 14-CV-2175, 2014 WL 5425501, at *6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint)) (dismissing the plaintiff's claims against defendants who were listed in the caption and list of parties but not otherwise referenced in the body of the operative pleading).

---

[4]     In addition, it appears that Defendant Healy was the assistant district attorney assigned to prosecute the trespass charge against Plaintiff.  (Dkt. No. 1 at 9-11.)  "Prosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'" *Joyner v. Cnty. of Cayuga*, 20-CV-0060, 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (D'Agostino, J.) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).  A prosecutor's decision whether or not to bring charges against an individual is undoubtedly protected by absolute prosecutorial immunity.  *Cruz v. Vill. of Spring Valley*, 21-CV-2073, 2022 WL 428247, at *4 (S.D.N.Y. Feb. 11, 2022) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("It is clear that 'the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions' covered by absolute immunity.")); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).  As a result, Plaintiff's claims against Defendant Healy are likely also barred pursuant to the doctrine of prosecutorial immunity.

        Moreover, claims against Defendant Healy in her official capacity—as an employee of the Chenango County Attorney's Office—are subject to dismissal pursuant to the Eleventh Amendment.  *See D'Alessandro v. City of New York,* 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the state, and therefore immune from suit in her official capacity."); *Rich v. New York*, 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2022) ("[A]ny claims Plaintiff may raise against the DA Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment.").

### B. Claims Against Defendant Costa

#### 1. Official Capacity

"[T]his District has held that [Section 1983] claims against municipal officers in their official capacities are really claims against the municipality." *Sears v. Carmichael*, 18-CV-0909, 2018 WL 7291417, at *2 (N.D.N.Y. Aug. 6, 2018) (Hummel, M.J.) (internal citations and quotations omitted), *report and recommendation adopted*, 2019 WL 587587 (N.D.N.Y. Feb. 13, 2019) (Hurd, J.). "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Complaint essentially complains of one discrete incident during which Plaintiff was arrested by Defendant Costa based on a false statement provided by Mr. Mackanesi. (*See generally* Dkt. No. 1.) Plaintiff fails to assert facts plausibly suggesting a policy or custom, which would support municipal liability based on these facts. *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing

*DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability."). In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Chenango County.

### 2.     Individual Capacity

#### i.     False Arrest

A Section 1983 claim for false arrests "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The substantive elements of a false arrest claim under Section 1983 are "substantially the same as [for] a claim for false arrest under New York law." *Weyant*, 101 F.3d at 852. To establish a claim for false arrest and imprisonment, a plaintiff must prove: "(1) the defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) did not consent to such confinement; and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).

Confinement is privileged, and a complete defense exists to a claim for false arrest and imprisonment when it is supported by probable cause. *Weyant*, 101 F.3d at 852; *see Banyan v. Sikorski*, 17-CV-4942, 2021 WL 1163653, at *5 (S.D.N.Y. Mar. 26, 2021) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action

8

is brought under state law or under § 1983."), *reconsideration denied sub nom.*, 2021 WL 2156226 (S.D.N.Y. May 27, 2021).  "Probable cause to arrest exists when [police] officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  Whether probable cause exists is analyzed by examining the facts known to the arresting officer at the time of the arrest.  *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

"[T]o establish probable cause for arresting [a plaintiff] for criminal trespass, [the defendant] must show that (1) there was a lawful order excluding [p]laintiff from the property; (2) that the order was communicated to him by a person with authority to give the order; and (3) that [p]laintiff defied the order."  *Yorzinski v. City of New York*, 175 F. Supp. 3d 69, 77 (S.D.N.Y. 2016).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendant Costa in his individual capacity.

### ii.     Unreasonable Search

"Generally, the elements of a claim for an unreasonable search are the following: (1) the defendant willfully conducted a search of the plaintiff; and (2) the search was objectively unreasonable under the circumstances."  *West v. Harkness*, 17-CV-0621, 2022 WL 1555364, at *6 (N.D.N.Y. May 17, 2022) (Suddaby, C.J.).  In deciding whether the second element has been satisfied, a fact finder must consider the following: (a) the scope of the particular intrusion; (b)

the manner in which it is conducted; (c) the justification for initiating it; and (d) the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

The Complaint alleges that Defendant Costa "conducted a search and made the arrest" (Dkt. No. 1 at 4) but fails to allege any additional facts or circumstances surrounding Defendant Costa's alleged search. (*See generally* Dkt. No. 1.) Indeed, in an attachment to the Complaint, Plaintiff included a document that purports to be an email he sent to his public defender on September 3, 2025, wherein Plaintiff states that he "never saw a police officer at his residence on said date inspecting the scene of the alleged crime." (Dkt. No. 1 at 12.) Hence, it is unclear whether Defendant Costa conducted a search and if so, the facts and circumstances of that search.

As a result, I recommend that Plaintiff's unreasonable search claim against Defendant Costa in his individual capacity be dismissed for failure to state a claim upon which relief may be granted.

### iii. Fourteenth Amendment Claim

Plaintiff lists the Fourteenth Amendment as a basis for relief. (Dkt. No. 1 at 3.) More specifically, Plaintiff states that the Fourteenth Amendment "protects against being subjected to criminal charges on the basis of false evidence." (*Id.*) To the extent that the Complaint is construed as liberally asserting a malicious prosecution claim pursuant to the Fourth Amendment, I recommend that it be dismissed.[5]

"The elements of a [Section] 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked

---

[5]    "When a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously." *Fraser v. City of New York*, 20-CV-5741, 2022 WL 3045524, at *2 (E.D.N.Y. Aug. 1, 2022) (citations

10

probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 633 (N.D.N.Y. 2021) (Hurd, J.) (quoting *Bernshtein v. City of New York*, 496 F. App'x 140, 142 (2d Cir. 2012) (summary order)); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

Here, Plaintiff's malicious prosecution claim fails because the underlying state court action was not terminated in Plaintiff's favor.  Attached to the Complaint is the certificate of disposition for the underlying state court action, which indicates that the criminal charges brought against Plaintiff were adjourned in contemplation of dismissal pursuant New York Criminal Procedure Law § 170.55.  (*See* Dkt. No. 1 at 11.)  "It has long been established that the acceptance of an adjournment in contemplation of dismissal does not constitute a favorable determination for purposes of a malicious prosecution claim." *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 85 (N.D.N.Y. 2025) (Nardacci, J.) (citations omitted); *see also Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (explaining that adjournment in contemplation of dismissal "is not a favorable termination because it leaves open the question of the accused's guilt and allows the

---

omitted).  "In these circumstances, courts must identify the specific constitutional right allegedly infringed . . . and judge the claim by reference to the specific constitutional standard which governs that right." *Fraser*, 2022 WL 3045524, at *2 (internal quotation marks and citation omitted).  To the extent that Plaintiff's Section 1983 claims of malicious prosecution (or false arrest or unlawful search) are based on the Fourteenth Amendment, those claims must be dismissed. *Passino v. Fulton Cnty. New York*, 25-CV-0727, 2026 WL 817990, at *5 (N.D.N.Y. Mar. 25, 2026) (Nardacci, J.).  "[I]t is the Fourth Amendment, and not [the Fourteenth Amendment right to] substantive due process, under which a [Section] 1983 malicious prosecution claim must be analyzed." *Wagner v. Hyra*, 518 F. Supp. 3d 613, 635 (N.D.N.Y. 2021) (Hurd, J.) (internal quotation marks and citation omitted).

11

state to pursue the criminal prosecution in the interests of justice during the conditional period")
(citation omitted).

Accordingly, I recommend that the Court dismiss Plaintiff's malicious prosecution claim
under the Fourth Amendment.

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se*
litigant without granting leave to amend at least once "when a liberal reading of the complaint
gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05
(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when
justice so requires.").  An opportunity to amend is not required, however, where "the problem
with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."
*Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding
L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact
sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated
differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is
not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d
129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1
(N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[6]

The problems with Plaintiff's claims (1) against Defendant Healy in her official capacity,
and (2) asserting malicious prosecution, are substantive such that a better pleading will not cure

---

[6]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015)
(Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171
F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can
rule out any possibility, however unlikely it might be, that an amended complaint would be

them.  As a result, I recommend that Plaintiff's claims (1) against Defendant Healy in her official capacity, and (2) asserting malicious prosecution be dismissed without leave to replead.

However, out of deference to Plaintiff's *pro se* status and because a more detailed pleading could potentially cure the defects identified, I recommend that Plaintiff's claims asserting (1) unreasonable search against Defendants Healy in her individual capacity, and Defendant Costa in his official and individual capacity, and (2) false arrest against (a) Defendant Healy in her individual capacity, and (b) Defendant Costa in his official capacity, be dismissed with leave to replead.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (Dkt. No. 5) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be (1) **ACCEPTED** to the extent that it asserts a false arrest claim pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Costa in his individual capacity; and (2) **DISMISSED** (a) **with leave to replead** to the extent that it asserts (i) an unreasonable search claim against Defendant Healy in her individual capacity and Defendant Costa in his official and individual capacity, and (ii) a false arrest claim against Defendant Healy in her individual capacity and Defendant Costa in his official capacity; and (b) **without leave to replead** to the extent that it asserts (i) claims against Defendant Healy in her official capacity, and (ii) malicious prosecution claims; and it is further

---

successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: July _2_, 2026
         Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[7]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

14

KeyCite Blue-Striped Flag
Appeal Filed by Adams v. City of Syracuse, 2nd Cir., October 17, 2025

2025 WL 2772081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,
v.
CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Anne M. Nardacci, United States District Judge:

### I. INTRODUCTION

**\*1** On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

### II. BACKGROUND[3]

#### A. The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

#### B. Relevant Events

##### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

### 2. May 6, 2016

#### a. 941 James Street

**\*2**  At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

#### i. 911 call

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

#### ii. Police response

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

**\*3**  Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him." [5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

**\*4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?"[6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

**\*5** Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed

Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

### 3. Criminal Investigations Division

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication."[7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

**\*6** The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed."[8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

**\*7** Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

**\*8** Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

 **\*9**  Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do," [9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....

(g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....

(h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and

(i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

**\*10** According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

### b. Officer Cecile

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the

> male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

### c. Officer Tolone

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

### d. Other Police Reports

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

### 5. Criminal Prosecution

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff [10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

**\*11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter. [11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1st with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.

**\*12** ....

> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 25 of 181

As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.

I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt.

No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

### a. Plaintiff's Capacity

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

 **\*13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

### 6. Additional Investigation by CID

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic

state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

**\*14** *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

### D. Procedural History

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

### E. Plaintiff's Claims

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

### III. STANDARD OF REVIEW

**\*15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines

"whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at \*4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505).

### IV. DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from

which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

**\*16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

**A. False Arrest under Section 1983 and New York law**
"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

### 1. Plaintiff's Detention at 941 James Street

**\*17**    Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case. [14] *See, e.g., United States v. Lefebvre,* 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario,* 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla,* 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice,* 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: ['] the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and

the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea,* 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

**\*18**    Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice,* 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice,* 873 F.3d at 167. *See also United States v. Newton,* 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice,* 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku,* 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

### 2. Probable Cause

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id*. The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id*. Ms. Goldych also indicated that the man's name was Pete. *Id*. Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

**\*19** Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

**\*20** At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a "green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

### 3. Subsequent Information

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, 153 F.4th at 179 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

#### a. Plaintiff's Continued Detention Prior to His Interrogation

**\*21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

#### b. Plaintiff's Interrogation

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

**\*22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth)

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced

his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

**\*23** Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally

acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch, J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

**\*24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739,

89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons, [18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

#### B. Malicious Prosecution under Section 1983

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562, 144 S.Ct. 1745, 219 L.Ed.2d 262 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019.

*See, e.g., Walsh v. City of New York,* 742 F. App'x 557, 562 (2d Cir. 2018) (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury,* 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

**\*25** Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano,* 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta,* 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g., Werkheiser v. Cnty. of Broome,* 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003)). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago,* 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York,* 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort,* 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello,* 612 F.3d at 163); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell,[19] *see, e.g., Cameron v. City of New York,* 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser,* 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York,* 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello,* 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti,* 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y.

Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

**\*26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkheiser*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at \*13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at

all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

**\*27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at \*13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

**C. Fabricated Evidence under Section 1983**

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also Ortiz,* 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's]

testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting *United States v. Ocampo-Guarin,* 968 F.2d 1406, 1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

**\*28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants. [22]

**D. *Monell* Claim**

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." *Alexander,* 132 F.4th at 160 (citing *Friend v. Gasparino,* 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk,* 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't. of Soc. Servs. of the City of New York,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

*Deferio v. City of Syracuse,* 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet,*

619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at \*12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at \*6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

**\*29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)). The Second Circuit has set forth the following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

> "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green*, 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants

largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

**\*30** The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12.[23] Following that conclusion are signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at \*11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own

testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis*.") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state,"[24] Dkt. No. 85-11 at 9.

**\*31** At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-

employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 972 N.Y.S.2d 169, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.*, 972 N.Y.S.2d 169, 995 N.E.2d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 592, 960 N.E.2d 356 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

**F. Qualified Immunity for the Individual Defendants**

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause

to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

**\*32** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of

the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir.

2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 51 A.D.2d 432, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

**\*33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074). [25]

**G. John Does 1-100**

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

---

## Footnotes

1    The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2    This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3    Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4    A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5    During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6    Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

7    Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8    Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9    The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10    Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11    From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12    The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13    To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14    It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15    Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.*, Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC,

**Adams v. City of Syracuse, Slip Copy (2025)**

https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25    Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656, 134 S.Ct. 1861). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 1163653
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan BANYAN, Plaintiff,
v.
Police Officer Craig SIKORSKI, Police Officer Joseph Tennariello, Lieutenant Ian Rule, Sergeant John Becerra, Esu Officer Paul Brauer, and the City of New York, Defendants.

17-cv-4942 (LJL)
|
Signed 03/26/2021

**Attorneys and Law Firms**

Joshua Luke Rushing, Perry M. Amsellem, Pryor Cashman LLP, New York, NY, for Plaintiff.

Joseph Rizza, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendants Police Officer Craig Sikorski, Police Officer Joseph Tennariello, Lieutenant Ian Rule, Sergeant John Becerra, ESU Officer Paul Brauer.

Joseph Rizza, Kavin Suresh Thadani, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendant The City of New York.

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** Defendants Craig Sikorski ("Sikorski"), Joseph Tennariello ("Tennariello"), Ian Rule ("Rule"), John Becerra ("Becerra"), and the City of New York (collectively "Defendants") move for summary judgment against Plaintiff Jonathan Banyan ("Plaintiff" or "Banyan"). For the following reasons, Defendants' motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

**A. Undisputed Facts**
This case arises out of Plaintiff's arrest on March 20, 2016. The following facts are undisputed. In the early morning, Police Officer Sikorski, Lieutenant Rule, and Police Officer Tennariello were in an unmarked SUV between Seventh and Eighth Avenues in New York. Dkt. No. 176 ¶ 1. Around 4:00 a.m., the officers made a traffic stop of a vehicle on 14th Street. *Id.* ¶ 2. While they were conducting the stop, an individual—whose identity remains unknown—approached the officers and told them that his friend had just been "robbed" of his jacket and "beat up" by three black males, one of whom was wearing a red vest. *Id.* ¶ 3. Taking the complainant with them, the officers drove in the direction the complainant informed them that the three individuals had gone. *Id.* ¶ 4. At Eighth Avenue, the complainant identified a group of three black males, one of whom was Plaintiff here, as the individuals who robbed his friend. *Id.* ¶ 5. The complainant also identified the jacket as one being held by Plaintiff. *Id.* ¶ 6.

Much about what happened next is disputed. *See infra.* Undisputed is that a violent altercation ensued between Plaintiff and Tennariello. *Id.* ¶¶ 8-10. At some point, Sikorski joined the altercation. *Id.* ¶ 15. While the struggle was ongoing, other officers arrived on the scene, one of whom, Sergeant Becerra, deployed his taser on Plaintiff three times. *Id.* ¶¶ 23-26. During the struggle, Plaintiff kicked Rule in the knee. *Id.* ¶ 28. Rule rolled his baton against the back of Plaintiff's Achilles tendon in an effort to subdue him. *Id.* ¶ 29. Finally, with the help of seven or eight other officers, who are not named in this action, Sikorski and Tennariello handcuffed Plaintiff. *Id.* ¶ 30.

After subduing Plaintiff, Defendants took him to the Sixth Precinct, where Plaintiff screamed and cursed at police. *Id.* ¶¶ 31-32. Plaintiff was taken to the hospital by ambulance. *Id.* ¶ 34. Because Plaintiff remained highly agitated, the Emergency Services Unit concluded that they would have to use restraints to get Plaintiff onto a stretcher. *Id.* ¶¶ 38-39. Restraints and a mesh restraint blanket were used to control him. *Id.* ¶ 39.

Plaintiff arrived at Bellevue Hospital around 7:10 a.m. *Id.* ¶ 41. Plaintiff was medically cleared and instructed to take ibuprofen for lower back pain. *Id.* ¶ 42.

Rule suffered injuries during the altercation. *Id.* ¶ 43. He had surgery to repair a torn meniscus in his left knee. *Id.* ¶ 44.

**B. Disputed Facts**
Defendants and Plaintiff offer differing accounts of the struggle, each supported by record evidence. According to Defendants, after the complainant identified Plaintiff and his

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 47 of 181

companions as the individuals who had robbed his friend, Tennariello exited the vehicle, identified himself as a police officer, and told Plaintiff that he was under arrest and to get against a wall. *Id.* ¶ 8. Plaintiff faced the wall, but then grew paranoid and "started screaming 'Help, help, the police are trying to kill me' " and "tried to squirm away." *Id.* ¶ 10. At this point, Tennariello told Plaintiff he was under arrest, but Plaintiff continued to try to escape. *Id.* ¶ 11. Rule identified himself as a police officer and told the other two members of the group to put their hands against the wall. *Id.* ¶ 12. Rule saw that Tennariello and Plaintiff were struggling and directed Sikorski to assist Tennariello. Sikorski saw that Tennariello was holding onto a handcuff that had been attached to Plaintiff's wrist and that Plaintiff continued to resist. *Id.* ¶ 15. Rule used his radio to call for assistance. *Id.* ¶ 16. An unidentified officer grabbed Plaintiff's legs and brought Plaintiff to the ground. *Id.* ¶ 18. As Plaintiff was falling, he grabbed Tennariello's shirt and vest, pulling him to the ground along with him. *Id.* ¶ 19. Once other officers arrived on the scene, Rule went to assist Tennariello and Sikorski. *Id.* ¶ 20. At this point, Becerra, having responded to Rule's radio call, arrived on the scene, and saw Sikorski, Rule, Tennariello, and perhaps one other officer struggling with Plaintiff. *Id.* ¶ 21. Becerra deployed his taser in stun mode to Plaintiff's lower back. *Id.* ¶ 23. After Becerra deployed his taser, Plaintiff continued to resist. *Id.* ¶ 24. Becerra warned Plaintiff that he would deploy the taser again if he continued to resist. *Id.* ¶ 26. Plaintiff continued to resist, and Becerra deployed his taser again. *Id.* ¶ 27. Finally, Sikorski and Tennariello, with the help of seven or eight other officers were able to get Plaintiff's left arm out from underneath him and to handcuff him. *Id.* ¶ 30.

**\*2** Plaintiff tells a different story. According to Plaintiff, Tennariello exited the vehicle with his gun drawn and did not identify himself as a police officer. *Id.* ¶ 8. He tackled Plaintiff and pushed him against the wall. *Id.* Plaintiff asked Tennariello why he was stopping him, but he did not answer his question and told him instead to "shut the f*** up." *Id.* ¶ 10. He then began punching Plaintiff in the face, at which point Plaintiff began to try to escape by squirming. *Id.* Plaintiff maintains that he never fought back, and only that he attempted to squirm away from the violence. *Id.* ¶ 13. At some point, Sikorski joined Tennariello in brutally beating Plaintiff. *Id.* ¶ 14. Plaintiff alleges that no attempt was made to handcuff him until after he was on the ground and had already been beaten. *Id.* ¶ 15. He was tackled so violently that his face struck the pavement and his vision was blurred. *Id.* ¶ 18. Plaintiff denies that he brought Tennariello

to the ground along with him. *Id.* ¶ 19. He maintains that the officers continued to beat him after pinning him to the ground. *Id.* ¶ 21. He also recounts that Becerra used his taser on him, but maintains that he used it three times in quick succession without any warning. *Id.* ¶ 26. Plaintiff denies that he kicked Rule in the leg intentionally, and states that any flailing was merely an attempt to squirm away and protect himself. *Id.* ¶ 28. Plaintiff acknowledges that he was eventually handcuffed, but he denies that this occurred prior to the end of the encounter. *Id.* ¶ 30.

## PROCEDURAL HISTORY

### A. Criminal Proceedings

As a result of the incident described above, Banyan was charged in New York state court with two counts of assault against a police officer in violation of N.Y. Penal Law § 120.05(3) and one count of resisting arrest in violation of N.Y. Penal Law § 205.30. *People v. Banyan*, 187 A.D.3d 643 (1st Dep't 2020). Banyan requested that the jury be given a justification charge, which would have permitted the jury to acquit him if it found that he was acting in self-defense. *Id.* The trial court denied the charge. During jury deliberations, the jury sent several notes to the judge expressing discomfort with the charges. One note questioned whether the jurors could acquit Banyan if they believed the law was immoral and requested instruction on jury nullification. Dkt. No. 170, Ex. D. The trial court told the jury that its request was improper. Banyan was convicted on May 17, 2017 and was sentenced to five years' imprisonment.

Banyan appealed the trial court's decision. On October 27, 2020, the Appellate Division found that the trial court had erred in failing to grant Banyan's request for a justification charge. *Id.* According to the court, "[v]iewed in the light most favorable to the defense, the testimony and video evidence show that after defendant resisted police efforts to handcuff him, approximately eight additional officers joined in a struggle, punching and tasing defendant, and the police lieutenant used a baton to roll defendant's Achilles tendon. These facts warranted a justification charge." *Id.* at 644. The Appellate Division ordered a new trial, which is currently pending.

### B. The Instant Proceedings

Banyan filed the complaint in this case on June 29, 2017, after he was convicted but before that conviction was overturned

for a new trial. Dkt. No. 2. On August 24, 2020, Defendants filed their motion for summary judgment. Dkt. No. 153. On November 10, 2020, Plaintiff wrote to the Court requesting appointment of pro bono counsel to represent him on his summary judgment motion. Dkt. No. 159. The Court granted the request on the same day. Dkt. No. 160.

On November 16, 2020, after the Appellate Division had reversed Plaintiff's criminal conviction and remanded for a new trial, Defendants moved to stay the case pending the resolution of Plaintiff's criminal case. Dkt. No. 162. Plaintiff opposed the motion on November 30, 2020. Dkt. No. 163. On December 2, 2020, the Court denied the motion for a stay. Dkt. No. 167. Plaintiff, now represented by counsel, filed his memorandum of law in opposition to Defendants' motion for summary judgment on February 22, 2021. Dkt. No. 170. Defendants' file their reply on March 22, 2021. Dkt. No. 179.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

**\*3** If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." F.D.I.C. v. Great

Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). Rather, to survive a summary judgment motion, the non-moving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). It "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," Gottlieb v. Cnty. Of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted), but rather must demonstrate more than "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## DISCUSSION

### A. Excessive Force

Plaintiff brings excessive force claims against Rule, Becerra, Sikorski, and Tennariello. Claims for use of "excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) ("The Fourth Amendment prohibits the use of excessive force in making an arrest.") (quoting Graham, 490 U.S. at 395). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment, ... [and] [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97. The application of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by light." Id. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

Case 3:25-cv-01218-GTS-ML   Document 6   Filed 07/02/26   Page 49 of 181

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)

#### 1. Claims against Rule and Becerra

In their memorandum in support of the motion to dismiss, Defendants advance several arguments as to why summary judgment should be granted in favor of Rule and Becerra. Defendants argue that Becerra's use of a taser under the circumstances did not constitute excessive force. *See Crowell v. Kirkpatrick*, 400 F. App'x 592, 595 (2d Cir. 2010) (holding that the use of a taser on individuals who were resisting arrest was reasonable as a matter of law). They argue that because Banyan was resisting the officers, Becerra's use of the taser was lawful. Defendants also argue that using the taser three times was objectively reasonable, in light of the facts that Becerra had arrived on the scene in response to a call for help, had observed the other officers struggling with Banyan, and that Banyan continued to resist after he deployed the taser one time. Dkt. No. 156 at 18-19.

**\*4** As for Rule, Defendants argue that his use of his baton on Banyan's Achilles tendon was objectively reasonable in light of the evidence that Rule saw Banyan resisting the other officers and that Banyan injured Rule's meniscus in the struggle. Dkt. No. 156 at 19. Defendants additionally argue that, because Banyan's medical records showed no injuries to his Achilles tendon or to his legs, no reasonable jury could conclude that Rule's use of force towards Banyan was excessive, even if Rule did kick him or stomp on his legs.

Plaintiff did not answer Defendants' arguments in his response. Plaintiff never mentions Becerra in his brief. As for Rule, Plaintiff mentions in his statement of facts only that Rule yelled at him to raise his hands and performed a "pain-inducing so-called 'compliance technique' by rolling his baton up and down Banyan's Achilles Tendon." Dkt. No. 170 at 8. His opposition contains no arguments responsive to Defendants' arguments regarding Rule and Becerra in their initial brief.

Because Plaintiff has not responded to Defendants' arguments with respect to Rule and Becerra, the Court considers those arguments abandoned. "[A] court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (citing *Jessamy v. City of New Rochelle, N.Y.*, 292 F. Supp. 2d 498, 515 (S.D.N.Y. 2003)). Plaintiff has not disputed Defendants' arguments that Becerra's use of

the taser was reasonable under the circumstances. Nor has Plaintiff responded to the argument that any use of force by Rule was reasonable. Accordingly, these arguments are deemed abandoned and summary judgment is granted against Plaintiff's excessive force claims against Rule and Becerra.

#### 2. Claims against Sikorski and Tennariello

While maintaining that Tennariello and Sikorskis' use of force was reasonable under the circumstances, Defendants concede in their reply that there are material issues of fact concerning the excessive force claims that require a trial. Dkt. No. 179 at 10. Plaintiff has pointed out a number of disputed facts, supported by citations to the record, between Plaintiff's account of events and Defendants' account, including whether Tennariello identified himself as a police officer before tackling Banyan, whether Tennariello told Banyan to get against a wall before tackling him, whether Tennariello began handcuffing Banyan at the beginning of the encounter, and whether the officers used more force than was necessary to apprehend him. Dkt. No. 170 at 2. Because Defendants concede that genuine issues of material facts are disputed with respect to these claims, the Court will not grant summary judgment to these two officers. *See United States v. Int'l Bus. Machines Corp.*, 1975 WL 940, at \*2 (S.D.N.Y. Aug. 6, 1975) ("It is, of course, axiomatic that summary judgment may be granted only when there is no genuine issue as to any material fact.").

#### B. Malicious Prosecution

Defendants argue that the Court should grant summary judgment in their favor on Plaintiff's malicious prosecution claim. "[C]laims for malicious prosecution under § 1983 are 'substantially the same' as claims for 'malicious prosecution under state law.' " *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)). To prevail on a claim for malicious prosecution under New York law, a plaintiff must establish that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (internal quotation marks omitted).

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 50 of 181

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)

**\*5**  At the time Defendants filed their initial motion for summary judgment in this case, Plaintiff's criminal conviction had not yet been reversed by the Appellate Division. Accordingly, Defendants argued that Plaintiff's conviction barred any claim of malicious prosecution, because a plaintiff cannot bring a Section 1983 malicious prosecution claim when the underlying prosecution resulted in a conviction. *See Heck v. Humphrey*, 512 U.S. 477, 489 (1994). Now, however, the conviction has been overturned and the case has returned to the trial court for a new trial.

Because Plaintiff's criminal trial is still ongoing, Plaintiff's claim of malicious prosecution has not yet accrued. A malicious prosecution claim does not accrue until the prosecution has been terminated in favor of the accused. *See id.*("[A] cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor."); *Beckett v. Inc. Vill. of Freeport*, 2014 WL 1330557, at \*2 (E.D.N.Y. Mar. 31, 2014) ("It is axiomatic that ... a claim for malicious prosecution does not arise until the underlying charges are dismissed in the plaintiff's favor."); *see also Thompson v. Rovella*, 734 F. App'x 787, 789 (2d Cir. 2018) (" '[T]he prosecution terminates in the plaintiff's favor,' ... when 'the prosecution against the plaintiff has conclusively ended,' such that 'the underlying indictment or criminal information has been vacated and cannot be revived.' ") (quoting *Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017)); *Sanders v. Simonovic*, 2021 WL 707060, \*5 (S.D.N.Y. Feb. 23, 2021) ("A 'favorable termination' does not occur until the prosecution against the plaintiff has 'conclusively' ended."). Thus, disposition of Plaintiff's malicious prosecution claim must await the resolution of his criminal case.

Plaintiff has opposed a stay of this case pending the outcome of his criminal case. Dkt. No. 163. Accordingly, Plaintiff's claim is dismissed in this case without prejudice as unripe. Plaintiff may replead his malicious prosecution claim when and if the criminal case is resolved in his favor.

### C. False Arrest

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotation marks omitted). "Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested

has committed or is committing a crime." *Id.* In determining whether an officer had probable cause, a court may consider only "those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis omitted).

In their initial brief, Defendants argue that Plaintiff's federal false arrest claim was barred because Plaintiff had been convicted. Since Defendants filed their motion to dismiss, Plaintiff's state court criminal conviction has been overturned. Accordingly, Defendants no longer rely on the state court conviction to argue that Plaintiff had no Section 1983 cause of action for false arrest. Instead, in their reply, Defendants now argue that probable cause to arrest existed because a complainant identified Plaintiff to the police as the individual who beat up and robbed his friend. Defendants argue that those undisputed facts give rise to probable cause.

**\*6**  Plaintiff responds that he "has no knowledge" regarding Defendants' assertions of fact but notes that "newly appointed *pro bono* counsel will move to reopen discovery to adduce inconsistencies in th[e officers'] account[s] or further credibility issues for the officers." Dkt. No. 176 ¶¶ 1-4.

There is no per se rule against the police relying on a tip—even an anonymous one—to make an arrest. *Illinois v. Gates*, 462 U.S. 213, 237-38 (1983). Whether probable cause exists depends on the totality of the circumstances. *Id.* at 230-31; *see also Roberts v. Azize*, 767 F. App'x 196, 200 (2d Cir. 2019) ("Whether an anonymous tip contains sufficient indicia of reliability to support probable cause is a fact-dependent inquiry that largely depends on whether the tipster conveys information that 'demonstrates inside information,' evincing 'a special familiarity with [the subject of the tip's] affairs.' ") (quoting *Alabama v. White*, 496 U.S. 325, 332 (1990)); *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (citation omitted) ("Even a tip from a completely anonymous informant—though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable—can form the basis of reasonable suspicion or probable cause if it is sufficiently corroborated."). Moreover, a non-movant may not resist summary judgment by raising issues of credibility alone. *See Rodriguez v. Schneider*, 1999 WL 459813, at \*1 n.3 (S.D.N.Y. June 29, 1999) ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.").

At the same time, however, the law disfavors granting summary judgment prior to the close of discovery, *see Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery."); *GMA Accessories, Inc. v. Croscill, Inc.*, 2007 WL 766294, at *1 (S.D.N.Y. Mar. 13, 2007) (Lynch, J.) ("[S]ummary judgment motions prior to discovery are disfavored."), and Plaintiff— now represented by counsel—has indicated he will move to take discovery that the unrepresented Plaintiff did not take, Dkt. No. 174 ¶¶ 1-6; *see Rivas v. Suffolk Cnty.*, 2008 WL 45406, at *2 (2d Cir. Jan. 3, 2008) ("Appointed counsel should be given the opportunity to file in the district court any and all motions that counsel deems appropriate, including motions ... to reopen discovery."). In these circumstances, where the case will proceed to trial on the excessive force claim in any event, it would be premature for the Court to rule upon Defendants' summary judgment motion before it has had the opportunity to consider whether discovery should be reopened. The Court's decision is without prejudice to Defendants moving the Court for summary judgment again after pro bono counsel moves to reopen discovery and after any additional period for discovery has closed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Summary judgment is granted with respect to Plaintiff's excessive force claims against Rule and Becerra. Summary judgment is denied with respect to Plaintiff's excessive force claims against Tennariello and Sikorski. Summary judgment is also denied as premature on Plaintiff's false arrest claim, though Defendants have the Court's leave to move for summary judgment again after any motion for additional discovery is decided and any additional discovery is taken. Plaintiff's malicious prosecution claim is dismissed as untimely, without prejudice to renewal when and if Plaintiff's criminal case is resolved in his favor.

**\*7** The Clerk of Court is respectfully directed to close the motion at Dkt. No. 153. Parties are directed to appear for a telephonic status conference on April 8, 2021 at 2:00 p.m. Parties are directed to dial (888) 251-2909 and use access code 2123101. In advance of that conference, the parties are directed to meet and confer regarding Plaintiff's motion to reopen discovery (including the number of depositions Plaintiff seeks leave to take) and a proposed schedule for the remainder of the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1163653

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2156226
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan C. BANYAN, Plaintiff,
v.
Police Officer Craig SIKORSKI, Police Officer
Joseph Tennariello, Lieutenant Ian Rule, Sergeant
John Becerra, The City of New York, Defendants.

17-cv-4942 (LJL)
|
Signed 05/27/2021

**Attorneys and Law Firms**

Joshua Luke Rushing, Perry M. Amsellem, Pryor Cashman LLP, New York, NY, for Plaintiff.

Joseph Rizza, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendants Police Officer Craig Sikorski, Police Officer Joseph Tennariello, Lieutenant Ian Rule, Sergeant John Becerra.

Joseph Rizza, Kavin Suresh Thadani, Nicolette Pellegrino, New York City Law Department, New York, NY, for Defendant The City of New York.

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** Plaintiff Jonathan C. Banyan moves the Court for reconsideration of its Order and Opinion dated March 26, 2021 to the extent that the Opinion held that Plaintiff had abandoned his claims against Lieutenant Ian Rule ("Rule") and Sergeant John Becerra ("Becerra"). For the following reasons, the motion is denied.

**BACKGROUND**

Plaintiff filed the complaint in this case on June 29, 2017, alleging, inter alia, that Defendants Officer Craig Sikorski ("Sikorski"), Officer Joseph Tennariello ("Tennariello"), Lieutenant Rule and Sergeant Becerra used excessive force in arresting him on March 20, 2016. Dkt. No. 2. Defendants moved for summary judgment on all of Plaintiff's claims. Dkt.

No. 153. On November 10, 2020, the Court appointed pro bono counsel to represent Plaintiff, who had previously been proceeding pro se, and, on February 22, 2021, counsel filed its opposition to Defendants' motion for summary judgment. Dkt. No. 170.

By Opinion and Order dated March 26, 2021, the Court denied summary judgment with respect to Plaintiff's excessive force claims against Officers Tennariello and Sikorski. Dkt. No. 181. However, the Court granted summary judgment to Defendants on Plaintiff's excessive force claims against Rule and Becerra, concluding that, because Plaintiff had not addressed any of the arguments raised in Defendants' motion for summary judgment regarding Rule and Becerra, Plaintiff had abandoned those claims. Plaintiff moves for reconsideration. Dkt. No. 182.

**DISCUSSION**

Federal Rule of Civil Procedure 60(a) provides that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a). "A motion for reconsideration should be granted only if the movant identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Spin Master Ltd. v. 158,* 2020 WL 5350541, at \*1 (S.D.N.Y. Sept. 4, 2020) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)). Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000). "The standard for granting a motion for reconsideration 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matter, in other words, that might reasonably be expected to alter the conclusion reached by the Court." *Justice v. City of New York,* 2015 WL 4523154, at \*1 (E.D.N.Y. July 27, 2015) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). A motion for reconsideration "is not a 'vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.' " *Spin Master*, 2020 WL 5350541, at \*1 (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

Case 3:25-cv-01218-GTS-ML Document 6 Filed 07/02/26 Page 53 of 181

Banyan v. Sikorski, Not Reported in Fed. Supp. (2021)

**\*2** The Court concluded in its Order and Opinion on Defendants' summary judgment motion that Plaintiff had abandoned his claims against Rule and Becerra. "A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." *Walker v. City of New York*, 2015 WL 4254026, at \*3 (quoting *Lipton v. Cnty. Of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)). Defendants had set forth, under separate headings in their memorandum of law in support of their motion for summary judgment, arguments in support of granting summary judgment in favor of Rule and Becerra on Plaintiff's claims against them for the use of excessive force. Plaintiff provided no argumentation in his brief in opposition explaining why the claims against Rule and Becerra should not be dismissed. Such a failure to respond to arguments set forth in a moving party's brief is an adequate ground for a Court to deem the claim abandoned. *See, e.g.*, *Gun Hill Road Serv. Station, Inc. v. ExxonMobil Oil Corp.*, 2013 WL 1804493, at \*11 n.5 (S.D.N.Y. Apr. 18, 2013) (holding that a party waived argument in failing to advance it in opposing summary judgment); *cf. Taylor v. Rodriguez*, 238 F.3d 188, 196-97 (2d Cir. 2001) ("[Plaintiff] includes in his appellate brief no argument regarding [certain claims]. Consequently we deem these claims abandoned.").

Plaintiff has not provided any adequate reason for the Court to reconsider its earlier determination. Plaintiff points to record evidence that he claims showed that there were material issues of disputed fact with respect to Rule and Becerra's liability. Regarding Rule—the officer who used his baton on Plaintiff's Achilles tendon—Plaintiff claims that there was evidence on the record contradicting Defendants' argument that Rule's use of his baton on his Achilles tendon was objectively reasonable in light of the evidence that Rule saw him resisting the other officers and that Plaintiff injured Rule in the struggle. Plaintiff points to:

- His averment that: "No officer attempted to handcuff me until the encounter was over." Dkt. No. 172 ¶ 11.

- The statement in his response to Defendants' Rule 56.1 Statement that: "No officer attempted to handcuff Plaintiff until after he was on the ground and had already been repeatedly beaten and abused." Dkt. No. 173 ¶ 15.

- The deposition testimony that Plaintiff was not placed in handcuffs until "[a]fter the abuse." Dkt. No. 171, Ex. C at 63:3-6.

- His averment that: "The officers assaulted me physically, causing me to attempt to squirm away from their abuse ... they were joined by several other officers who all assaulted me variously." Dkt. No. 172 ¶¶ 10, 13.

According to Plaintiff, these statements contradict the officers' account that they witnessed a struggle to apprehend him. If he was not resisting arrest, Plaintiff reasons, then it was not reasonable for Rule to use his baton on his Achilles tendon.

With respect to Becerra—the officer who used his taser on Plaintiff three times—Plaintiff makes the claim that the record supported a finding that there were material facts in dispute regarding the question of whether he had used excessive force. He points to three statements in his summary judgment brief in opposition, which he claims supported his argument that material facts remained in dispute about Becerra's liability:

- "Nor can Defendants establish the reasonableness of their brutal actions by asking this Court to rely upon inferences which Defendants fabricate from limited medical records, with no cross-examination or input from an expert." Dkt. No. 170 at 2.

- "The Defendants cannot rely on defense counsel's interpretation of Banyan's medical record on summary judgment to resolve these critical factual disputes and inquiries." *Id.* at 11-12.

- "Indeed, Defendants' reliance on their own counsel's interpretation of Banyan's medical record to argue that the officers' attack was purportedly insignificant is insufficient as a matter of law to resolve on summary judgment the viciousness of the attack sworn to by Banyan." *Id.* at 12.

**\*3** As the Court noted in its Order and Opinion, nothing in Plaintiff's brief in opposition, outside the caption, mentioned Becerra by name.

Plaintiff's arguments fail to undermine the basis for the Court's decision on summary judgment. Plaintiff points to a few facts in the record that, he claims, demonstrate that genuine issues of material fact remain with respect to Rule and Becerra. But it is not the Court's role, on a motion for summary judgment, independently to scour the record to locate factual material that could support a finding that genuine issues of material fact remain. After the moving party argues that no

genuine issue of material facts exists, it is the obligation of the party opposing summary judgment to show, based upon the record, the existence of genuine issues of fact and to identify why they are material with respect to the claims on which the moving party seeks summary judgment. Plaintiff did not address Defendants' arguments in his opposition brief. He did not respond to the argument that Rule's use of his baton on his Achilles tendon was objectively reasonable in light of the evidence that Plaintiff was resisting the other officers and that he injured Rule's meniscus in the struggle. Nor did Plaintiff address the argument that Becerra's use of his taser was lawful, given that he was resisting the officers and that he continued to resist after Becerra used his taser the first time. The Court deemed the claims against Rule and Becerra abandoned, because Plaintiff failed to address Defendants' arguments in his brief in opposition. On this motion for reconsideration, Plaintiff has presented nothing that would lead the Court to reevaluate that conclusion.

Plaintiff further argues that, because he explicitly abandoned other claims, but not the claims against Rule and Becerra, the Court should have inferred that he did not intend to abandon the claims against Rule and Becerra. The argument is a non-sequitur. A court may find that a party has abandoned its claim, whether or not it explicitly states an intention to abandon such claim. The test of abandonment is whether the party "respond[ed] to a defendant's arguments that the claim should be dismissed." *Walker*, 2015 WL 4254026, at *3 (quoting *Lipton*, 315 F. Supp. 2d at 446). Plaintiff did not do so here.

Plaintiff finally makes the argument that he has shown by filing this motion for reconsideration that he does not wish to abandon his claims against Rule and Becerra, and that the Court should accordingly revive the claims. This proposition is not supported by law. In support of his argument, Plaintiff

relies upon *Currin v. Williams*, 2009 WL 10676979 (D. Conn. Jan. 30, 2009). In *Currin*, the court had dismissed plaintiffs' claims for failure to prosecute and to comply with court orders. *Id.* at *1. Plaintiff, who was proceeding pro se, filed a motion for reconsideration, claiming that, because of problems with mail delivery, he had not received the court's warnings that his case would be dismissed. *Id.* He filed his motion for reconsideration once he learned of the court's ruling. *Id.* The court held that, because of plaintiff's pro se status, he was entitled to the benefit of the doubt that he did not know his case was at risk of being dismissed and that by filing, plaintiff had demonstrated his intent to prosecute. *Id.*

**\*4** This motion for reconsideration bears no resemblance to the motion in *Currin*. In *Currin*, the plaintiff was proceeding pro se and his case had been dismissed for failure to prosecute. Here, Plaintiff is counseled and is asking for certain claims, which he already had the opportunity to pursue and chose not to so pursue, to be revived. Under these circumstances, a Plaintiff's motion for reconsideration standing alone cannot restore claims that the Plaintiff through its opposition to summary judgment previously abandoned.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration is DENIED. The Clerk of Court is respectfully directed to close the motion at Dkt. No. 182.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2156226

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 56 of 181

forms the basis of defendants' motion to dismiss— the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 57 of 181

Brown v. Peters, Not Reported in F.Supp. (1997)

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 60 of 181

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

**Footnotes**

1       I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5425501
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Eileen CASINO, Plaintiff,
v.
" 'Mr R. ROHL' or 'John Doe' Owner/Administrator
of Woodhaven Nursing Home," Defendant.

No. 14–CV–2175 (SJF)(GRB).
|
Signed Oct. 23, 2014.

**Attorneys and Law Firms**

Eileen Casino, South Haven, NY, pro se.

## ORDER

FEUERSTEIN, District Judge.

**\*1** On April 3, 2014, *pro se* plaintiff Eileen Casino ("plaintiff")[1] filed a fourth *in forma pauperis* complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") challenging the quality of care Donato J. Casino allegedly received at, *inter alia,* Woodhaven Nursing Home ("Woodhaven"),[2] accompanied by an application to proceed *in forma pauperis*. On May 30, 2014, plaintiff filed an amended complaint pursuant to Section 1983 against ' "MR. R. ROHL' or 'JOHN DOE' Owner/Administrator of Woodhaven Nursing Home" ("defendant").

Since plaintiff's financial status, as set forth in her declaration in support of her application to proceed *in forma pauperis,* qualifies her to commence this action without prepayment of the filing fees, *see* 28 U.S.C. § 1915(a)(1), her application to proceed *in forma pauperis* is granted. However, for the reasons set forth below, the amended complaint is *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim for relief.

I. Background

A. Prior Litigation

1. The First Casino Action

On September 11, 2013, plaintiff filed in this Court, *inter alia,* a complaint pursuant to Section 1983 against Brian Cassidy ("Cassidy") and "Mr, Rohl, as owner/admin,"[3] among others, alleging violations of Mr. Casino's civil rights relating to his treatment and care in an unidentified nursing home and to court proceedings in which Cassidy acted as his law guardian, which was assigned docket number 13–CV–5095 ("the first action"). By Order dated November 8, 2013, *inter alia:* (1) plaintiff's claims in the first action were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) for lack of standing and failure to state a claim for relief; and (2) Mr. Casino's claims in the first action were *sua sponte* dismissed without prejudice on the basis that plaintiff, who is not an attorney, could not assert *pro se* claims on his behalf.

2. The Second Complaint

On October 28, 2013, plaintiff filed another complaint in this court pursuant to Section 1983 against "Stonybrook [sic] University Medical Center" ("Stony Brook"), Cassidy and Woodhaven alleging, *inter alia,* that those defendants were "not always acting in the best interest of [Mr.] Casino or his family or according to all our wishes" and "unfair competition for family time with my husband" (Compl. under docket number 13–6357 at 1–2), which was assigned docket number 13–CV–6357 ("the second action"). By Order dated January 27, 2014, *inter alia:* (1) plaintiff's claims against Stony Brook were *sua sponte* dismissed for lack of subject matter jurisdiction pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure; (2) plaintiff's Section 1983 claims against Woodhaven and Cassidy were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim for relief; and any state law claims were dismissed without prejudice pursuant to 28 U.S.C. § 1367.

3. The Third Complaint

**\*2** On or about January 22, 2014, plaintiff filed a third complaint ("the third action") pursuant to Section 1983 on behalf of herself and Mr. Casino against Stony Brook, Cassidy, Woodmere Nursing Home ("Woodmere") and the New York State Mental Health Court ("the State Court") alleging, *inter alia,* that those defendants' actions concerning Mr. Casino's care were "against [the] best interest[s] & wish[es] of p[atien]t & [his] family resulting in setbacks of health at Stonybrook [sic] Hospital" (Compl. under docket number 14–CV–00629 at ¶ III), which was assigned docket number 14–CV–00629 ("the third action"). By Order dated April 10, 2014, *inter alia:* (1) plaintiff's claims against Stony

Brook and the State Court were *sua sponte* dismissed pursuant to Rule 12(h) (3) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction; (2) plaintiff's Section 1983 claims against Woodmere and Cassidy were *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) for failure to state a claim for relief; (3) any state law claims were dismissed without prejudice pursuant to 28 U.S.C. § 1367; and (4) Mr. Casino's claims were *sua sponte* dismissed without prejudice because plaintiff, who is not an attorney, could not assert *pro se* claims on his behalf.

B. The Instant Complaint [4]

Since the original complaint filed by plaintiff was not signed, the Court's *pro se* office sent plaintiff a Notice of Deficiency ("Notice") on May 14, 2014, informing her that she must file a signed complaint within fourteen (14) days from the date of the Notice in order to proceed with this case. [See Docket Entry No. 5]. On May 30, 2014, plaintiff filed a signed amended complaint against defendant alleging that the "right to life[,] liberty[,] happiness guarantee [sic] in Constitution of USA was denied [and] there is now wrongful death of Donato Casino caused by criminal negligence [and] human rights abuses." (Amended Complaint ["Am. Compl."], ¶ II(B)) (case converted to lowercase).

The following is plaintiff's statement of her claims against defendant in the amended complaint, which she alleges occurred "[b]etween June of 2013–Sept 10 of 2013," (Am.Compl., ¶ III(A));

"At all visits from myself I found Dan in a dark room, no company, no radio or tv turned on, on his back, no care given yet that day incl. no diaper change or feeding or fluid/ice [indecipherable] Approx. 2 visits or more per [week]. Approx. 2 [weeks] per [month]. Actually Dan on their premises....

[ ] No ability or available call bell[.]

[ ] 'Sterile['] dressing table filthy at each visit[.]

[ ] 'Sterile' dressing to be used left on table unattended, open to dirty air for who knows how long w/ointments on them open to air[ .]

5 different hosp. stays-only they sent him later rather than in timely fashion. Also-last hosp. stay at Stony Brook Hosp. was 5 months from Sept–2013 to end of Jan/Feb '14[,] which consisted of health crisis after health crisis requiring heroic means to save Dan's life during that 5 mos.

After [transfer] to new home in Nassau Co. Dan was never the same-responsive, but min. interactive–1 more stay at Franklin Hosp. (2–3 wk) back to Woodmere-then final stay at S. Nassau Hosp. Dan did not get his last wish for me to be by his side in his last hour because of location. I arr[ived] at Nassau after (Cassidy) (law guardian) approved a DNR.

**\*3** At Nassau Hosp.–3 handwritten pps. of meds scheduled on 1 shift shown to me[.] Feeding at 30 ml. (only 1/3 what they [brought] him up to at Franklin (90 ml) still insufficient for his frame[.) ]

I *saw* 5 dark spots (large) on Doplar in his stomach-they were ulcers, yet hosp. claims they could not determine cause of bleeding or infection. Nassau continued use of Tylenol, though Franklin had said they would not use it-contraindicated by a condition Dan had.

Woodmere had Dan off [of] ventilator, IV P/C Line, feeding & hydration at 2 visits and failed [indecipherable] to hosp[.]"

(Am.Compl.¶¶ III–IV) (emphasis in original; case converted).

Plaintiff seeks, *inter alia,* compensatory damages in the amount of "½ a million dollars."

(Am.Compl.¶ V) (case converted).

II. Discussion

A. Standard of Review

Under the *in forma pauperis* statute, 28 U.S.C. § 1915(e) (2) (B), a district court must dismiss a complaint if it "(i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

It is axiomatic that district courts are required to read *pro se* complaints liberally, *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir.2013), and to construe them "to raise the strongest arguments that they suggest." *Gerstenbluth v. Credit Suisse Securities (USA) LLC,* 728 F.3d 139, 142–43 (2d Cir.2013) (quotations and citations omitted). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations in the complaint." *Harrington v. Cnty. of Suffolk,* 607 F.3d 31, 33 (2d Cir.2010);

see also *Ashcroft v. Iqbal* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Nevertheless, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868; *see also In re Amaranth Natural Gas Commodities Litig.,* 730 F.3d 170, 180 (2d Cir.2013).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929); *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 717 (2d Cir.2013) (accord). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 127 S.Ct. at 1959, 167 L.Ed.2d 929.

### B. Section 1983

**\*4** Section 1983 of Tile 42 of the United States Code provides, in relevant part:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally

guaranteed rights 'under color' of state law." *Filarsky v. Delia,* —— U.S. ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). Thus, to state a Section 1983 claim, a plaintiff must allege: (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Paulk,* —— U.S. ——, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012).

Although Section 1983 liability may only be imposed upon wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it," *Nat'l Collegiate Athletic Ass'n. v. Tarkanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (quotations and citation omitted); *see also Hafer v. Melo,* 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Congress enacted § 1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." (quotations and citations omitted)), "[a] private actor may be liable under § 1983 * * * if there is a sufficiently close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Sykes v. Bank of Am.,* 723 F.3d 399, 406 (2d Cir.2013) (quotations, internal quotations and citations omitted); *see also Fabrikant v. French,* 691 F.3d 193, 206–07 (2d Cir.2012) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action. * * * [T]here must be such a close nexus between the state and the challenged action that the state is responsible for the specific conduct of which the plaintiff complains." (quotations, alterations, emphasis and citations omitted)). "Anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." *Filarsky,* 132 S.Ct. at 1661 (quotations and citation omitted); *see also Fabrikant,* 691 F.3d at 207 ("The fundamental question * * * is whether the private entity's challenged actions are 'fairly attributable' to the state." (quoting *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982))). "Three main tests have emerged:

**\*5** For the purposes of section 1983, the actions of a nominally private entity are attributable to the state ... (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the state ('the public function test')."

*Fabrikant,* 691 F.3d at 207 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (alteration in original)).

Defendant, as the owner or administrator of Woodhaven, a private nursing home, was not acting "under color of state law" for purposes of Section 1983 with respect to the conduct alleged in the amended complaint. *White v. St. Joseph's Hosp.,* 369 F. App'x 225, 226 (2d Cir. Mar.10, 2010) (summary order) ("[P]rivate actors and institutions, such as the * * * nursing home * * * are generally not proper Section 1983 defendants because they do not act under color of state law. * * * [T]he presence of state funding or regulation, in the absence of some concerted action with state officials, does not transform a private party's actions into state action."); *Baum v. Northern Dutchess Hosp.,* 764 F.Supp.2d 410, 430–33 (N.D.N.Y.2011) (dismissing Section 1983 claims against private nursing home because it is not a state actor); *Mitchell v. Home,* 377 F.Supp.2d 361, 370 (S.D.N.Y.2005) (accord).

Moreover, in order to state a claim for relief under Section 1983, a plaintiff must allege the personal involvement of the defendant in the purported constitutional deprivation. *Spavone v. New York State Dep't of Corr. Servs.,* 719 F.3d 127, 135 (2d Cir.2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)); *Grullon v. City of New Haven.* 720 F.3d 133, 138–39 (2d Cir.2013).

"Personal involvement" may be established by evidence of direct participation by a supervisor in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of New York,* 352 F.3d 733, 753 (2d Cir.2003); see also *Grullon,* 720 F.3d at 139. "An individual cannot be held liable for damages under Section 1983 'merely because he held a high position of authority'...." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). A complaint based upon a violation under Section 1983 that does not allege the personal involvement of a defendant fails as a matter of law. *See Costello v. City of Burlington,* 632 F.3d 41, 48–49 (2d Cir.2011).

**\*6** Since, *inter alia,* defendant is nowhere mentioned or referenced in the body of the amended complaint, plaintiff has not adequately pled his personal involvement in any of the constitutional deprivations alleged in the amended complaint. Accordingly, plaintiff's Section 1983 claims are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) for failure to state a claim for relief.

### 1. Leave to Amend

Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." Although, "when addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Thompson v. Carter.* 284 F.3d 411, 416 (2d Cir.2002) (quotations and citation omitted), leave to amend is not required, *inter alia,* where a proposed amendment would be futile. *See Grullon,* 720 F.3d at 140; *Anderson News, L.L.C. v. American Media, Inc.,* 680 F.3d 162, 185 (2d Cir.2012), *cert. denied sub nom Curtis Circulation Co. v. Anderson News, L.L.C.,* —— U.S. ——, 133 S.Ct. 846, 184 L.Ed.2d 655 (2013). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Panther Partners. Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 119 (2d Cir.2012).

Since, *inter alia,* even a liberal reading of the amended complaint does not give any indication that plaintiff can state a plausible federal claim against defendant, and this is plaintiff's fourth unsuccessful attempt to litigate essentially the same claims, any amendment to the amended complaint to replead the Section 1983 claims against defendant would be futile. Accordingly, plaintiff's Section 1983 claims against defendant are dismissed with prejudice.

### C. Supplemental Jurisdiction

Although the dismissal of state law claims is not required when the federal claims in an action are dismissed, *see Wisconsin Dep't of Corr. v. Schacht,* 524 U.S. 381, 391–92, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998), a federal court may decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U .S.C. § 1367(c)(3). *See Carlsbad Tech., Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 129 S.Ct. 1862, 1866–1867, 173 L.Ed.2d 843 (2009) (holding that a district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary); *Lundv v. Catholic Health Svs. of Long Island Inc.,* 711 F.3d 106, 117 (2d Cir.2013) ("The exercise of supplemental jurisdiction is within the sound discretion of the district court."). The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over the pendent state law claims. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Lundy,* 711 F.3d at 117–18 (accord). Generally, where all of the federal claims in an action are dismissed before trial, the balance of factors will favor declining to exercise supplemental jurisdiction over the remaining state law claims. *See Cohill,* 484 U.S. at 350 n. 7; *Lundy,* 711 F.3d at 118 ("Once all federal claims have been dismissed, the balance of factors will usually point toward a declination."); *Delaney v. Bank of Am. Corp.,* 766 F.3d 163, 170 (2d Cir.2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (quotations and citation omitted)).

**\*7** In light of the dismissal of all federal claims in this action prior to service of a summons and the amended complaint upon defendant, and upon consideration of all relevant factors, i.e., judicial economy, convenience, fairness and comity, I decline to exercise supplemental jurisdiction over any remaining state law claims in this action. Accordingly, to the extent the amended complaint asserts any state law claims, those claims are dismissed without prejudice pursuant to 28

U.S.C. § 1367(c)(3). Plaintiff is advised that pursuant to 28 U.S.C. § 1367(d), the statute of limitations for any state law claims, to the extent those claims were timely filed in this Court, is tolled for a period of **thirty (30) days after the date of this order,** unless a longer tolling period is otherwise provided under state law.

### D. Filing Injunction

Under the All Writs Act, district courts are empowered to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act grants district courts the power, under certain circumstances, to enjoin parties from filing further lawsuits." *MLE Realty Assocs. v. Handler,* 192 F.3d 259, 261 (2d Cir.1999); *see also Matter of Hartford Textile Corp.,* 613 F.2d 388, 390 (2d Cir.1979) (holding that the All Writs Act "grant[s] the district court power sua sponte to enjoin further filings in support of frivolous and vexatious claims.") "The district courts have the power and the obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel." *Lau v. Meddaugh,* 229 F.3d 121, 123 (2d Cir.2000) (quotations and citation omitted); *see also Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system." (quotations and citations omitted)); *Safir v. United States Lines, Inc.,* 792 F.2d 19, 24 (2d Cir.1986) ("A district court not only may but should protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation." (quoting *Abdullah v. Gatto.* 773 F.2d 487, 488 (2d Cir.1985) (*per curiam* )).

"The filing of repetitive and frivolous suits constitutes the type of abuse [of the judicial process] for which an injunction forbidding further litigation may be an appropriate sanction." *Shafii v. British Airways, PLC,* 83 F.3d 566, 571 (2d Cir.1996); *see also Lau,* 229 F.3d at 123 ("The issuance of a filing injunction is appropriate when a plaintiff abuses the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive proceedings." (quotations, alterations and citations omitted)). The following factors should be considered in determining whether to restrict a litigant's future access to the courts:

**\*8** "(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, *e.g.,* does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigation has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties."

*Safir,* 792 F.2d at 24; *see also Iwachiw v. New York State Dep't of Motor Vehicles,* 396 F.3d 525, 528 (2d Cir.2005) (accord). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir.* 792 F.2d at 24.

The court must first provide a litigant with notice and an opportunity to be heard before imposing a filing injunction, *see Lau,* 229 F.3d at 123; *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) (*per curiam),* and the filing injunction must be narrowly tailored so as to preserve the litigant's right of access to the court, *see Bd. of Managers of 2900 Ocean Ave. Condo. v. Bronkovic,* 83 F.3d 44, 45 (2d Cir.1996) (holding that filing injunctions "must be appropriately narrow."); *e.g. SBC 2010–1, LLC v. Morton,* 552 F. App'x 9, 12–13 (2d Cir. Dec.18, 2013) (summary order) (affirming the district court's issuance of a filing injunction on the basis, *inter alia,* that it was "narrowly crafted"); *Malcolm v. Bd. of Educ. of Honeoye Falls–Lima Cent. Sch. Dist.,* 506 F. App'x 65, 70 (2d Cir. Dec.26, 2012) (summary order) (accord).

This lawsuit is plaintiff's fourth unsuccessful attempt in this Court to litigate essentially the same claims regarding the treatment and care of Mr. Casino since September 2013. Given the court's "obligation to protect the public and the efficient administration of justice from individuals who have a history of litigation entailing vexation, harassment and needless expense to other parties and an unnecessary burden on the courts and their supporting personnel," *Lau,* 229 F.3d

at 123, ***plaintiff is warned that similar, future actions will not be tolerated.*** If plaintiff persists in filing actions asserting claims previously asserted and dismissed by this Court with prejudice or for lack of subject matter jurisdiction, the Court will issue an order to show cause why she should not be required to seek leave of this Court before filing any future actions in this Court.

Finally, plaintiff is cautioned that Rule 11 of the Federal Rule of Civil Procedure applies to *pro se* litigants, *see Maduakolam v. Columbia Univ.,* 866 F.2d 53, 56 (2d Cir.1989) ("Rule 11 applies both to represented and *pro se* litigants \* \* \*."); *e.g., Ginther v. Provident Life and Cas. Ins. Co.,* 350 F. App'x 494, 496 (2d Cir.2009) (affirming a district court's imposition of Rule 11 sanctions against a *pro se* litigant), and that should she file another frivolous action, it is within the Court's authority to consider imposing sanctions upon her. *See* Fed.R.Civ.P. 11.[5]

III. Conclusion

**\*9** For the reasons set forth above, plaintiffs application to proceed *in forma pauperis* is granted; plaintiff's Section 1983 claims against defendant are *sua sponte* dismissed in their entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) for failure to state a claim for relief; any state law claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3); and any claims asserted by plaintiff on behalf of her children and grandchild are dismissed without prejudice. ***Plaintiff is warned that her repetitive filing of actions in this Court asserting similar claims relating to the care and treatment of Mr. Donato will not be tolerated.*** If plaintiff persists in filing actions asserting claims previously asserted and dismissed by this Court with prejudice or for lack of subject matter jurisdiction, the Court: (1) ***will issue an order to show cause why she should not be required to seek leave of this Court before filing any future actions in this Court relating to the care and treatment of Mr. Donato;*** and (2) will consider imposing sanctions upon her pursuant to Rule 11 of the Federal Rules of Civil Procedure.

The Clerk of the Court shall close this case and, pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, serve notice of entry of this Order upon all parties as provided in Rule 5(b) of the Federal Rules of Civil Procedure and record such service on the docket.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good

faith and therefore in forma pauperis status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5425501

## Footnotes

1    Although the caption of the complaint indicates that plaintiff is also asserting claims on behalf of her "children and grandchild," "[a] person who has not been admitted to the practice of law may not represent anybody other than himself." *Guest v. Hansen,* 603 F.3d 15, 20 (2d Cir.2010); *see* 28 U.S.C. § 1654. Accordingly any claims asserted by plaintiff on behalf of her children and grandchild are dismissed without prejudice.

2    As set forth below, each of plaintiff's earlier cases were *sua sponte* dismissed.

3    In her application to proceed *in forma pauperis* in this action, plaintiff identifies Mr. Rohl as the "owner/ administrator" of Woodhaven. (Application to Proceed *In Forma Pauperis* ["IFP Applic."] at 1).

4    All material allegations in the Complaint are assumed to be true for the purposes of this order, *see, e.g. Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 58 (2d Cir.1998) (in reviewing a *pro se* complaint for *sua sponte* dismissal, a court is required to accept the material allegations in the complaint as true), and do not constitute findings of fact by the Court.

5    This Court's April 10, 2014 order in the third action also warned plaintiff that the Court is considering issuing an order to show cause why a filing injunction should not be imposed upon her and imposing sanctions upon her pursuant to Rule 11 of the Federal Rules of Civil Procedure based upon her filing of repetitive and frivolous lawsuits. However, this action was commenced one (1) week before the Court issued the April 10, 2014 order.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady County Jail;
Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

### *DECISION and ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

**\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

## Footnotes

1       Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 428247
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Daniel CRUZ, Plaintiff,
v.
VILLAGE OF SPRING VALLEY et al., Defendants.

No. 21-CV-2073 (KMK)
|
Signed 02/11/2022

**Attorneys and Law Firms**

John V. Decolator, Esq., Garden City, NY, Counsel for Plaintiff.

Vernee Ciara Pelage, Esq., Brian S. Sokoloff, Esq., Sokoloff Stern LLP, Counsel for Defendants Village of Spring Valley, Spring Valley Police Department, and Police Officer Timothy Ward.

Robert Benjamin Weissman, Esq., Saretsky Katz & Dranoff, LLP, Elmsford, NY, Counsel for Defendant County of Rockland and County of Rockland District Attorney.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Daniel Cruz ("Cruz" or "Plaintiff") brings this Action under 42 U.S.C. § 1983 and state law against the Village of Spring Valley ("Spring Valley"), the Spring Valley Police Department, Police Officer Timothy Ward ("Ward"), Police Officer John Doe (together, the "Spring Valley Defendants"), the County of Rockland ("Rockland County"), and the Rockland County District Attorney, (together, the "Rockland County Defendants" and collectively, "Defendants") alleging false arrest and imprisonment, malicious prosecution, negligence, intentional infliction of emotional distress, and violation of Plaintiff's Fifth, Sixth, and Fourteenth Amendment rights. (*See generally* Am. Compl. (Dkt. No. 15).) Before the Court is the Rockland County Defendants' Motion To Dismiss the Amended Complaint as against the Rockland County Defendants (the "Motion"), filed pursuant to Federal Rule of Civil Procedure 12(b)(6). (Not. of Mot. (Dkt. No. 21).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background
Unless otherwise stated, the following facts are drawn from Plaintiff's Amended Complaint and are assumed true for the purpose of resolving the instant Motion.[1] *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

On October 23, 2013, Plaintiff was panhandling outside a store in Spring Valley, New York. (Am. Compl. ¶ 17.) Ward, an undercover Spring Valley police officer, approached Plaintiff and asked where he could obtain drugs. (*Id.* ¶ 18.) Plaintiff told Ward he could obtain marijuana and crack cocaine for him and used Ward's phone to make a call. (*Id.* ¶ 19.) Plaintiff and Ward then bicycled to an apartment complex, where Plaintiff took $40 from Ward, left for approximately five to ten minutes, and returned with two bags of marijuana and a bag of crack cocaine, which he gave to Ward. (*Id.* ¶ 20.) Plaintiff also purchased a small bag of crack cocaine for himself, which he immediately started smoking with a crack pipe. (*Id.* ¶ 20–21.) Plaintiff also asked Ward for a small amount of the crack cocaine Ward had purchased. (*Id.* ¶ 22.) Ward gave Plaintiff a small amount of crack cocaine from his bag, and Plaintiff smoked that piece of crack in front of Ward. (*Id.*)

On October 29, 2013, Plaintiff was panhandling in front of the same store when he was again approached by Ward, who asked Plaintiff for the "same thing" as last time. (*Id.* ¶ 23.) Plaintiff again used Ward's phone to make a phone call, bicycled with Ward to a location near Lake Street in Spring Valley, took $40 from Ward, left for approximately five or ten minutes, and returned with a quantity of marijuana and crack cocaine. (*Id.* ¶ 24.) Plaintiff again asked Ward for some of the crack cocaine, and after Ward gave him some, Plaintiff smoked that portion in front of Ward. (*Id.* ¶ 25.)

**\*2** On May 14, 2014, Plaintiff was arrested and detained by an unknown police officer. (*Id.* ¶ 26.) Plaintiff alleges that the officer placed Plaintiff in handcuffs that were too tight. (*Id.* ¶ 28.) Plaintiff was arraigned and charged with criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree. (*Id.* ¶ 33.) Plaintiff was indicted by a grand jury, but the indictment was dismissed "because the prosecution had failed to instruct the grand jury on the defense of agency." (*Id.* ¶ 52.) However,

on appeal the appellate court reinstated the indictment. (*Id.* ¶ 53.)

After a jury trial in 2017, Plaintiff was convicted of criminal sale of a controlled substance in the third degree. (*Id.* ¶ 54.) Plaintiff was found not guilty of criminal possession of a controlled substance in the third degree, but he was convicted of the lesser included offense of criminal possession of a controlled substance in the seventh degree. (*Id.*)

Plaintiff appealed, and the appellate court vacated his conviction for criminal sale of a controlled substance in the third degree. (*Id.* ¶ 55.) According to Plaintiff, the appellate court found that "the prosecution had failed to satisfy any of the nine (9) criteria or factors that must be considered when evaluating an agency defense." (*Id.* ¶ 56.) On November 21, 2019, after having been incarcerated for five and a half years "with exceptions," Plaintiff was released from prison. (*Id.* ¶¶ 34, 57.) [2]

The Amended Complaint brings five causes of action: (1) false arrest claims under New York State common law and 42 U.S.C. § 1983 against the Spring Valley Defendants, (*id.* ¶¶ 58–76); (2) malicious prosecution claims under New York State common law and 42 U.S.C. § 1983 against the Rockland County Defendants, (*id.* ¶¶ 77–86); (3) a claim of negligent hiring, training, supervision and retention in connection with the conduct of Officers Ward and Doe against the Spring Valley Defendants, (*id.* ¶¶ 87–96); (4) a § 1983 *Monell* policy claim against the Spring Valley Defendants, (*id.* ¶¶ 97–111); and (5) a claim for punitive damages against all Defendants, (*id.* ¶¶ 112–114.) On May 27, 2021, Plaintiff withdrew the fifth cause of action for punitive damages and the state law malicious prosecution claims against the Rockland County Defendants. (Pl.'s Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") at 3 (Dkt. No. 28).)

### B. Procedural History

Plaintiff originally filed his Complaint in the Supreme Court of the State of New York for Rockland County on February 18, 2021. (Dkt. No. 1-1.) On March 10, 2021, the Rockland County Defendants filed a Notice of Removal to remove the case to the United States District Court for the Southern District of New York. (Dkt. No. 1.) On March 12, 2021, the Rockland County Defendants filed a letter outlining the grounds for their anticipated motion to dismiss. (Dkt. No. 3.) On March 17, 2021, the Spring Valley Defendants also filed a letter outlining the grounds for their anticipated motion

to dismiss. (Dkt. No. 6.) On April 28, 2021, after seeking permission from the Court, (*see* Dkt. No. 12), Plaintiff filed an Amended Complaint, (Dkt. No. 15). On May 27, 2021, the Spring Valley Defendants filed an Answer to the Amended Complaint. (Dkt. No. 17.) On June 3, 2021, the Rockland County Defendants filed another pre-motion letter outlining the grounds for their anticipated motion to dismiss, (Dkt. No. 19), and the same day, the Court set a briefing schedule, (Dkt. No. 20). Also on June 3, 2021, the Rockland County Defendants filed their Motion to Dismiss and accompanying papers. (Dkt. Nos. 21–23.) On August 12, 2021, Plaintiff filed an Opposition, (Dkt. No. 28), and the Rockland County Defendants replied on August 25, 2021, (Dkt. No. 29.)

### II. Discussion

#### A. Standard of Review

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 72 of 181

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

1. Eleventh Amendment

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alteration and quotation marks omitted). "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983." *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)).

"The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Gollomp*, 568 F.3d at 366 (alteration omitted). This includes prosecutors. *See Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997) ("To the extent [the plaintiff] seeks damages from [former and current prosecutors] in their official capacities, the Eleventh Amendment bars his claims."); *see also D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) ("[I]f a district attorney or an assistant attorney acts as a prosecutor, [he or] she is an agent of the State, and therefore immune from suit in [his or] her official

capacity."); *Dejesus-Vasquez v. Bethencourt*, No. 19-CV-967, 2020 WL 1047909, at *5 (S.D.N.Y. Mar. 4, 2020) (dismissing claims against district attorney and assistant district attorney as barred by the Eleventh Amendment).

Thus, to the extent that Plaintiff asserts claims against the Rockland County District Attorney in his official capacity, those claims are dismissed.

2. Prosecutorial Immunity

"Absolute immunity protects a prosecutor not only from liability but also from suit." *Ogunkoya v. Monaghan*, 913 F.3d 64, 67 (2d Cir. 2019) (citation and quotation marks omitted); *see also Barnett v. City of Yonkers*, No. 15-CV-4013, 2020 WL 2539005, at *4 (S.D.N.Y. May 19, 2020) (same). Prosecutors are entitled to absolute immunity from civil suits for damages under § 1983 when "function[ing] as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004) (citation and quotation marks omitted); *see also Kroemer v. Tantillo*, 758 F. App'x 84, 86–87 (2d Cir. 2018) ("Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate." (alterations and quotation marks omitted) (*quoting Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995))). However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts apply "a functional approach, which looks to the nature of the function performed [by the prosecutor], not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations and quotation marks omitted); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (noting that courts "must take account of ... 'functional' considerations" in deciding "whether absolute immunity attaches to a particular kind of prosecutorial activity" (citations omitted)).

**\*4** It is clear that "the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions" covered by absolute immunity. *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (*citing Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also*

*Hill,* 45 F.3d at 661 (noting that absolute immunity covers such acts as "initiating a prosecution and presenting the case" in court proceedings (citations omitted)). Also covered is prosecutors' "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley,* 509 U.S. at 273. Absolute immunity even protects "the knowing presentation of perjured testimony to a grand jury, without any prosecutorial involvement in its earlier inducement." *Bernard,* 356 F.3d at 506 (citation omitted); *see also Hill,* 45 F.3d at 661 (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)). Furthermore, a prosecutor's motives for actions that are deemed to be within his or her role as an advocate are irrelevant for purposes of absolute immunity. *See Shmueli,* 424 F.3d at 237–38 (holding that absolute immunity is "not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy"); *Bernard,* 356 F.3d at 503 (holding that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused" (citation omitted)).

By contrast, "[w]hen a [prosecutor] functions outside his or her role as an advocate for the People, the shield of [absolute] immunity is absent." *Hill,* 45 F.3d at 661. Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley,* 509 U.S. at 273 (citation and quotation marks omitted); *see also Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir. 1998) ("[W]hen a prosecutor ... performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (citations and quotation marks omitted)). In determining whether a prosecutor is functioning within a prosecutorial or an investigative role, courts must look to the prosecutor's general "role and function in an ongoing proceeding," and will reach a determination based "chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Ogunkoya,* 913 F.3d at 70 (citation and quotation marks omitted).

Here, Plaintiff makes no allegations suggesting that the prosecution engaged in investigatory functions. Nor does Plaintiff claim that any allegedly investigatory acts by the prosecution were done prior to or independent from the "judicial phase of the criminal process." *DiBlasio v. Novello,* 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler,* 424 U.S. at 430); *see also Scalpi v. Town of E. Fishkill,* No. 14-CV-2126, 2016 WL 858955, at *10 (S.D.N.Y. Feb. 29, 2016) ("The [a]mended [c]omplaint's generalized allegations fail to adequately allege that either [of the defendant prosecutors] functioned in any way that would prevent immunity from attaching."); *Watson v. Grady,* No. 09-CV-3055, 2010 WL 3835047, at *18 (S.D.N.Y. Sept. 30, 2010) ("Even construed liberally, [the] [p]laintiff does not allege any particular acts of investigative misconduct by [the defendant prosecutors.]").

Accordingly, Plaintiff's claims against the Rockland County District Attorney in his official capacity, as well as any claims against the Rockland County District Attorney's Office, are dismissed due to prosecutorial immunity. *See Valentin v. City of Rochester,* 783 F. App'x 97, 100 (2d Cir. 2019) (dismissing district attorney's office and its current and former district attorneys from suit because they were entitled to prosecutorial immunity); *Maldanado v. New York City,* No. 16-CV-4191, 2016 WL 7494861, at *3 (E.D.N.Y. Dec. 29, 2016) (dismissing claim where the plaintiff "alleged no conduct by the Queens County District Attorney's Office that falls outside the scope of prosecutorial immunity as defined by federal law."); *Arum v. Miller,* 331 F. Supp. 2d 99, 112 (E.D.N.Y. 2004) ("[D]ue to prosecutorial immunity, [the plaintiff's] claim against the Nassau County District Attorney's Office also must be dismissed.").

### 3. *Monell* Liability

**\*5** "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). That is, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York,* 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008).[3]

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 74 of 181

Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009); *see also Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester County*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Jan. 3, 2011) (dismissing a claim against the county because the complaint "[did] not allege the existence of an unconstitutional custom or policy"), *report and recommendation adopted sub nom.*, *Arnold v. Westchester Cnty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton*, 566 F. Supp. 2d at 270 ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur*, 475 U.S. at 478 (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong") (italics in original). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is

not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

**\*6** A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Roe*, 542 F.3d at 36–37 (describing the second category for establishing *Monell* liability); *Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the alleged injury" (quoting *Brown,* 520 U.S. at 404)); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York,* No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link— between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

The Rockland County Defendants argue that Plaintiff fails to satisfy the fifth element because he has not alleged the existence of a policy that "supposedly contributed to his prosecution, [nor has he] provide[d] detailed factual pleading concerning such policy." (Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem") at 9 (Dkt. No. 22.) The Court agrees.

Plaintiff fails to cite or describe any policies officially promulgated by Rockland County or the Rockland County District Attorney's Office that allegedly led to his prosecution. To survive a motion to dismiss, Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Tieman v. City of Newburgh,* No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting *Santos v. New York City,* 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)). "Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York,* No. 13-CV-3412, 2013 WL 6667681, at *4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or custom would be insufficient if wholly conclusory"); *Lara-Grimaldi v. Cty. of Putnam,* No. 17-CV-622, 2018 WL 1626348, at *20 (S.D.N.Y. Mar. 29, 2018) (dismissing a *Monell* claim where the plaintiff failed "to cite or describe a policy officially promulgated [the county] or a specific act taken by a final policymaker of [the county]" relevant the plaintiff's claims) (collecting cases); *Guerrero v. City of New York,* No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("At the pleading stage, the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (quotation marks

omitted)); *Santos,* 847 F. Supp. 2d at 577 ("Because the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff, [the plaintiff's] claims against the [c]ity are dismissed." (citation omitted)); *Simms v. City of New York,* No. 10-CV-3420, 2011 WL 4543051, at *2 n. 3 (S.D.N.Y. Sept. 28, 2011) ("Since [*Iqbal* and *Twombly*], courts in this district have generally required that plaintiffs provide more than a simple recitation of their theory of liability....") (collecting cases), *aff'd,* 480 Fed. App'x 627 (2d Cir. 2012); *5 Borough Pawn, LLC v. City of New York,* 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise —that violates the Federal Constitution"); *cf. Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *Simms,* 480 Fed. App'x at 631 n.4 ("While it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's [policy] prior to discovery ... this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." (citation omitted)).

**\*7** Accordingly, Plaintiff cannot maintain a claim against Rockland County or the Rockland County District Attorney, and those claims are therefore dismissed. And, because the Court has dismissed all of the Rockland County Defendants, the Court need not reach the merits of Plaintiff's claims against them.

### III. Conclusion

For the reasons stated above, the Court grants the Rockland County Defendants' Motion To Dismiss. Because this is the first adjudication of Plaintiff's claims on the merits, Plaintiff's claims are dismissed without prejudice. If Plaintiff wishes to file a second amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order.

SO ORDERED.

Cruz v. Village of Spring Valley, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 76 of 181

**All Citations**

Not Reported in Fed. Supp., 2022 WL 428247

---

## Footnotes

1    "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)).

2    The Court notes that it is unclear what Plaintiff means when he alleges that he was incarcerated for five and a half years "with exceptions." (*See id.* ¶ 34.)

3    Counties are municipal entities for purposes of *Monell* liability. *See Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991) (holding that a county could be held liable for a county district attorney's long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 77 of 181

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

## ORDER and REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent me an amended [1] civil rights complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No. 3). Plaintiff Flagg has also filed an application to proceed in forma pauperis ("IFP"). (Dkt. No. 4).

### I. IFP Application
A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 4). The court finds that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in

law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

### II. Complaint
Plaintiff states that she is the mother of Mario Leslie, who at the time of the incidents described in the complaint, was on parole. (Amended Complaint ("AC") at 1). [2] On August 8, 2016, defendant New York State Parole Officer ("PO") Mark Saben went to Mr. Leslie's home at 514 Marcellus Street in Syracuse, New York, to conduct a "standard home visit." [3] (*Id.*) Mr. Leslie lived at the Marcellus Street address with his girlfriend, Tamacha Rodriguez. (*Id.*) Plaintiff claims that Ms. Rodriguez answered the door for PO Saben, and that Mr. Leslie was "summoned" from his bedroom to speak with defendant Saben. (*Id.*) After some discussion, PO Saben was walking toward the front door, when he spotted some glassine packets "known to contain heroin." (*Id.*) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (*Id.*)

**\*2** Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set

of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department."[4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York. (AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant.[5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home.[6] (*Id.*) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (*Id.*) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (*Id.*)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (*Id.*) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3rd party (Feldman, Kramer & Monaco, P.C.)" (*Id.*) Plaintiff claims that the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr. Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property.[7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (*Id.*) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

***3** Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (*Id.*) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (*Id.*) In

applying a very liberal reading of the AC,[8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours" worth of lost income[9] on the day of the search, unspecified lost income for the day that she had to appear in court,[10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

## III. Eleventh Amendment/New York State Division of Parole

### A. Legal Standards

**\*4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home.[11]

## IV. Syracuse Police Department/Municipal Liability

### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at *24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 80 of 181

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir. 1979).

**\*5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York,* No. 17-CV-3563. 2019 WL 1434597, at \*10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester,* 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton,* 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

## V. Prosecutorial Immunity/Personal Involvement

### A. Legal Standards

#### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk,* 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk,* 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello,* 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse,* 876 F.2d 287, 292 (2d Cir. 1989).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

**\*6** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk,* 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*.

*Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

**\*7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

## VI. Search and Seizure

### A. Legal Standards

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.'" *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is "'based on seemingly reliable information which is later found to be erroneous.'" *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

### B. Application

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 82 of 181

or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

**\*8** The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture. [17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5002215

---

### Footnotes

1    When plaintiff filed her original complaint, the case was administratively closed due to plaintiff's failure to comply with the filing fee requirement. (Dkt. No. 2). Prior to re-filing her motion to proceed IFP, (Dkt. No. 4), plaintiff also filed an amended complaint, which the court will review as the operative pleading. The case was re-opened on August 1, 2019. (Dkt. No. 6).

2    Plaintiff numbered the pages of the "Fact" section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits ("AC Ex.") with the page number as assigned by the court's electronic filing system ("CM/ECF").

3    Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 83 of 181

This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

Plaintiff does not allege that PO Rigby participated in the search of her apartment.

Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF p.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint, and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

Article 13-a is entitled "Proceeds of a Crime -Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

Although not relevant to the court's decision because it is based on absolute immunity of the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's **sworn** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.,* 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under

New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

15    To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit. *See Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

16    Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

17    The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau*, 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios*, the District Attorney was the proper "defendant" in New York State Court.

---

**End of Document**                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 85 of 181

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,
v.
NYS DIVISION OF PAROLE; Mark Saben, Parole Officer; Syracuse Police Dept.; Detective William Summers, ID#409; D.P. Proud, ID# 0140; Richard Curran, ID# 0066; William J. Fitzpatrick, Onondaga County, District Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1**  This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order and Report-Recommendation dated August 15, 2019 (Dkt. No. 7), Magistrate Judge Baxter grants Plaintiff's application to proceed in forma pauperis, and examines the sufficiency of the allegations set forth in the Amended Complaint ("AC") in light of 28 U.S.C. § 1915. He recommends that the AC (Dkt. No. 3) be dismissed in its entirety as against defendants N.Y.S. Division of Parole, Syracuse Police Department, William J. Fitzpatrick, and Sean Chase; that to the extent that the AC may be read as naming Sgt. Llukaci or PO Rigby, the AC be dismissed without prejudice for failure to state a claim; and that if the Court adopts these recommendations that the case be returned to him for further proceedings, including an order serving the remaining defendants Saben, Summers, Proud, and Curran. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS and ADOPTS** the recommendations in the Order and Report-Recommendation (Dkt. No. 7) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3) is **DISMISSED IN ITS ENTIRETY** as against defendants N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may be read as naming SGT. LLUKACI or PO RIGBY, it is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge Baxter for further proceedings, including an order serving the remaining defendants: SABEN, SUMMERS, PROUD, and CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 86 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

2022 WL 3045524
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Joan FRASER, Plaintiff,
v.
CITY OF NEW YORK, New York
City Police Department, and Police
Officers John Doe 1-5, Defendants.

20-CV-5741 (NGG) (RER)
|
Signed July 29, 2022
|
Filed August 1, 2022

**Attorneys and Law Firms**

Ethan Daniel Irwin, Ethan D. Irwin, PLLC, New York, NY, for Plaintiff.

Caroline McGuire, Joseph P. Zangrilli, Erin T. Ryan, New York City Law Department, New York, NY, John L. Garcia, LaRocca Hornik Rosen & Greenberg LLP, New York, NY, for Defendant City of New York.

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, United States District Judge.

**\*1** Plaintiff, Joan Fraser, brings this action against the City of New York (the "City"), the New York City Police Department (the "NYPD"), and five unnamed NYPD officers (the "Officers"). Ms. Fraser asserts claims under the First, Fourth, and Fourteenth Amendments, and for assault and battery, intentional and negligent infliction of emotional distress, and negligent hiring, retention, and supervision. Additionally, Ms. Fraser alleges two *Monell* claims against the City for its unconstitutional policies and inadequate training of police officers. The City filed a partial motion to dismiss Ms. Fraser's First and Fourteenth Amendment claims, intentional and negligent infliction of emotional distress claims, negligent hiring, retention, and supervision claim, and *Monell* claims. The City also contends that the NYPD should be removed as a defendant since it is not a suable entity and that Ms. Fraser should be prohibited from making additional amendments to her complaint.

For the reasons set forth below, the City's motion to dismiss Ms. Fraser's Fourteenth Amendment claim, intentional and negligent infliction of emotional distress claims, negligent hiring, retention, and supervision claim, and *Monell* claim for unconstitutional policies is GRANTED. The City's motion to dismiss Ms. Fraser's First Amendment claim and *Monell* claim for inadequate training is DENIED. The NYPD is removed as a Defendant because the NYPD is not a suable entity. The court declines to issue an order prohibiting further amendments to the complaint.

### I. BACKGROUND

The following summary is drawn from the facts alleged in the Amended Complaint, which the court accepts as true. *See N.Y. Pet Welfare Ass'n v. City of N.Y.*, 850 F.3d 79, 86 (2d. Cir. 2017).[1]

Ms. Fraser attended and recorded a protest in Brooklyn on May 29, 2020, following the death of George Floyd. (Am. Compl. (Dkt. 14) ¶¶ 13, 17.) At approximately 10:15 p.m., near the intersection of Classon and Lafayette Avenues, one or more NYPD officers struck her twice, using their hands and batons. (*Id.* ¶¶ 13, 18.) Ms. Fraser alleges that she was "violently knocked ... to the ground," which caused "severe, serious, and permanent injuries." (*Id.* ¶ 19.) Ms. Fraser was treated in an ambulance at the scene and sought follow-up treatment the next day at a local hospital. (*Id.* ¶¶ 21-23.) Ms. Fraser continues to require medical care for the injuries sustained. (*Id.* ¶ 23.)

### II. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court assesses "the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The complaint must "state a claim [for] relief that is plausible on its face" by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Mere labels and conclusions or formulaic recitations of the elements of a cause of action will not do; rather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original).

## III. DISCUSSION

### A. NYPD as a Suable Entity

**\*2** The City argues that the NYPD should be removed as a defendant since it is not a suable entity. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency." N.Y.C. Charter Ch. 17 § 396. The NYPD is an agency of the City of New York and is therefore a non-suable entity. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (affirming the district court's dismissal of claims against the NYPD as a non-suable entity). Accordingly, the City's motion to remove the NYPD as a defendant is GRANTED. The case may proceed against the City, and if Ms. Fraser ascertains the identities of the John Doe police officers such that she may properly serve them, the case may proceed against them as well.

### B. Constitutional Claims

The City moves to dismiss Ms. Fraser's claims that (i) the Officers' use of excessive force and indifference to her medical needs violated her rights under the Fourteenth Amendment, and (ii) the Officers violated her rights under the First Amendment, as incorporated by the Fourteenth Amendment.

#### 1. Fourteenth Amendment Claim

Ms. Fraser alleges that Defendants violated her Fourteenth Amendment rights when they restrained her, which "depriv[ed] her of her personal liberty," and when they "fail[ed] to properly and adequately address" her "physical injuries." (Am, Compl. ¶¶ 100-07.)

##### a. Excessive Force

When a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Bogart v. City of N.Y.*, No. 13-CV-1017 (NRB), 2016 WL 4939075, at \*7 (S.D.N.Y. Sept. 6, 2016). [2] In these circumstances, courts must "identif[y] the specific constitutional right allegedly infringed by the challenged application of force" and judge the claim by "reference to the specific constitutional standard which governs that right." *Graham*, 490 U.S. at 394-95 (expressing a preference for "an explicit textual source of constitutional protection" over "the more generalized notion of substantive due process").

Excessive force claims arising out of an arrest or seizure are evaluated under the Fourth Amendment using an "objective reasonableness" standard. *See id.* at 397-98 (explaining that this covers "excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen"), Where plaintiffs do not allege "that they were arrested or seized," courts analyze the use of excessive force under the Fourteenth Amendment's more stringent "shocks the conscience" standard. *Tierney v. Davidson*, 133 F. 3d 189, 199 (2d Cir. 1998).

Because Ms. Fraser's Fourteenth and Fourth Amendment claims rely on the same alleged use of excessive force, the court cannot allow both to proceed and must determine which constitutional right was specifically infringed in this case. Ms. Fraser alleges that the Officers "wrongly and affirmatively restrain[ed]" her, "depriving her of her personal liberty, by twice forcibly pushing and striking her, and pushing her to the ground." (Am. Compl. ¶ 102.) The court thus finds that the Fourth Amendment addresses the specific constitutional right allegedly infringed because Ms. Fraser alleges that she was seized in the course of this incident. *See Graham*, 490 U.S. at 395; (*see also* Am. Compl. ¶ 15.) Accordingly, Ms. Fraser's excessive force claim may proceed under the Fourth Amendment standard. However, her Fourteenth Amendment excessive force claim cannot proceed.

##### b. Deliberate Indifference to Medical Needs

Ms. Fraser also alleges that Defendants "were deliberately indifferent to [her] condition and needs," in violation of the Fourteenth Amendment. (*Id.* ¶ 104.) Since the allegations about the seizure and force are more appropriately brought under the Fourth Amendment, the court construes the deliberate indifference claim to concern the alleged failure to "properly and adequately address [her] physical injuries." (*Id.* ¶ 103.)

**\*3** "[T]he Supreme Court has recognized that conduct exhibiting 'deliberate indifference' to harm can support a substantive due process claim," where the conduct shocks the

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 88 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

conscience. *Lombardi v. Whitman*, 485 F.3d 73, 82 (2d Cir. 2007).[3] The Court explained that:

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). In *Lewis*, the Court held that police conduct during a car chase does not reach this conscience-shocking level without the "intent to harm suspects physically or to worsen their legal plight." *Id.* at 854. Courts up to and including the Supreme Court have differentiated between "occasion[s] calling for fast action" and instances where officials "hav[e] time to make unhurried judgments." *Id.* at 851-53 ("As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical."). In these fast-action situations, courts have noted that "when unforeseen circumstances demand an officer's instant judgment," the standard for what shocks the conscience is even higher. *Id.* at 852-53. Neither negligently inflicted harm nor "an intermediate level of fault, such as recklessness is ... enough to impose constitutional liability." *Pena v. DePrisco*, 432 F.3d 98, 113 (2d Cir. 2005).

Here, the Officers were responding to the protest and did not have time to deliberate, so a more demanding standard for deliberate indifference is appropriate. Ms. Fraser has not pleaded any facts indicating that the Officers "fail[ed] to properly and adequately address [her] physical injuries," (*see* Am. Compl. ¶ 103)—certainly not to the conscience-shocking level required for a finding of deliberate indifference. She apparently quickly made her way to an ambulance on the scene after the alleged assault. Thus, she has failed to raise a cognizable claim for deliberate indifference under the Fourteenth Amendment.

* * *

Accordingly, because Ms. Fraser's Fourteenth Amendment excessive force claim is more appropriately brought under the

Fourth Amendment, and her deliberate indifference claim is not cognizable, the City's motion to dismiss the Fourteenth Amendment claim is GRANTED.

### 2. First Amendment Claim

Ms. Fraser claims that Defendants violated her First and Fourteenth Amendment rights "by engaging in conduct that is shocking to the conscience and is offensive to the community's sense of fair play and decency," and that Defendants were aware of the violations of her rights because the "First Amendment Right to freedom of expression and speech is a Right that is so clearly established that a reasonable person under the circumstances presented herein would have known the said conduct was a violation," specifically her right "to assemble for peaceful and lawful protests." (Am. Compl. ¶¶ 41, 44, 46.) The City moves to dismiss this cause of action because "it is duplicative of [her] excessive force claim under the Fourth Amendment," and she "fails to clearly allege what this conduct is." (Mem. in Supp. of Mot. to Dismiss ("Mot.") (Dkt. 20) at 9.)

**\*4** As to the City's claim that Ms. Fraser's First Amendment claim is duplicative of her Fourth Amendment claim, a plaintiff may allege First and Fourth Amendment claims arising out of the same alleged conduct. *See Salmon v. Blesser*, 802 F.3d 249, 255-56 (2d Cir. 2015) (finding that the plaintiff could have properly alleged both First and Fourth Amendment claims had plaintiff sufficiently asserted he was exercising his First Amendment rights at the time the officers used force); *Pluma v. City of N.Y.*, No. 13-CV-2017 (LAP), 2015 WL 1623828, at *6-*8 (S.D.N.Y. 2015) (reasoning that plaintiff could have brought a Fourth Amendment excessive force claim and a First Amendment claim had the plaintiff alleged facts that satisfied the requirements of each claim). Consequently, the court declines to dismiss Ms. Fraser's claim on that basis.

As to the City's claim that Ms. Fraser has not clearly alleged what the conduct is, the court agrees that the Amended Complaint could more clearly apprise the court of the First Amendment conduct, However, that is not fatal here.

"To state a First Amendment claim, a plaintiff must allege facts admitting a plausible inference that the defendant's actions restricted, or were retaliation against, speech or conduct protected by the First Amendment." *Salmon*, 802 F.3d at 255. Ms. Fraser alleges sufficient facts to establish that

she was plausibly engaging in expressive conduct protected by the First Amendment at the time of the incident: She asserts that Defendants prevented her from attending a protest and recording police activity. (Am. Compl. ¶ 44.) Attending a protest is clearly protected under the First Amendment. *See Cox v. Louisiana*, 379 U.S. 559, 574 (1965). Courts in this circuit have found that recording police activity is also protected under the First Amendment. *See Higginbotham v. City of N.Y.*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015) (holding that the First Amendment protects the filming of police activity); *Pluma*, 2015 WL 1623828, at *6-*8 (S.D.N.Y. 2015) (same, and noting that "some Courts of Appeals have held that the First Amendment protects the right to film the police," but "neither the Supreme Court nor the Second Circuit has addressed [it]").

At the motion to dismiss stage, the court finds that these allegations amount to a plausible inference that the Defendants restricted Ms. Fraser's First Amendment conduct by interfering with her ability to participate in and record the protest. The court recognizes, however, "that the claim, like all claims, may look very different at the summary judgment stage." *Marom v. City of N.Y.*, 15-CV-2017 (PKC), 2016 WL 916424, at *11 (S.D.N.Y. Mar. 7, 2016). For these reasons, the City's motion to dismiss Ms. Fraser's First Amendment claim is DENIED.

**C. State Law Tort Claims**

The City has also moved to dismiss Ms. Fraser's claims of intentional infliction of emotional distress (IIED), negligent infliction of emotional distress (NIED), and negligent hiring, retention, and supervision.

### 1. Intentional Infliction of Emotional Distress

Defendants move to dismiss Ms. Fraser's IIED claim because she also alleges assault and battery, a traditional tort, arising out of the same set of facts. Under New York law, an IIED claim may "be invoked only as a last resort," *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014), "to provide relief in those circumstances where traditional theories of recovery do not," *Sheila C. v. Povich*, 781 N.Y.S. 2d 342, 351 (1st Dep't 2004). As a result, the New York Court of Appeals has considered the possibility that an IIED claim can never be brought when the challenged conduct "falls well within the ambit of other traditional tort liability." *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58 (1978). The four

appellate division courts in New York have concluded that it may not. *See Salmon*, 802 F.3d at 256 (collecting cases). Thus, courts in this circuit have consistently concluded that IIED claims are duplicative of traditional tort claims. *See, e.g., id.* at 256-57 (holding that where the challenged conduct "would have been actionable under state law as a battery," the IIED claim was properly dismissed); *Rubio v. Cnty. of Suffolk*, No. 01-CV-1806 (TCP), 2007 WL 2993830, at *5 (E.D.N.Y. Oct. 9, 2007) (holding that the IIED claim was duplicative of other state tort claims, including assault and battery).

**\*5** Ms. Fraser's IIED claim fails because "the conduct complained of falls well within the ambit of other traditional tort liability." *Turley*, 774 F.3d at 159. Specifically, the challenged conduct amounts to an assault, and Ms. Fraser has alleged assault as a cause of action in the Amended Complaint. Accordingly, the City's motion to dismiss Ms. Fraser's claim for intentional infliction of intentional distress is GRANTED.

### 2. Negligent Infliction of Emotional Distress

Defendants move to dismiss Ms. Fraser's NIED claim because, as with IIED claims, a claim for NIED should be asserted as a last resort. Courts in the Second Circuit have described NIED claims as "an even greater stretch" than IIED claims given "the narrow band of negligent emotional distress cases recognized under New York law." *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 386 (E.D.N.Y 2021); *see also Broadnax v. Gonzalez*, 2 N.Y.3d 148, 153 (2004) (explaining that New York courts have shown a "longstanding reluctance to recognize causes of action for negligent infliction of emotional distress").

As a result, NIED claims are generally dismissed when the claim arises out of the same facts that give rise to a traditional tort cause of action. *See, e.g., Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 364 (S.D.N.Y 2021) (dismissing NIED claim because "the allegations supporting the NIED claim track the allegations supporting plaintiff's negligent screening, hiring, and supervision claim, as well as her negligence claim"); *Buoniello v. Ethicon Women's Health & Urology*, No. 19-CV-4021 (DRH) (ARL), 2020 WL 5802276, at *4 (E.D.N.Y. Sept. 29, 2020) (dismissing plaintiff's NIED claim because it was duplicative of other tort causes of action); *Berrio v. City of N.Y.*, No. 15-CV-9570 (ALC), 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017) ("New York does not recognize NIED or IIED causes of action where the conduct underlying

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 90 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

them may be addressed through traditional tort remedies."); *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 327-28 (E.D.N.Y. 2016) (granting summary judgment to defendants on NIED claim because it "mirror[ed]" another tort claim).

Like her IIED claim, Ms. Fraser's NIED claim arises out of the same facts and circumstances as her claim for assault and battery, a traditional tort claim. (*See* Am. Compl. ¶¶ 61-69.) And she has not provided any basis on which the court can conclude that this claim is distinct. Ms. Fraser therefore cannot pursue the same claim under a NIED theory. Accordingly the City's motion to dismiss the negligent infliction of emotional distress claim is GRANTED.

### 3. Negligent Hiring, Supervision, and Retention

The City argues that Ms. Fraser's negligent hiring, supervision, and retention claim fails because the Officers were acting within the scope of their employment. Under New York law, a plaintiff may state a claim for negligent hiring, supervision, or retention, by showing, "in addition to the standard elements of negligence,"

> (1) that the tort-feasor and the defendant were in an employee-employer relationship ...; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence ...; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). "Generally, where an employee is acting within the scope of his or her employment ..., no claim may proceed against the employer for negligent hiring or retention." *Karoon v. N.Y.C. Transit Auth.*, 659 N.Y.S.2d 27, 29 (1st Dep't 1997) (granting defendant New York City Transit Authority summary judgment on negligent hiring, retention, and training claim because bus driver was acting within the scope of employment). As a result, courts in this circuit have consistently dismissed negligent hiring, retention, and

supervision claims where the defendant was acting within the scope of employment. *See, e.g.*, *Paul v. City of N.Y.*, No. 16-CV-1952 (VSB), 2017 WL 4271648, at *7 (S.D.N.Y Sept. 25, 2017) (dismissing negligent hiring, training, and supervision claim because "there are no allegations in the Amended Complaint that the officers were at any point acting outside the scope of their duties and none of the facts as alleged directly or inferentially supports such a finding"); *Melvin v. Cnty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *21 (S.D.N.Y. Mar. 29, 2016) (dismissing negligent hiring, retention, and training claim because there were no allegations in the complaint that the defendants "were acting outside scope of employment during the course of events giving rise to Plaintiff's claim").

 **\*6**  Here, the Officers were acting within the scope of their employment as police officers at the protest. They were not attending in their personal capacities. Ms. Fraser concedes as much, as she alleges that "Defendants POLICE OFFICERS ... at all times herein were acting in such capacity as the agent, servants, and/or employees of the City and NYPD, within the scope of their employment." (Am. Compl. ¶¶ 12-13.)

Notwithstanding the case law in this circuit, Ms. Fraser argues that *Jaquez v. City of New York* supports her position. *See* No. 10-CV-2881 (KBF), 2014 WL 2696567 (S.D.N.Y. June 9, 2014). She argues that the *Jacquez* court "held that an alternative pleading ... is satisfied when, like here, plaintiff alleges that the Defendants City and NYPD, and their delegated supervisors *knew or should have known* of Defendant-Officer's propensity for their illegal conduct." (Opp. at 21.) However, Ms. Fraser appears to misunderstand the holding in *Jacquez*. Like Ms. Fraser, the plaintiffs in *Jacquez* pleaded that "the City knew or should have known that the individual defendants were likely to engage in the conduct that caused ... death." 2014 WL 2696567, at *7. But the court held that this claim failed as a matter of law because "plaintiffs have failed to allege, even in the alternative, that the individual defendants were acting outside the scope of their employment at the time of the alleged misconduct." *Id.* So too here, Ms. Fraser has not pled in the alternative that the Officers were acting outside the scope of their employment.

Because the Officers were acting in the scope of their employment, and Ms. Fraser has not pled in the alternative that the Officers were acting outside the scope of their employment, the City's motion to dismiss her claim for negligent hiring, supervision, and retention is GRANTED.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 91 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

## D. Municipal Liability Claims

A municipality may be held liable under 42 U.S.C. § 1983 when a plaintiff's injury is the result of municipal policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). On a motion to dismiss, the "mere assertion ... that a municipality has ... a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Montero v. City of Yonkers*, 890 F.3d 386, 403-04 (2d Cir. 2018). A municipality may be held liable under § 1983 for the constitutional violations of its employees that "may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. Thus, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove ...: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007). But a municipality may not be held liable solely "by application of the doctrine of *respondeat superior.*" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). And "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998).

Ms. Fraser alleges that the City and NYPD "promulgated official Policies, Rules, and Regulations" that "allow[ ], permit[ ], and encourag[e] the use of Excessive Force" and that the City inadequately trains police officers. (Am. Compl. ¶¶ 78-99.)

### 1. Unconstitutional Policy

**\*7**  To bring a *Monell* claim for an unconstitutional policy, the plaintiff must show that an "action pursuant to official municipal policy caused the[ ] injury," which "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011). At the pleading stage, the court "does not impose a probability requirement ...; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence," *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007).

The City argues that this claim should be dismissed because single acts of excessive force by non-policymaking municipal employees, *i.e.*, police officers, are not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability under § 1983. A single incident is usually not sufficient because the municipality could have acted properly and merely hired a "bad apple," who acted in violation of others' constitutional rights. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985). However, a single act may justify liability of the municipality when a plaintiff establishes that the single act is one of many. In other words, "such acts would justify liability of the municipality if, for example, they were ... sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Ms. Fraser refers generally to NYPD officers' consistent and widespread use of excessive force as an official policy. (*See* Am. Compl. ¶¶ 82-84.) In support of this argument, Ms. Fraser attached a December 2020 report on an investigation conducted by the New York City Department of Investigation titled *Investigation into NYPD Response to George Floyd Protests* (hereinafter, "DOI Report") to her opposition motion. (*See* DOI Report (Dkt. 21-3).) [4] She notes the DOI Report's findings about police officers' "use of force and certain crowd control tactics to respond to the Floyd protests," which included the use of batons. (*See id.* at 3, 42-43.)

Courts in this circuit have allowed plaintiffs to rely on governmental reports to "adequately plead the existence of de facto customs or policies." *Felix v. City of N.Y.*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018) (holding that a report from the Inspector General for the NYPD and references to a series of lawsuits could "substantiate policymakers' awareness of the NYPD's deficient policies"); *see also Lopez v. City of N.Y.*, 20-CV-2502 (LJL), 2022 WL 2078194, at *8 (S.D.N.Y June 9, 2022) (holding that a Mollen Commission report could have supported a plaintiff's claim of widespread "police falsification" had the report established that the falsifications continued through the relevant time period); *Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) ("[T]he DOJ Report appended to Plaintiff's Complaint is sufficient to allege a widespread practice at [the local jail] of which policymakers were aware").

**\*8** "That a report was published after the subject incident does not prevent plaintiffs from relying on it—provided plaintiffs plead other allegations from which the court may infer high-level policymakers' acquiescence." *Felix,* 344 F. Supp. 3d at 658. In *Felix,* the court found that the report "adequately reflect[ed] the City's notice of problems that occurred prior to its publication," where "[i]t discusse[d] extensive research and planning" that had occurred well in advance of the incident, and the "[r]eport was an internal document rather than a document developed by an outside agency." *Id.* at 658. Thus, the court found that the plaintiffs were "rely[ing] on the report not for the notice it provided on its date of publication, but for the inference it supports that high-level policymakers were aware of the alleged deficiencies at the time of" the relevant incident. *Id.* So too here, Ms. Fraser attempts to rely on the DOI Report for the inference of prior notice.

However, the DOI Report, which is not an internal document, does not indicate that the NYPD had notice of the widespread use of excessive force prior to the protests in May 2020. At the outset, the City correctly points out that the DOI Report did not "reach[ ] the conclusion that the NYPD had unconstitutional policies or patrol guide procedures," and Ms. Fraser "fails to identify any policies and procedures that could possibly be the cause of [her] harm." (Mot. at 6.) In fact, the DOI Report spends few of its 111 pages discussing excessive force. Though the DOI Report mentions earlier protests implicating First Amendment freedoms, such as the Occupy Wall Street protests, it does not state that excessive force was an issue at these earlier protests such that the NYPD would have had notice of the issue. (DOI Report at 6.) The DOI Report discusses excessive force as part of its finding that "the NYPD's primary strategy appears to have involved the application of disorder control tactics and methods." (*Id.* at 35.) It explains that "there were allegations of individual instances of excessive force, some widely reported, such as the police vehicle in Brooklyn driving into a crowd, excessive use of batons, and use of pepper spray." (*Id.* at 42.) Staff from the NYPD's Community Affairs Unit "confirmed observing instances that they believed to constitute disproportionate force by officers, including punching, lacking, tackling, or using batons to strike protesters. (*Id.* at 43.) The NYPD executives who were consulted on the report "noted their agreement with disciplinary action against officers involved in particular reported incidents," but beyond the reported incidents, "did not believe officers engaged in widespread excessive force during the protests." (*Id.*) The court has not seen anything in the DOI Report indicating that high-level NYPD officials were aware of this issue prior to the May 2020 protests.

In her opposition motion, Ms. Fraser also directs the court to *In re New York City Policing During Summer 2020 Demonstrations*, in which the plaintiffs alleged similar excessive force claims arising out of the same series of protests. 548 F. Supp. 3d 383, 401 (S.D.N. Y 2021). There, plaintiffs relied on the same DOI report, in addition to non-governmental organization reports documenting police misconduct at protests in earlier decades; several lawsuits alleging incidences of police brutality; thousands of Civilian Complaint Review Board complaints in response to NYPD practices at the May-June 2020 protests, reports from the New York Attorney General's Office, Human Rights Watch, and Corporation Counsel; and the incidents alleged in the complaints. *Id.* at 401. Based on this comprehensive evidence, the court concluded that the plaintiffs had sufficiently demonstrated the existence of an official policy, as compared to the single DOI Report relied on here. *Id.* at 402.

Even drawing all inferences in Ms. Fraser's favor, the court cannot conclude on the basis of a single allegation and one report published after the incident that she has stated a claim for an unconstitutional policy of excessive force. Accordingly, the City's motion to dismiss the *Monell* claim for unconstitutional policies is GRANTED. If Ms. Fraser seeks to file another amended complaint on this cause of action, she should consider appending more extensive evidence of the alleged unconstitutional policy, along the lines of what the plaintiffs submitted in *In re New York City Policing During Summer 2020 Demonstrations.*

### 2. Inadequate Training

**\*9** Defendants also move to dismiss Ms. Eraser's *Monell* claim that the City is liable under § 1983 for failing to adequately train the Officers. She alleges that the City inadequately trained its officers, in particular on how to police First Amendment-protected expression at protests. (Am. Compl. ¶¶ 86-99.)

Inadequate training may be the basis of a § 1983 claim where the municipality has displayed "deliberate indifference to the rights of persons with whom the police come into contact." *See City of Canton v. Harris,* 489 U.S. 378, 388 (1989). To establish that a municipality's failure to train its employees amounts to "deliberate indifference," a plaintiff must plead

Case 3:25-cv-01218-GTS-ML     Document 6     Filed 07/02/26     Page 93 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

some facts that, if proven, would tend to show that (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice ... will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007). Additionally, the policymaker's deliberate indifference in training must cause the injury and "be based on more than the mere fact that the misconduct occurred in the first place." *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 129-31 (2d Cir. 2004).

At the motion dismiss stage, plaintiff's alleging the failure to train "confront pleading standards that threaten their ability to press their claims beyond mere accusation." *Osterhoudt v. City of N.Y.*, No. 10-CV-3173 (RJD) (RML), 2012 WL 4481927, at *2 (E.D.N.Y. Sept, 27, 2012). This is in large part because "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage." *Amnesty America*, 361 F.3d at 130 n.10.

In recognition of these difficulties, the Second Circuit has held that a plaintiff "need only plead that the city's failure to train caused the constitutional violation." *Id.*; *see also Jackson v. Nassau Cnty.*, 552 F. Supp. 32 350, 380-81 (E.D.N.Y. 2021) (denying motion to dismiss inadequate training claim where plaintiff relied on the court's earlier decision in another case "discussing allegations of misconduct by County investigators ... for fabrication of evidence and coercive interrogation tactics"); *Reyes v. Cnty. of Suffolk*, 995 F. Supp. 2d 215, 231 (E.D.N.Y. 2014) (allowing inadequate training claim to proceed where plaintiff alleged three other examples of the same alleged failure); *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) (allowing inadequate training claim to proceed even though plaintiff "d[id] not plead much factual detail concerning Suffolk County's training programs").

Ms. Fraser alleges that the City failed to train police officers to "specifically address First Amendment-Protected Expression, including the failure to facilitate a peaceful assembly." (Am. Compl. ¶ 89.) With respect to the first prong from *Jenkins*, she has alleged the policymakers' knowledge that its employees would confront this situation. Specifically, she asserts that the City was "aware of the need to create and implement policies, practices, and procedures ... for policing

of protests and crowds ... exercising their First Amendment Rights." (*See id.* ¶ 92.) On the second prong, she alleges that the City did not provide "sufficient training on policing First Amendment-Protected Expression" despite knowing Officers would police "protests and crowds who were exercising their First Amendment Rights," (*See id.* ¶¶ 92-94.) Finally, she has alleged causation—that the City's lack of training led to her injuries. (*Id.* ¶ 94). She supports these allegations with references to the DOI Report, which provides, among other things, that the NYPD does not have policies specific to policing protests and that "other than for personnel assigned to [the Strategic Response Group] ..., prior to the Floyd protests, NYPD lacked standardized, agencywide, in-service training related to policing protests." (*See* Compl. ¶¶ 90-93; DOI Report at 34-35, 56, 60-61.) [5]

**\*10**  For these reasons, Ms. Fraser "has nudged [her] claims across the line from conceivable to plausible," *Osterhoudt*, 2012 WL 4481927, at *2* (quoting *Twombly*, 550 U.S. at 570), and the City's motion to dismiss this claim is DENIED.

### E. Amendments to the Complaint

Under Federal Rule of Civil Procedure 15, leave to amend should be "freely" granted "when justice so requires," Fed. R. Civ. P. 15(a)(2). It should not be denied "[i]n the absence of ... undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*

Ms. Fraser has amended her complaint once, and the record does not indicate that she has repeatedly submitted deficient pleadings. Given the liberal standard set forth in Rule 15(a), the court declines to *ex ante* issue an order prohibiting Ms. Fraser from further amending her complaint. However, she is warned not to continue seeking relief under causes of action that would be impermissibly duplicative, such as her Fourteenth Amendment, IIED, and NIED claims, or are inconsistent with her factual allegations, such as her negligent hiring, supervision, and retention claim. Ms. Fraser's counsel is directed to conduct research on the legal standards of any claims she asserts, so as to avoid wasting the court's time with meritless claims.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 94 of 181

Fraser v. City of New York, Not Reported in Fed. Supp. (2022)

## IV. CONCLUSION

For the reasons stated above, the City's motion to dismiss Ms. Fraser's Fourteenth Amendment claim, intentional and negligent infliction of emotional distress claims, negligent hiring, supervision, and retention claim, and *Monell* claim for unconstitutional policies is GRANTED. The City's motion to dismiss Ms. Fraser's First Amendment claim and *Monell* claim for inadequate training is DENIED. The NYPD is removed as a Defendant because the NYPD is not a suable entity. The court declines to issue an order prohibiting Ms. Eraser from further amending her complaint.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3045524

---

### Footnotes

1     When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

2     The City has moved to dismiss the Fourteenth Amendment claim but not the Fourth Amendment claim.

3     Though Ms. Fraser alleges that she "was in the custody of the Defendants," (Am. Compl. ¶ 101), she has not alleged that she was handcuffed, arrested, or brought to a police precinct or vehicle. Since Ms. Fraser was not in custody at the time of the incident, she can bring her deliberate indifference claim only under the Fourteenth Amendment, not under the Eighth Amendment. *See DeShaney v. Winnebago Cnty. Dept' of Soc. Servs.*, 489 U.S. 189, 198-200 (1989).

4     Defendant argues that the court may not consider the DOI Report since it was not attached to the Amended Complaint nor sufficiently referenced in the Amended Complaint. Though the DOI Report was not attached to the Amended Complaint, there are multiple references to and discussions of the report within the Amended Complaint, which in the court's view, constitutes "a clear, definite, and substantial reference." *Trump v. Vance,* 977 F.3d 198, 210 n.8 (2d Cir. 2020) (holding that two brief quotations from a New York Times article in the Second Amended Complaint, which did not include the title or date of the article, allowed the panel to consider the entire article because the reference "[wa]s far more substantial than a mere passing reference"); *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (holding that two documents were incorporated by reference to the complaint where the complaint "explicitly refer [red] to and relie[d] upon" them). However, the court does not consider the reports first referenced in her opposition.

5     Though Ms. Fraser also references a second report on policing and the NYPD patrol guide, neither of which were submitted to the court, in alleging inadequate training, the court does not find these documents to be persuasive. Though the second report generally finds that improvements in training are warranted for policing protests, this finding is not specific to the NYPD. With respect to the NYPD patrol guide, Ms. Fraser does not point to any specific problems.

---

**End of Document**         © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 95 of 181

2026 WL 1296172
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

H.E. Amir M. HAMZA and
Francis Arthur Yakel, Plaintiffs,
v.
Athansios Dimadis KOTSIDIS, et al., Defendants.
H.E. Amir M. Hamza, Plaintiff,
v.
Chris Liberati-Conant, et al., Defendants.
H.E. Amir M. Hamza, Plaintiff,
v.
Athanasios Dimadis Kotsidis, a/k/
a Thanos Dimadis, et al., Defendants.

1:25-cv-968 (ECC/ML), 1:25-cv-1429
(ECC/ML), 1:25-cv-1506 (ECC/ML)
|
Signed 05/12/2026

**Attorneys and Law Firms**

H.E. Amir M. Hamza, Pro se Plaintiff

Francis Arthur Yakel, Pro se Plaintiff

### MEMORANDUM-DECISION AND ORDER

Elizabeth C. Coombe, United States District Judge:

### I. INTRODUCTION

 **\*1** Plaintiffs H.E. Amir M. Hamza and Francis Arthur Yakel commenced the above captioned lead case by filing a Complaint on July 22, 2025. *Hamza et al. v. Kotsidis et al.,* 1:25-cv-968 (ECC/ML) (*Hamza I*) Dkt. No. 1. On August 7, 2025, the Court accepted Plaintiffs' Amended Complaint filed as of right. Dkt. No. 37. [1] Plaintiffs subsequently filed a motion to amend the Amended Complaint, which the Court granted on October 8, 2025, and the Second Amended Complaint became the operative pleading. Dkt. Nos. 49, 50. Hamza subsequently commenced the above captioned member cases by filing separate Complaints on October 13, 2025 and October 26, 2025. *Hamza v. Liberati-Conant, et al.,* 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) (*Hamza II*) Dkt. No. 1; *Hamza v. Kotsidis et al.,* 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) (*Hamza III*) Dkt. No. 1. Plaintiffs filed applications to proceed

in forma pauperis (IFP) in the above captioned actions. *Hamza I* Dkt. Nos. 3, 4; *Hamza II* Dkt. No. 2; *Hamza III* Dkt. No. 4.

These cases were referred to Magistrate Judge Miroslav Lovric who, on November 26, 2025, granted Plaintiffs' motions for IFP status and ordered the consolidation of these actions, designating *Hamza I* as the lead case. *Hamza I* Dkt. No. 54; *Hamza II* Dkt. No. 6; *Hamza III* Dkt. No. 7. Magistrate Judge Lovric further recommended that the *Hamza I* Second Amended Complaint, *Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as frivolous, or, in the alternative, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (iii) because they seek relief against defendants who are immune from such relief and for failure to state a claim upon which relief may be granted. *Id*.

Hamza filed objections to Magistrate Judge Lovric's recommendation on December 3, 2025. Dkt. No. 55. On December 7, 2025, Plaintiffs filed a letter motion seeking leave to file a Third Amended Complaint consolidating various claims from *Hamza I, Hamza II*, and *Hamza III* into a single action, in light of Magistrate Judge Lovric's recommendations. Dkt. No. 56. That motion, along with Magistrate Judge Lovric's Report-Recommendation, is presently before this Court.

### II. REPORT-RECOMMENDATION

This Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.,* 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections "must be specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines,* 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report[-]Recommendation must be specific and clearly aimed at particular findings in the magistrate [judge]'s proposal ...." *Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at \*2, (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**\*2** Hamza filed a 741-page submission in objection to Magistrate Judge Lovric's report-recommendation recommending dismissal of *Hamza I, Hamza II* and *Hamza III*. Dkt. No. 55. Namely, Hamza takes issue with Magistrate Judge Lovric's characterization of the pleadings, and otherwise attempts to interject new facts and allegations for consideration in conjunction with Plaintiffs' claims. Ultimately, Hamza requests the Court permit amendment in order to file a more streamlined and clarified pleading – that is, the proposed Third Amended Complaint that Plaintiffs filed soon after submitting objections to the report-recommendation. *See* Dkt. No. 56 at 3-32 (TAC).

Under de novo review, the Court agrees with Magistrate Judge Lovric's recommendations that the *Hamza I* Second Amended Complaint*, Hamza II* Complaint, and *Hamza III* Complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2), and the report-recommendation is therefore adopted in this respect. The Court shares Magistrate Judge Lovric's concerns regarding Hamza's abusive litigation history, and joins in cautioning Hamza that voluminous, frivolous filings that overwhelm the judiciary's resources, and congest the docket, will not be tolerated. Hamza represents, and the Court recognizes, that he is an experienced pro se litigant – having actively litigated numerous matters in federal and state court. Dkt. No. 56 at 1. Hamza states that these experiences have afforded him the ability to learn and understand the legal process. *Id.* Although a court "is ordinarily obligated to afford a special solicitude to pro se litigants," the "appropriate degree of special solicitude is not identical with regard to all pro se litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010). The "degree of solicitude may be lessened," for example, where a particular pro se litigant is "experienced in litigation and familiar with the procedural setting presented." *Id*. A court may exercise its discretion, "based on the totality of the relevant circumstances," to determine "what degree of solicitude, if any, should be afforded." *Id*. at 102–03. Thus, to the extent the Court recognizes that Plaintiff Hamza is an experienced pro se litigant, the Court expects that he be "conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits." *Zimmerman v. Burge*, No. 06-cv-0176 (GLS/GHL), 2008 WL 850677, at \*9 (N.D.N.Y. Mar. 28, 2008).

Notwithstanding these concerns, the Court recognizes that Magistrate Judge Lovric's report-recommendation was the first instance in which any pleading deficiencies were identified to the pro se Plaintiffs. Generally, when the court dismisses a pro se complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, in an abundance of caution regarding Plaintiffs' pro se status, and recognizing Plaintiffs' effort to consolidate their numerous claims across the three actions into one streamlined pleading, the Court exercises its authority to accept Plaintiffs' Third Amended Complaint for filing, and will proceed to review its sufficiency pursuant to 28 U.S.C. 1915(e)(2).

## III. THIRD AMENDED COMPLAINT

Plaintiffs' allegations in the Third Amended Complaint will be summarized to the extent they are relevant to the Court's analysis.

### A. Personal Involvement

"To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d Cir. 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)). The Second Circuit has also made clear that "there is no special rule for supervisory liability" under Section 1983. *Tangreti, 983 F.3d at 618*. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Tangreti, 983 F.3d at 618*).

**\*3** Plaintiffs identify Philip Tkacy, Douglas Cropper, Carla Ingersoll, and Morgan Klima as defendants in the caption and list of parties. However, these defendants are not otherwise referenced anywhere in the body of the Third Amended Complaint, and the pleading lacks factual allegations sufficient to allege that these individuals were personally involved in conduct that violated Plaintiff's constitutional rights. Accordingly, Plaintiffs fail to state a cognizable claim against Tkacy, Cropper, Ingersoll, and Klima, and the Third Amended Complaint is dismissed as against them. *See Cipriani v. Buffardi*, No. 06-cv-0889 (GTS/DRH), 2007 WL 607341, \*1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what

the defendant did to the plaintiff.") (citation omitted); *see also Casino v. Rohl*, No. 14-cv-2175, 2014 WL 5425501, at \*6 (E.D.N.Y. Oct. 23, 2014) (dismissing complaint since the plaintiff had not adequately pled the defendant's personal involvement in any of the constitutional deprivations alleged in the amended complaint).

Plaintiffs also name Village of Philmont Police Chief Vernon Doyle as a defendant. The minimal allegations against Doyle in the Third Amended Complaint are asserted in his supervisory capacity, and Plaintiffs do not assert that Doyle was personally involved in conduct violating their constitutional rights. *See* TAC ¶¶ 36 ("The Philmont Police Department, under Chief Doyle, responded to multiple calls and complaints but failed to curb Thanos and Marou's surveillance ...."), 84 (generally alleging supervisory liability against Doyle because he "knew of and condoned" allegedly unconstitutional practices). Plaintiffs' conclusory allegations are insufficient to show that Doyle personally violated their rights. Accordingly, the claims against Doyle fail to state a claim.

### B. State Action under § 1983

"It is well-settled that a plaintiff alleging a violation of his constitutional rights under Section 1983 must show that the defendant acted under color of state law." *Jeanty v. Sciortino*, 669 F. Supp. 3d 96, 112 (N.D.N.Y. 2023) (citing *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012)); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). As a general rule private parties are not state actors subject to § 1983 liability. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-cv-1624, 2009 WL 35074, at \*3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.' ") (citation omitted). However, the actions of private individuals and entities may be attributed to the state for Section 1983 purposes if "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citation omitted). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

### 1. Thanos and Marou

Plaintiffs allege that Defendants Athanasios Dimadis Kotsidis (Thanos) and Maroula Kotsidou (Marou) acquired an adjacent property to Hamza's residence (the property) in June 2022. TAC ¶¶ 13, 25-26. Plaintiffs further allege that the property is utilized for charitable purposes, in conjunction with an organization founded by Hamza and operated, in part, by Yakel. *Id.* at ¶¶ 11, 26-27. Plaintiffs contend that Thanos and Marou "began a pattern of conduct directed at Plaintiffs designed to interfere with the use, enjoyment, and charitable development" of the property. *Id.* at ¶ 28. Specifically, Plaintiffs allege that Thanos and Marou conducted video and camera surveillance of Plaintiffs on the property, and "obstructed or attempted to obstruct vehicular and pedestrian access" to the property, including blocking driveways, interfering with construction deliveries, and using "exaggerated, fabricated, or wholly false" complaints to officials to frustrate the charitable organization's purpose. *Id.* at ¶¶ 29-31. Thanos and Marou also "publicly and privately defamed Plaintiffs by spreading statements accusing them of criminal behavior, dishonesty, and instability, including in communications to neighbors, public officials, and third parties ...." *Id.* at ¶ 33.

**\*4** Plaintiffs allege that officials responded to some of Thanos and Marou's "false" complaints, and "initiated investigations and/or enforcement actions that, upon information and belief, were premised on false information from Thanos and Marou and were selectively pursued against Plaintiffs while similar or worse conditions nearby were ignored." TAC ¶ 32. Plaintiffs further allege that they "repeatedly notified" Village of Philmont officials of Thanos and Marou's ongoing surveillance and harassment, however "[i]nstead of providing even-handed support of enforcing neutral rules, the Village and its agents routinely took Thanos and Marou's side, treating Plaintiff's own reports as nuisances, delaying responses to FOIL requests, and selectively applying ordinances to Plaintiffs while overlooking comparable conduct by others." *Id.* at ¶¶ 34-35; *see also id.* at ¶ 36 (alleging that Village of Philmont Police Department responded to multiple calls and complaints but failed to curb the surveillance, and instead used the dispute to scrutinize Plaintiffs' conduct).

Liberally construed, Plaintiffs seek to proceed against Thanos and Marou under the "joint action" doctrine. " 'To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law.' " *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) (quoting *Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996)). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999)). "The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action." *Id.* (citing *Ginsberg*, 189 F.3d at 272).

The Third Amended Complaint does not sufficiently allege joint action between Thanos and Marou and any state officials, such that the former could be held liable under § 1983. Liberally construed, Plaintiffs' allegations suggest that village and law enforcement officials did not respond favorably to their complaints about Thanos and Marou, but instead credited Thanos and Marou's complaints and otherwise scrutinized Plaintiffs' conduct in an unfair manner. Plaintiffs, however, do not allege any facts that Thanos and Marou directed or pressured state actors in pursuing the alleged violation of their constitutional rights. Nor is there any allegation that Thanos and Marou were involved in a plan, prearrangement, or conspiracy with any state officials. Even assuming Thanos and Marou intended to harm Plaintiffs by reporting their conduct, "a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 386 (E.D.N.Y. 2013) (citing *Kash v. Honey*, 38 F. App'x 73, 75–76 (2d Cir. 2002) (finding no state action by private lawyer who plaintiff alleged "maliciously, for purpose or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights ... falsely charged [plaintiff] in an accusatory instrument")). Otherwise, Plaintiffs' allegations do not plausibly allege joint action with state actors for purposes of § 1983. *See Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015) ("[T]he provision of information to police officers, even if that information is

false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983."); *Sherman v. City of New York*, No. 18-cv-5359, 2019 WL 2164081, at *7 (E.D.N.Y. May 16, 2019) ("Plaintiff's allegations simply amount to the assertion that Eilenberg provided the officers with false information and the officers inappropriately accepted Eilenberg's version of events despite evidence to the contrary. This is patently insufficient to state a claim of joint action."); *United States v. Hanratty*, No. 24-cr-153, 2024 WL 4892742, at *3 (S.D.N.Y. Nov. 26, 2024) ("That EBCC was eager to cooperate with the Government does not convert EBCC's conduct in the Civil Case into joint activity or state action."). [2] In the absence of state action, Plaintiffs' allegations fail to state a § 1983 claim against Thanos and Marou.

**2. U-Haul and Hudson Rentals**

**\*5** Plaintiffs' only allegation against Defendants U-Haul, Inc. and Hudson Rentals and Garden Design is that these entities "were involved in actions related to a U-Haul truck and equipment on or near Elm Street that Thanos and Marou used as pretext for further complaints, obstruction, and allegations against Plaintiffs, with resulting interference in Plaintiffs' property rights and [the foundation's] operations." TAC ¶ 37. Even assuming that Plaintiffs articulated a constitutional violation as against these entities, which they have not, Plaintiffs' conclusory and vague allegations do not suffice to plead state action on their part, under any of the relevant tests enumerated above. Accordingly, Plaintiffs' allegations against U-Haul, Inc. and Hudson Rentals and Garden Design fail to state a claim under § 1983 for, among other reasons, lack of state action.

**C. Conspiracy**

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citation omitted); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002). "To state a conspiracy claim under 42 U.S.C. § 1985[,]" a plaintiff must allege "(1) some racial or other class-based discriminatory animus underlying the [defendants'] actions; and (2) that the conspiracy was aimed at interfering with [the plaintiff's] protected rights." *Brito v. Arthur*, 403

F. App'x 620, 621 (2d Cir. 2010) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).

In order to state a claim under either statute, allegations of direct evidence of conspiracy are not necessary, "but detailed allegations of the conspiracy's 'time and place' must be provided for a complaint to cross the plausibility threshold." *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 82 (N.D.N.Y. 2025) (citing *Ciambriello*, 292 F.3d at 325). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190 (2d Cir. 2012) (quoting *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)). "Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)." *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (citing *Kiryas Joel Alliance*, 495 F. App'x at 190-91); *see also Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011).

Here, Plaintiffs fail to state a plausible cause of action for conspiracy under either § 1983 or § 1985(3). At the outset, even viewing the allegations in the light most favorable to Plaintiffs, the Third Amended Complaint fails to allege any specific facts regarding a "meeting of the minds" among *all*, much less any, of the individual defendants. Instead, Plaintiffs' allegations regarding a meeting of the minds merely reiterate the relevant statutory language without any factual support. *See, e.g.,* TAC ¶ 77 ("Defendants reached an agreement, tacit or express, to deprive Plaintiffs of their constitutional rights...."), ¶ 80 ("Defendants conspired ... to deprive [Hamza] of equal protection and equal privileges and immunities.").

Furthermore, Plaintiffs have not sufficiently set forth how all the individual defendants acted in concert with one another to violate Plaintiffs' rights. Plaintiffs contend that the offending conduct includes "using Thanos and Marou's surveillance and reports as a pipeline to law enforcement and the DAO," "selectively targeting Plaintiffs with tickets, investigations, and criminal charges," "denying equal access to volunteer and civic opportunities," and "maintaining prosecutions and investigations as leverage." TAC ¶ 77. As previously discussed, evidence that private actors reported purported criminal activity to law enforcement does not establish a "meeting of the minds" or concerted behavior sufficient to state a conspiracy claim. Otherwise, these general and conclusory allegations do not plausibly allege that all the

individual defendants acted in concert with one another, as claimed.

**\*6** Finally, the Court notes that while "a plaintiff may assert a civil conspiracy claim under § 1983 for the deprivation of a constitutional right, he must first show a violation of the underlying constitutional right." *DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 373 (E.D.N.Y. 2016). It is unclear which of Plaintiffs' constitutionally protected rights the Defendants allegedly acted in concert to violate. However, to the extent Plaintiffs have failed to plausibly allege an underlying violation of their constitutional rights, they cannot sustain a claim of conspiracy to violate those rights.

For all of these reasons, Plaintiffs' conspiracy claims under § 1983 and § 1985(3) fail to state a claim as a matter of law.

### D. *Monell* Liability

"Under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), local governments may be held liable in § 1983 actions." *Frost v. New York City Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020). *Monell* emphasized, however, that "a municipality cannot be held liable ... on a respondeat superior theory." *Monell*, 436 U.S. at 691. Thus, "[t]he elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020)). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *Moran v. Cnty. of Suffolk*, No. 11 Civ. 3704, 2015 WL 1321685, at \*9 (E.D.N.Y. Mar. 24, 2015) (citations omitted).

Plaintiffs allege that "[t]he constitutional violations described" in the Third Amended Complaint "were caused by policies, customs, or practices" of the Village of Philmont.[3] TAC ¶ 83. With respect to Plaintiffs' claims premised on a failure-to-train theory, the Court is mindful that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

*Connick v. Thompson*, 563 U.S. 51, 61 (2011). A failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

**\*7** To set forth a failure-to-train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman v. City of Newburgh,* No. 13-cv-4178, 2015 WL 1379652, at \*22 (S.D.N.Y. Mar. 26, 2015). Here, Plaintiffs' claim fails because they have not alleged a specific training deficiency, nor does the Third Amended Complaint contain sufficient factual matter to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plaintiffs' broad allegation that that the municipality failed to train and supervise officers[4] on "neutral handling of neighbor disputes and petitioning," without more, is the sort that is regularly dismissed as too general and conclusory. *See Taranto v. Putnam Cnty.*, No. 21-cv-2455, 2023 WL 6318280, at \*19 (S.D.N.Y. Sept. 28, 2023) (collecting cases).

The remainder of Plaintiffs' *Monell* claims are liberally construed as alleging an actionable policy or custom through actions or decisions made by municipal officials with decision making authority. Although not specifically articulated in Plaintiffs' cause of action asserting *Monell* liability, the pleading as a whole can be construed to allege liability based on the Village of Philmont Trustees' alleged decision to reject Plaintiff Hamza's volunteer firefighter application in retaliation for his prior complaints and lawsuits. At this stage of the litigation, the Court will permit this claim to proceed to service. In doing so, the Court expresses no opinion on the

merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

**E. Detzel and MacFarlane**

Plaintiffs allege that Defendants Jason Detzel and Bob MacFarlane were Village trustees, employees and/or officials. TAC ¶ 17. Plaintiffs allege that Detzel and MacFarlane were repeatedly notified of Thanos and Marou's ongoing surveillance and harassment, and "routinely took Thanos and Marou's side" to the Plaintiff's detriment. *Id.* at ¶ 34-35. Plaintiffs further allege that Plaintiff Hamza's application to become a volunteer firefighter with the village was "rejected ... without explanation" by the Village Board of Trustees, and that in an "informal conversation, [ ] Detzel indicated that the rejection stemmed from a perception that Hamza was a 'rabble rouser' tied to his complaints, FOIL requests, and litigation[.]" *Id.* at ¶¶ 38-41.

Plaintiffs assert a First Amendment retaliation claim against Detzel and MacFarlane based on the denial of his volunteer application. TAC ¶¶ 57-62. At this stage of the litigation, the Court will permit only this claim to proceed to service as to Detzel and MacFarlane, as Plaintiffs' allegations otherwise fail to state any other § 1983 claims against them. In doing so, the Court expresses no opinion on the merits, nor does it suggest whether the claim would survive a properly filed dispositive motion.

**F. New York State Police**

Plaintiffs name the New York State Police (NYSP) in the Third Amended Complaint "only to the extent permitted for declaratory and injunctive relief and under state law as appropriate." TAC ¶ 20. "The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)). "The doctrine of *Ex parte Young* is a limited exception to the general principle of sovereign immunity and allows 'a suit [for injunctive relief] challenging the constitutionality of a state official's actions in enforcing state law' under the theory that such a suit is not 'one against the State,' and therefore not barred by the Eleventh Amendment." *CSX Transp., Inc. v. New York State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (quotation omitted). The *Ex parte Young* doctrine "does not apply when the state is the real, substantial party in interest." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp.*

*v. Halderman*, 465 U.S. 89, 101 (1984)) (additional quotation and quotation marks omitted); *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that *Ex parte Young* has "no application in suits against the States and their agencies, which are barred regardless of the relief sought"). "[A] plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly." *Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991). Accordingly, Plaintiffs' claims against the NYSP do not fall within the *Ex parte Young* exception, and are barred by sovereign immunity.

### G. Trooper Miguel Rodriguez

**\*8** Plaintiff alleges that on August 1, 2025, "officers – including [Defendant] Trooper Rodriguez – arrived at Hamza's home and seized him on a Menacing 3° charge arising from allegations connected to the Elm Street dispute. No contemporaneous warrant or probable cause documentation was shown." TAC ¶ 48. Hamza "was subjected to custodial questioning without Miranda warnings, and the timing of the arrest, its execution, and its maintenance reflected retaliatory and selective motives tied to his ongoing speech and previous federal filings." *Id.* at ¶ 49.

"To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Whitbeck v. Otsego Cnty.*, No. 3:25-cv-00673 (AMN/ML), 2025 WL 2959467, at *2 (N.D.N.Y. Oct. 20, 2025) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)). Confinement is otherwise privileged when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Here, although thin, Plaintiffs' allegations are sufficient at this juncture to permit the Fourth Amendment false arrest claim against Rodriguez to proceed to service. In making this determination, the Court expresses no opinion on the merits, or to whether Plaintiff Hamza's false arrest claim can survive a properly filed dispositive motion.

Plaintiffs have otherwise failed to state a First Amendment retaliation, Fourteenth Amendment equal protection or Fourteenth Amendment due process claim against Rodriguez,

as alleged in the Third Amended Complaint. Namely, Plaintiffs have failed to allege that Rodriguez had any personal involvement in the conduct giving rise to these claims. Plaintiffs' general allegations surrounding the "custodial questioning without Miranda warnings" do not identify Rodriguez or otherwise suggest he was personally involved in said conduct. Otherwise, the pleading is devoid of any reference to Rodriguez plausibly supporting these claims.

### H. Liberati-Conant and Davidson-Cunningham

#### 1. Individual Capacity

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)). "Instead of relying on strict categories of actions with respect to which absolute immunity attaches, the relevant question is 'whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate.' " *Id.* (quoting *Warney v. Monroe Cty.*, 587 F.3d 113, 123 (2d Cir. 2009)). Ultimately, the Court asks "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012). "The decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function." *Ogunkoya v. Monaghan*, 913 F.3d 64, 71 (2d Cir. 2019) (citations omitted).

Plaintiffs purport to sue District Attorney of Columbia County Chris Liberati-Conant "in his individual capacity for non-advocacy, administrative, and policy-making acts." TAC ¶ 22. It is, however, clear from the pleading that Plaintiffs' allegations against Liberati-Conant arise from his functional roles in the prosecutor's office. Specifically, Plaintiff contends that the district attorney's office, "through" Liberati-Conant, failed to sufficiently evaluate criminal charges against Thanos and Marou. TAC ¶ 45. Plaintiffs further allege that Liberati-Conant refused to recuse himself from Hamza's criminal prosecution, notwithstanding a purported conflict. *Id.* at ¶¶ 50-51. At a minimum, Liberati-Conant's decision whether or not to bring charges against Thanos and Marou is undoubtedly protected by absolute prosecutorial immunity. *Cruz v. Vill. of Spring Valley*, No. 21-cv-2073, 2022 WL 428247, at

*4 (S.D.N.Y. Feb. 11, 2022) (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) ("It is clear that 'the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions' covered by absolute immunity.")); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (noting that prosecutors are "immune for conduct in preparing for [prosecutorial] functions," including "evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged" (citations omitted)).

**\*9** Liberati-Conant's decision not to recuse himself from prosecuting Hamza's criminal action, although a closer call, is also protected by prosecutorial immunity. *See McDonough v. Smith*, No. 1:15-cv-01505 (MAD), 2016 WL 5717263, at \*20 (N.D.N.Y. Sept. 30, 2016), *vacated and remanded on other grounds*, 783 F. App'x 91 (2d Cir. 2019) (evaluating whether district attorney's decision to recuse himself is entitled to absolute immunity in the absence of authority from the Second Circuit, and concluding that "a district attorney is entitled to absolute immunity for the act of recusing himself from a prosecution because such act is intimately tied to his functions as an advocate for the people."); *see also Delta Fuel Co., Inc. v. Maxwell,* 485 F. App'x 685, 686 (5th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976)) ("[B]ecause the recusal was done in [the defendant's] role as district attorney, [the defendant] was entitled to absolute prosecutorial immunity"); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 934 (9th Cir. 2012) applying absolute immunity to prosecutor's acts of recusing himself and appointing a special prosecutor upon evaluation of existing conflicts of interest).

Plaintiffs also name the Columbia County District Attorney's Office Chief of Staff Zechariah Davidson-Cunningham as a defendant in this action. Plaintiffs' allegations against Davidson-Cunningham are based on his involvement in the "intake, maintenance, and communications" concerning Hamza's criminal case. TAC ¶ 23. Plaintiffs allege Davidson-Cunningham also failed to properly evaluate their complaints against Thanos and Marou, and that Davidson-Cunningham "continued to oversee intake and decisions, allowing the [criminal case against Plaintiff Hamza] to remain pending without meaningful progress toward trial or dismissal." *Id.* at ¶¶ 45-47, 51. Assuming that Plaintiffs have alleged a plausible constitutional violation by Davidson-Cunningham, it is for conduct committed in the course of his duties as staff of the prosecutor of the state. Accordingly, he is also entitled to absolute immunity. *See Andrews v. Grillot*, No. 3:22-cv-873, 2023 WL 5228179, at \*4 (D. Conn. Aug. 15, 2023)

(concluding that agents of the EPA acting at the direction of the EPA's lawyers during the course of an enforcement action were shielded from suit by absolute immunity) (citing *Maqablh v. Heinz*, No. 3:16-cv-289, 2017 WL 1347695, at \*3 (W.D. Ky. Apr. 10, 2017) ("The immunity afforded to prosecuting attorneys also applies to members of the prosecutor's staff for acts committed in the course of their duties as staff of a prosecutor of the state.") (cleaned up))); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)).

### 2. Official Capacity – Prospective Relief

Plaintiff also names Liberati-Conant as a defendant "in his official capacity for prospective injunctive and declaratory relief concerning ongoing practices of the [district attorney's office]." TAC ¶ 22. The Eleventh Amendment does not "bar actions seeking only prospective injunctive relief against state officials to prevent a continuing violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005) (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law."). The *Ex parte Young* doctrine requires that plaintiffs' complaint " '(a) alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). "In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (quoting *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011)); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, N.Y.*, 945 F.3d 83, 110 (2d Cir. 2019) (" '[C]onjectural' injuries do not suffice under Article III.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983)) ("[The plaintiffs] lack standing to pursue

injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

**\*10**  In this case, Plaintiffs' requests for prospective relief against Liberati-Conant fail to state a claim. Even assuming Plaintiffs' plausibly alleged a constitutional violation, which the Court seriously questions, the injunctive relief they seek is not sufficiently pled to be tied to an allegation of ongoing violations of federal law. At the outset, Plaintiff's request for declaratory relief finding that "Defendants' actions violated Plaintiffs' rights under" §§ 1983 and 1985(3) is "wholly retrospective," and therefore does not fall under the *Ex parte Young* exception. *See T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2700 (2025) (concluding that request for "only a declaration – in the past tense – that the Board '*violated* Title II' " is retrospective).

With respect to Plaintiffs' requests for prospective injunctive relief, Plaintiffs must plead more than conclusory, general requests that the "defendants" be enjoined from "selective enforcement of laws against Plaintiffs." TAC at 30. *Craig v. Connecticut Dep't of Mental Health Nov. 28, 2017 & Addiction Servs.*, No. 3:16-cv-2100, 2017 WL 5892193, at \*5 (D. Conn. Nov. 28, 2017) ("[Plaintiff's] request for injunctive relief - 'an order that each defendant shall fully comply with the provisions of [sic] pursuant to 42 U.S.C. § 1981 ...'- is impermissibly vague and overbroad."); *Peregrine Myanmar Ltd. V. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) ("[U]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law."). For these reasons, Plaintiffs' official capacity claim against Liberati-Conant fails to state a claim.

### I. Plaintiff Yakel

Yakel does not have standing to bring the limited claims this Court is permitting to proceed to service. To have standing to sue, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing, among others, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff must also "assert his [or her] own legal rights and interests, and cannot rest his [or her] claim to relief on the legal rights or interest of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Rejamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("The 'prudential standing rule ... normally bars litigants from asserting the

rights or legal interests of others in order to obtain relief from injury to themselves.' ") (quoting *Warth*, 422 U.S. at 509). At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element" of standing. *Id.* (citation omitted).

Here, Yakel has failed to identify any concrete and particularized harms he has suffered that are fairly traceable to (1) the Village of Philmont's alleged rejection of Hamza's volunteer firefighter application in retaliation for his complaints and litigation, or (2) Rodriguez's alleged false arrest of Hamza on August 1, 2025. Indeed, Plaintiff Yakel is barely referenced throughout the body of the Third Amended Complaint. Because the surviving claims do not allege independent claims for relief on behalf of Yakel, he lacks standing to maintain this action. *See, e.g., Hesse v. E. Windsor Police Dep't*, No. 3:24-cv-2044, 2025 WL 2379269, at \*3 (D. Conn. Aug. 15, 2025) (wife lacked standing to bring claims alleging violations related to the arrest and prosecution of her husband); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) ("First, Angela Morgan lacks standing to bring individual claims under § 1983 based upon a deprivation of her daughter's constitutional rights."). Accordingly, Plaintiff Yakel is dismissed from this action without prejudice.

### IV. CONCLUSION

**\*11**  For these reasons, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation is **ADOPTED** to the extent set forth above, and Plaintiffs' Second Amended Complaint in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) Dkt. No. 50, Complaint in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) Dkt. No. 1, and Complaint in *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.) Dkt. No. 1 are **DISMISSED,** and it is further

**ORDERED** that in *Hamza II* No. 1:25-cv-1429 (ECC/ML) (N.D.N.Y.) and *Hamza III* No. 1:25-cv-1506 (ECC/ML) (N.D.N.Y.), the Clerk of the Court enter judgment closing these actions for the reasons set forth in this Memorandum-Decision and Order, and it is further

**ORDERED** that in *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) the Third Amended Complaint is accepted for filing. The Clerk of the Court shall docket the Third Amended Complaint, as set forth in Dkt. No. 56 at 3-32, as a separate

entry on the docket, attaching as exhibits the submissions found at Dkt. No. 55-1; [5] and it is further

**ORDERED** that the Clerk of the Court serve a Rule 11 affidavit and a copy of the Third Amended Complaint on Plaintiff Hamza, [6] and it is further

**ORDERED** that, pursuant to the Court's careful review of the Third Amended Complaint under 28 U.S.C. § 1915(e)(2), the following claims **SURVIVE** initial review and require a response: (1) Hamza's First Amendment retaliation claim against Defendants Jason Detzel and Bob MacFarlane arising from the rejection of Hamza's volunteer firefighter application, (2) Hamza's *Monell* claim against Defendant Village of Philmont arising from the rejection of Hamza's volunteer firefighter application, and (3) Hamza's Fourth Amendment false arrest claim against Defendant Trooper Miguel Rodriguez arising from Hamza's arrest on August 1, 2025; and it is further

 **\*12  ORDERED** that Plaintiff is directed to submit proposed summonses to the Clerk of the Court for Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez; [7] and upon receipt of the Rule 11 affidavit and proposed summonses, the Clerk shall issue summonses and forward them, along with the necessary copies of the Third Amended Complaint and a copy of this Memorandum-Decision and Order to the United States Marshal for service upon Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez. The Clerk shall forward a copy of the summons, Third Amended Complaint, and this Memorandum-Decision and Order by electronic mail to the New York State Attorney General's Office, and it is further

**ORDERED** that a response to the Third Amended Complaint be filed by Defendants Village of Philmont, Jason Detzel, Bob MacFarlane, and Miguel Rodriguez as provided for in the Federal Rules of Civil Procedure after service of process, and it is further

**ORDERED** that, except as to the foregoing, the remaining claims asserted in the Third Amended Complaint are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2); and it is further

**ORDERED** that the Clerk of the Court shall **TERMINATE** the following defendants from the *Hamza I* No. 1:25-cv-968 (ECC/ML) (N.D.N.Y.) docket: Athanasios Dimadis Kotsidis, Maroula Kotsidou, Chief Vernon Doyle, U-Haul, Inc., New York Department of Environmental Conservation, Philip Tkacy, Douglas Cropper, Carla Ingersoll, Morgan Klima, Hudson Rentals and Garden Design, New York State Police, Chris Liberati-Conant, Zechariah Davidson-Cunningham, The Government of the Hellenic Republic, (Greece), Association of Foreign Press Correspondents in the USA, Inc. (AFPC-USA), The George Washington University Graduate School of Political Management (GPSM), and The United States Department of State, and it is further

**ORDERED** that the claims brought by Plaintiff Yakel are **DISMISSED,** and the Clerk of the Court shall **TERMINATE** Plaintiff Yakel from the docket.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 1296172

---

## Footnotes

1    Citations to docket entries refer to those filed in *Hamza I,* unless otherwise noted.

2    The Court notes that Magistrate Judge Lovric provided an extensive list of allegations contained in Plaintiffs' *Hamza I* Second Amended Complaint, strongly suggesting that state actors were *not* acting in concert with Thanos and Marou to violate Plaintiffs' constitutional rights. Dkt. No. 54 at 32-34.

3    Plaintiff also alleges *Monell* liability against the New York State Police and the "DA in Official Capacity." TAC ¶¶ 82-84. However, the "holding in *Monell* was limited to local government units which are not considered part of the State for Eleventh Amendment purposes," and therefore does not apply to state agencies such as the

NYSP or the District Attorney's Office. *See Daly v. Town of Dewitt*, No. 18-cv-845 (TJM), 2019 WL 4170162, at \*3–4 (N.D.N.Y. Sept. 2, 2019) (dismissing municipal liability claim against NYSP); *see also Strasser v. New York*, No. 10-cv-141 (FJS/DEP), 2012 WL 253391, at \*3 (N.D.N.Y. Jan. 26, 2012) (adopting magistrate judge's recommendation to dismiss *Monell* claims against the state or its entities, including the NYSP, and noting that *Monell* "provides no basis to permit plaintiff to assert claims against the state or its agencies"); *Mobley v. Rodriguez*, No. 7:25-cv-6784, 2025 WL 3042024, at \*3 (S.D.N.Y. Oct. 31, 2025) ("In the State of New York, a District Attorney's Office, when prosecuting a criminal matter, is deemed an arm of the State of New York and, therefore, in that context, enjoys Eleventh Amendment immunity from suit."). Accordingly, Plaintiffs fail to state a *Monell* claim against the NYSP and the District Attorney's Office.

4    Moreover, and to reiterate, Plaintiff has not alleged an underlying constitutional violation by any Village of Philmont law enforcement officer that would support such a *Monell* claim based on a failure-to-train theory.

5    In his letter motion seeking to file the Third Amended Complaint, Hamza contends that the draft pleading "references certain exhibits cited in [his] objections to the RRO," and states that "if the Court grants leave to amend, [he] will formally incorporate those exhibits and provide the Court with detailed descriptions of each exhibit so their relevance and evidentiary value are clear." Dkt. No. 56. To the extent the pleading relies on these documents, they will be docketed as exhibits to the Third Amended Complaint. Hamza's request to otherwise formally incorporate the exhibits and provide descriptions is denied.

6    The Third Amended Complaint is not signed. *See generally* Dkt. No. 56 at 3-32. Rule 11(a) of the Federal Rules of Civil Procedure requires that every pleading be signed "by at least one attorney of record in the attorney's name ... or by a party personally if the party is unrepresented." Therefore, as the only plaintiff with surviving claims, Hamza must, within fourteen days, execute and file an affidavit which states that he has read the Third Amended Complaint and the text of Federal Rule of Civil Procedure 11. By executing the same, Hamza shall be declaring that he is representing to the Court all of the representations delineated in Federal Rule of Civil Procedure 11(b) with respect to the Third Amended Complaint. Hamza is advised that if he does not comply, this action may be dismissed without prejudice.

7    The Clerk is directed to provide Plaintiff with blank summonses to complete.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Disagreement Recognized by   Herron v. Best Buy Co. Inc.,   E.D.Cal., February 14, 2013

2011 WL 587587

Only the Westlaw citation is currently available.

United States District Court,

E.D. California.

Charles S. JACKSON and Lucille Jackson, Plaintiffs,

v.

OCWEN LOAN SERVICING, LLC.,

a Delaware corporation, Defendant.

No. 2:10–cv–00711–MCE–GGH.

|

Feb. 9, 2011.

West KeySummary

1      **Antitrust and Trade Regulation** 🔑 Finance and Banking in General;  Lending

Loan servicer's failure to accept borrower's home loan payment as timely was not a violation of a constitutional or statutory provision. Therefore, servicer's actions did not constitute an unfair business practice under California's Unfair Competition Law. Servicer agreed to modify the terms of borrower's home loan if borrower fulfilled its obligation to make timely payments for a three-month trial period. Borrower remitted its first payment to the wrong address and did not correct its mistake until after the deadline for payment, resulting in servicer's refusal to honor the terms of the loan modification agreement. Borrower failed to point to any constitutional or statutory provision which prohibited servicer's actions. West's Ann.Cal.Bus. & Prof.Code § 17200, et seq.

**Attorneys and Law Firms**

Ali Nehme, Law Offices of Deborah J. Pimentel, Deborah J. Pimentel, NCAED, Attorney at Law, San Ramon, CA, for Plaintiffs.

Rebecca L. Wilson, Houser & Allison, APC, Carlsbad, CA, for Defendant.

*MEMORANDUM AND ORDER*

MORRISON C. ENGLAND, JR., District Judge.

**\*1**  Plaintiffs Charles and Lucille Jackson ("Plaintiffs") seek redress from Defendant Ocwen Loan Servicing, LLC ("Defendant") based on claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unfair business practice, fraudulent business practice, declaratory relief for unlawful foreclosure, and financial abuse of an elder. Plaintiffs have a Notice of Action Pending ("Lis Pendens") on their former residence at 2444 Oceanic Drive, Fairfield, CA 94533.

Presently before the Court is a Motion by Defendant to Dismiss Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) [1] . Defendant also moves to Expunge the Lis Pendens recorded against Plaintiffs' residence. For the reasons set forth below, Defendant's Motions to Dismiss and Expunge are granted in part and denied in part. [2]

**BACKGROUND** [3]

This action arises out of activity surrounding a residential loan transaction for Plaintiffs' property located in the City of Fairfield, County of Solano, California. On July 18, 2006, Plaintiffs entered into a mortgage loan for $380,700. Defendant was the servicer of Plaintiffs' mortgage.

In July 2009, Plaintiffs entered into a written agreement with Defendant, the Home Affordable Modification Trial Period Plan ("HAMP"). The HAMP is a home loan modification program that amends mortgages for homeowners who certify that they are unable to afford mortgage payments on their principal residence.

In order to receive the modification agreement, homeowners must first pass through the HAMP's "trial period" of three months where they are required to make regular and timely mortgage payments, and during which time the terms of the original loan remain in place. Plaintiffs incorrectly sent their first trial period payment to the wrong address. Plaintiffs later corrected their mistake and sent payment to the correct address, but Defendant refused the payment as late, thereby causing Plaintiffs to fail the trial period and be denied the modification agreement. Plaintiffs were advised by Defendant to reapply for the HAMP, but chose not to do so. Defendant proceeded with foreclosure on the residence and recorded a Notice of Default in the Official Records of Solano County on August 17, 2009. [4] Defendant indicates that Plaintiffs were $23,356.90 behind on their mortgage payments as of August 14, 2009. Defendant recorded the Notice of Trustee's Sale in the Official Records of Solano County on December 23, 2009. The foreclosure sale was initially scheduled for January 11, 2010, but was rescheduled on several occasions until it was eventually sold to a third party on July 27, 2010. Plaintiffs filed the present lawsuit against Defendant on January 11, 2010, and recorded a Lis Pendens on the property.

### STANDARD

#### A. Motion to Dismiss

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and quotations omitted). Though "a complaint attacked by a Rule 12(b)(6) motion" need not contain "detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (*quoting Papasan v. Allain,* 478 U.S. 265, 2869, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (*citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure §*

1216 (3d ed.2004) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.")).

**\*2** Further, "Rule 8(a)(2) ... requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing ... grounds on which the claim rests." *Twombly,* 550 U.S. at 555 n. 3 (internal citations omitted). A pleading must then contain "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If the "plaintiffs ... have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.*

Once the court grants a motion to dismiss, they must then decide whether to grant a plaintiff leave to amend. Rule 15(a) authorizes the court to freely grant leave to amend when there is no "undue delay, bad faith, or dilatory motive on the part of the movant." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In fact, leave to amend is generally only denied when it is clear that the deficiencies of the complaint cannot possibly be cured by an amended version. *See DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir.1992); *Balistieri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990) ("A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (internal citations omitted).

#### B. Motion to Expunge Lis Pendens

"A Lis Pendens is recorded by someone asserting a real property claim, to give notice that a lawsuit has been filed which may, if that person prevails, affect title to possession of the real property described in the notice." *Fed. Deposit Ins. Corp. v. Charlton,* 17 Cal.App.4th 1066, 1069, 21 Cal.Rptr.2d 686 (1993) (citing Cal.Civ.Proc.Code §§ 405.2, 405.4, and 405.20). A Lis Pendens, once filed, prevents the property's transfer until the Lis Pendens is expunged or the litigation is resolved. BGJ *Assoc., LLC v.Super. Ct. Of L . A.,* 75 Cal.App.4th 952, 966–67, 89 Cal.Rptr.2d 693 (1999). The Lis Pendens is expunged if the pleading on which the Lis Pendens is based does not contain a real property claim, or if the evidence fails to establish the probable validity of the real property claims. *Orange Cnty. v. H.K. and Shanghai Banking Corp. Ltd.,* 52 F.3d 821, 823–24 (9th Cir.1995). To constitute a "real property claim," the cause of action, if meritorious, must affect the right of possession of specific real property or

affect the title to the specific real property. Cal.Civ.Proc.Code § 405.4. The "probable validity" standard means "it is more likely than not that the claimant will obtain a judgment against the defendant on the claim." *Id.* at § 405.3.

## ANALYSIS

### A. Motion to Dismiss

**1. Breach of Contract**

Under California law, to state a claim for breach of contract, a plaintiff must plead: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance of the contract; (3) defendant's breach of the contract; and (4) resulting damages. *Armstrong Petrol. Corp. v. Tri Valley Oil & Gas Co.,* 116 Cal.App.4th 1375, 1391 n. 6, 11 Cal.Rptr.3d 412 (2004).

**\*3** Plaintiffs and Defendant disagree on whether the HAMP is a contract under law. Because the Court reviews this claim on a motion to dismiss standard, Plaintiffs need only allege sufficient facts to raise their breach of contract claim above mere speculation. Plaintiffs have pled enough facts under this standard to fairly argue that the HAMP is an enforceable contract, that they had performed contractual obligations under the HAMP, and that Defendant subsequently refused to perform. Defendant's Motion to Dismiss Plaintiffs' first claim for breach of contract is denied.

**2. Breach of Good Faith and Fair Dealing**

The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 683–84, 254 Cal.Rptr. 211, 765 P.2d 373 (1998). The covenant of good faith is read into contracts to protect the express terms or promises of the contract. *Id.* at 690, 254 Cal.Rptr. 211, 765 P.2d 373.

This covenant is particularly well-suited to situations where one party has discretionary power affecting the rights of another. *Carma Developers Cal., Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 372, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992).

Assuming the HAMP even constitutes a binding contract, Plaintiffs' claim for breach of good faith and fair dealing is sufficient to withstand a motion to dismiss. Plaintiffs allege that Defendant acted in bad faith by refusing to accept their first payment, which would have ensured their compliance

with the HAMP. Further, this payment was delayed as a direct result of Defendant's omission of information necessary for Plaintiffs to successfully perform their obligations. Thus, Defendant's Motion to Dismiss Plaintiffs' second claim for breach of good faith and fair dealing is denied.

**3. Promissory Estoppel**

Promissory estoppel makes a "promise binding under certain circumstances, without consideration in the usual sense of something bargained for and something given in exchange." *Garcia v. WorldSav., FSB,* 183 Cal.App. 4th 1037, 1040–41 (2010) (citing *Youngman v. Nev. Irrigation Dist.,* 70 Cal.2d 240, 249, 74 Cal.Rptr. 398, 449 P.2d 462 (1969)). If, by language or conduct, an individual leads another to do what he otherwise would not have done, then he should not be denied the "expectations upon which he acted." *Id.* Absence of consideration does not defeat a claim based on promissory estoppel. *Id.*

The required elements are: (1) a clear and unambiguous promise in its terms; (2) reliance that is reasonable and foreseeable; and (3) an injury that results from reliance. *Laks v. Coast Fed. Sav. & Loan Assn.,* 60 Cal.App.3d 885, 890, 131 Cal.Rptr. 836 (1976).

Plaintiffs have properly pled the elements for a promissory estoppel claim. They allege that Defendant promised to provide to them a loan modification upon completion of their obligations under the HAMP. This promise is clear and unambiguous from the written document provided. And because this document was in a writing signed by both parties, Plaintiffs' reliance on that promise was reasonably foreseeable as they acted in conformity with the express terms of the writing. Defendant's Motion to Dismiss Plaintiffs' third claim for promissory estoppel is denied.

**4. Unfair Business Practice under California law**

**\*4** California Business and Professions Code § 17200, *et seq.,* more commonly known as California's Unfair Competition Law ("UCL"), defines unfair competition as "any unlawful, unfair or fraudulent business act or practice". A claim for "unfair" business practices under the UCL requires a plaintiff to "tether" its allegation to a constitutional or statutory provision or a regulation carrying out statutory policy. *Webb v. Smart Document Solutions, LLC,* 499 F.3d 1078, 1082–83 (9th Cir.2007).

See also *Ferrington v. McAfee, Inc.,* No. 10–01455, 2010 WL 3910169 at *11–13 (N.D.Cal., Oct.5, 2010), *Buller v. Sutter Health,* 160 Cal.App.4th 981, 991, 74 Cal.Rptr.3d 47 (2008) (citing *Belton v. Comcast Cable Holdings, LLC.,* 151 Cal.App.4th 1224, 1239–40, 60 Cal.Rptr.3d 631 (2007)). [5] Plaintiffs provide no facts indicating that a constitutional or statutory policy prohibits the actions allegedly taken by Defendant. Since Plaintiffs have not tethered their allegations to any constitutional or statutory provision as required, their claim for unfair business practices is insufficient to withstand dismissal. Defendant's Motion to Dismiss Plaintiffs' fourth claim for unfair business practices is granted.

**5. Fraudulent business practices under California law**
A "fraudulent" business act or practice claim under the UCL requires a plaintiff to allege that consumers are likely to be deceived by the defendant's conduct. *Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal.3d 197, 212, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Under the heightened pleading standard of Rule 9(b), when alleging fraud, a plaintiff must state with particularity specific facts or circumstances constituting fraud.

Plaintiffs have properly alleged that consumers are likely to be deceived by Defendant's omission of the correct address in the HAMP. However, they have failed to plead any facts or circumstances indicating why Defendant's failure to act rises to the level of fraud. Plaintiffs bear the burden of demonstrating Defendant's conduct was not mere omission, but an actual fraudulent business practice. Plaintiffs' own conclusion that the conduct amounts to fraud is insufficient under the heightened pleading standard of Rule 9(b). Defendant's Motion to Dismiss Plaintiffs' fifth claim for fraudulent business practices is granted.

**6. Unlawful foreclosure/Request for declaratory relief**
California Civil Code § 2923.5 precludes lenders in California from filing a notice of default to begin foreclosure until thirty days after making initial contact with the homeowners, and satisfying certain due diligence requirements as detailed in the statute. Courts have found this statute to create a private right of action, however, the right is limited to preventing an impending foreclosure. *Mabry v. Superior Court,* 185 Cal.App.4th 208, 214–15, 110 Cal.Rptr.3d 201 (2010). If the foreclosure sale has already been completed, a plaintiff has no right to further legal action under this section, regardless of

the lender's failure to comply with the statutory requirements. *Id.*

**\*5** Because the sale of Plaintiffs' home was completed in July 2010, we do not reach a judgment as to whether Defendant violated § 2923.5. Plaintiffs have no valid claim under Cal. Civ.Code § 2923.5. Defendant's Motion to Dismiss Plaintiffs' sixth claim for declaratory relief is granted.

**7. Financial abuse of an elder**
California Welfare and Institutions Code § 15610.30 prohibits financial abuse of an elder. An "elder" is defined as a person over the age of 65. Cal. Welfare & Inst.Code § 15610.27. A defendant violates this statute if the defendant itself, or in assistance of another, takes, secretes, appropriates, obtains, or retains real or personal property of an elder for a wrongful use, with intent to defraud, or by undue influence. Cal. Welfare & Inst.Code § 15610.30.

Plaintiff Mrs. Jackson was not over 65 at the time of the alleged violation and, as such, lacks standing to bring this claim. Plaintiff Mr. Jackson does meet the age requirement, however, he does not plead sufficient facts to suggest Defendant forced him, with intent to defraud or by undue influence, to send his payment to a different address, or to somehow become late on payments thereby causing him to lose his property. Nor does the complaint demonstrate that Defendant took his property for a wrongful use. Thus, Defendant's Motion to Dismiss Plaintiffs' seventh claim for financial abuse of an elder is granted.

**B. Motion to Expunge Lis Pendens**
A recorded Lis Pendens may only be expunged if the pleading on which the Lis Pendens is based does not contain a real property claim, or if the evidence fails to establish the probable validity of the real property claim. *Orange Cnty. v. H.K. and Shanghai Banking Corp. Ltd.,* 52 F.3d 821, 823–24 (9th Cir.1995); *see supra.*

The Court finds that at this stage of the litigation, when Plaintiffs' allegations of fact must be accepted as true, it is not yet possible to make a finding by a preponderance of the evidence that Plaintiffs' real property claims are valid. Regardless of whether these claims are ultimately meritorious, there is an action currently pending which may affect title to the real property. As a notice of pending action, a Lis Pendens, is primarily recorded as a signal to the world that a suit has been filed regarding the property

so that there will not be a bona fide purchaser for value without notice. A ruling that would expunge such notification necessarily requires further litigation than has presently transpired. Accordingly, Defendant's Motion to Expunge Lis Pendens is denied without prejudice.

**CONCLUSION**

As a matter of law, and for the reasons set forth above, Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 24) is GRANTED without further leave to amend as to Claims 4, 5, 6 and 7, and DENIED as to Claims 1, 2, and 3. Defendant's Motion to Expunge the Lis Pendens is DENIED without prejudice. The parties are to file a joint status report within 30 days of this Order being electronically filed.

**\*6** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 587587

---

**Footnotes**

1    Unless otherwise noted, all further references to Rule or Rules are to the Federal Rules of Civil Procedure.

2    Because oral argument will not be of material assistance, the Court deemed this matter suitable for decision without oral argument. E.D. Cal. Local Rule 230(g).

3    The factual assertions in this section are based on the allegations in Plaintiffs' Second Amended Complaint unless otherwise specified.

4    The factual assertions in this paragraph come from Defendant's Motion to Dismiss unless otherwise specified.

5    California courts are split as to the appropriate test for finding business practices "unfair" under the UCL as they pertain to consumers as opposed to direct competitors. Ninth Circuit courts have ruled that either standard will be upheld. Therefore, the Court need not address the dispute. *Lozano v. AT & T Wireless Services, Inc.,* 504 F.3d 718, 736–37 (9th Cir.2007).

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    5

🚩 KeyCite Yellow Flag

Declined to Extend by   Broadwater v. County of Onondaga,   N.D.N.Y., March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,
v.
COUNTY OF CAYUGA; Cayuga County Sheriff's Department; City of Auburn; Shawn I. Butler, Chief of Auburn Police Department, as an Individual and in his official capacity; Cayuga County District Attorney's Office; Jon E. Budelmann, as an Individual and in his capacity as District Attorney for Cayuga County; and Anthony Spinelli, as an Individual and in his capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF JARROD W. SMITH, 11 South Main Street, P.O. Box 173, Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville, New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER, 6575 Kirkville Road, East Syracuse, New York 13057, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

**\*1**  On or about February 18, 2020, Plaintiff filed a complaint against Defendants City of Auburn, Shawn L. Butler, County of Cayuga, Cayuga County District Attorney's Office, Jon E. Budelmann, and Anthony Spinelli, asserting eight claims

pursuant to 42 U.S.C. §§ 1983 and 1988, and state law. *See* Dkt. No. 5. Specifically, Plaintiff's complaint alleges the following causes of action: (1) false arrest under the Fourth and Fourteenth Amendments; (2) malicious prosecution under the Fourth and Fourteenth Amendments; (3) negligent failure to train or supervise; (4) state law false arrest; (5) state law false imprisonment; (6) intentional and negligent infliction of emotional distress under New York State law; (7) negligence; and (8) deliberate indifference to medical care under the Eighth Amendment. *See* Dkt. No. 5 at ¶¶ 40-114. Currently before the Court is Defendants' motion to dismiss the complaint in its entirety. *See* Dkt. No. 9.

**II. BACKGROUND**

According to the complaint, on August 10, 2018, Plaintiff was the passenger in a vehicle that was driven by 140 Wall Street, allegedly in violation of an order of protection for Linda Fitzsimmons and Lee Joyner, who both reside at that address. *See* Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145 Wall Street, several houses down from 140 Wall Street, on the opposite side of the street. *See id.* at ¶ 25. Plaintiff was not the driver of the vehicle and had no control over how the driver was delivering him to his home. *See id.*

On August 13, 2018, Plaintiff was arraigned on two felony complaints charging him with two counts of Criminal Contempt in the First Degree based on the alleged violation of the order of protection. *See id.* at ¶ 22. At the conclusion of his arraignment, Plaintiff was remanded to the Cayuga County Jail. *See id.* Plaintiff claims that "Defendant police officer lacked the requisite requirement of having probable cause to arrest the Plaintiff; and did falsely arrest and imprison the Plaintiff." *Id.* at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his capacity as Cayuga County District Attorney, presented Plaintiff's charges to a grand jury, which "No Billed" the case. *See id.* at ¶ 26. At this point, Plaintiff was released from custody. *See id.*

During the fifty-three days during which Plaintiff "was being illegally imprisoned," he slipped and fell at the Cayuga County Jail. *See id.* at ¶ 31. According to Plaintiff, on August 31, 2018, a water pipe burst at the Cayuga County Jail near Plaintiff's cell while he was already locked in for the night and sleeping. *See id.* at ¶ 32. Plaintiff was woken by a bursting water pipe that was turned off by a Cayuga County

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water off" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

#### A. Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

#### B. Documents Considered in Deciding Motion to Dismiss

In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, \*3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 113 of 181

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*,

No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

## C. *Monell* and Supervisory Liability

 **\*4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise because] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted). [1]

### D. Cayuga County District Attorney's Office and Auburn Police Department

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, \*8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

### E. False Arrest

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 115 of 181

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

**\*6** In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

**F. Malicious Prosecution**

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt.

No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution. [3]

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8** The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced

or continued the underlying criminal proceeding.' " *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### 1. Initiation of Criminal Prosecution

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated that the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

### 2. Malice

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### 3. Prosecutorial Immunity

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, \*3 (W.D.N.Y. June 22, 2017) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, \*3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not

so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses 'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, \*4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at \*4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983

Case 3:25-cv-01218-GTS-ML   Document 6   Filed 07/02/26   Page 118 of 181

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress

In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

### H. Negligence

In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a

plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

### I. Deliberate Indifference to Serious Medical Needs

In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a *'mens rea* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person

actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12**  Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981))). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 120 of 181

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See Connick*, 131 S. Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At best, the facts set forth in the

complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

### IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**;[4] and the Court further

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

---

**Footnotes**

1    As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

2    Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

3    Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case, not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up

with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

4    As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

---

**End of Document**                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2026 WL 817990
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph R. PASSINO, Plaintiff,
v.
FULTON COUNTY NEW YORK, et al., Defendants.

1:25-cv-00727 (AMN/DJS)
|
Signed 03/25/2026

**Attorneys and Law Firms**

VINCENT U. UBA, ESQ., UBA LAW FIRM, P.C., 744 Broadway, Albany, New York 12207, Attorneys for Plaintiff.

STEPHEN M. GROUDINE, ESQ., MURPHY BURNS GROUDINE LLP, 407 Albany Shaker Road, Loudonville, New York 12211, Attorneys for Defendants Fulton County, Richard C. Giardino, Jeffrey Fake, Jordan M. Shannon, and Robert Stemmler.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

## I. INTRODUCTION

 **\*1**  On April 22, 2025, Plaintiff Joseph R. Passino commenced this suit in New York Supreme Court pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York state law alleging injuries arising out of two criminal prosecutions and raising various related claims against Richard C. Giardino, Jeffrey Fake, Jordan M. Shannon, and Robert Stemmler in their official and individual capacities, and against Fulton County (collectively, "County Defendants"). *See* Dkt. No. 2 ("Complaint"). Plaintiff also brings claims against Jodie-Lynn Vannie and Gladys K. Griffith, who have not appeared in the action, and an unidentified Jane Doe (collectively with County Defendants, "Defendants"). *See id*. County Defendants removed the state action to this Court on June 9, 2025. Dkt. No. 1.

Presently before the Court is County Defendants' motion to dismiss for failure to state a claim on which relief can be granted. Dkt. No. 10 (the "Motion"); *see* Fed. R. Civ. Pro. 12(b)(6). Plaintiff opposed the Motion, *see* Dkt. No. 19, and County Defendants replied in further support. Dkt. No. 20.

For the reasons set forth below, the Motion is granted in part and denied in part.

## II. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Complaint, its attachments, or materials it incorporates by reference, and are assumed to be true for purposes of ruling on the motion, *see Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (*per curiam*), or are otherwise matters of public record. *Williams v. N.Y.C. Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020).

### A. The Parties

Plaintiff Joesph R. Passino is an individual residing in Fulton County, New York. Dkt. No. 2 at ¶ 1. At all relevant times, Plaintiff was the Dog Control Officer for the Town of Perth, New York. *Id.* at ¶ 2. Plaintiff also served as a volunteer backup Animal Control Officer for the Fulton County Sheriff's Department, the New York State Police, the Town of Amsterdam, the Town of Bleecker, and the Village of Mayfield. *Id.* at ¶ 3.

Fulton County is a municipal corporation organized under New York law, with its principal administrative office in Johnstown, New York. *Id.* at ¶¶ 4, 7. At all relevant times, Defendant Richard C. Giardino was the Fulton County Sheriff, *see id.* at ¶ 14, Defendants Jeffrey Fake and Jordan M. Shannon were deputy sheriffs with the Fulton County Sheriff's Department ("FCSD"), *see id.* at ¶¶ 8, 10, and Defendant Robert Stemmler was a sergeant with FCSD who also supervised Defendant Shannon. *Id.* at ¶ 12.

At all relevant times, Defendants Jodi-Lynn Vannie and Gladys K. Griffith were individuals residing in Amsterdam, New York. *See* Dkt. No. 2-12 at 1; Dkt. No. 2-3 at 6. [1]

### B. Plaintiff's Allegations

Plaintiff's claims arise out of two incidents, each leading to an arrest and a criminal proceeding. *See* Dkt. No. 2 at ¶¶ 42-220. For context, Plaintiff also alleges a particular history of interactions between himself and FCSD, *see id.* at ¶¶ 22-41, including two instances in which FCSD called him

to shoot a sick or injured animal within five hundred feet of a "dwelling house, farm building or farm structure, school building, school playground, or occupied factory or church," one instance in which FCSD members shot a horse within five hundred feet of the same, and one instance in which Plaintiff refused a directive by Defendant Giardino to break into a home without a warrant to seize an unlicensed dog that had been deprived of food and water for a week. *Id.* at ¶¶ 22-39. As to this last instance, Plaintiff alleges that "because [he] would not go along with FCSD's lawful or unlawful instructions[,]" FCSD employees and agents no longer wanted him as the Dog Control Officer. *Id.* at ¶ 40.

### 1. April 7, 2021 Arrest

**\*2**  As to the first incident, Plaintiff alleges that on January 4, 2021, he received multiple calls regarding two at-large dogs, one of which was acting aggressively. *Id.* at ¶ 42. After Defendant Griffith informed Plaintiff that she had seen the dogs walking toward Perth Bible Church, Plaintiff drove to that location and saw the two dogs in the driveway of the pastor's house, which is also on the property. *Id.* at ¶¶ 43-44. Perth Bible Church also operates a school, which was in session. *See* Dkt. No. 2-3 at 2. Then, Plaintiff alleges that while he was waiting for backup, he observed one of the dogs barking and growling at someone in the house, at which point he attempted to engage the dogs himself next to the garage while armed with a loaded pistol. Dkt. No. 2 at ¶¶ 45-47. Plaintiff alleges that one of the dogs had already charged his truck aggressively when he pulled in, and that the same dog "lunged violently" at him when he was out of the truck. *Id.* at ¶¶ 45, 48. Plaintiff alleges that after he missed an attempt to hit that dog with the butt of his pistol, the dog again lunged violently at Plaintiff, who then "took the safety lock off his pistol and shot the male dog with the bullet grazing the male dog's tooth." *Id.* at ¶ 48. At that point, the dog retreated. *Id.* Plaintiff then reported the incident to FCSD, canvassed the neighborhood, and identified the dogs' owner, who later found and collected the dogs. *Id.* at ¶¶ 49-50.

After an investigation into the incident that took place on January 4, 2021, Defendant Fake arrested Plaintiff on April 7, 2021 and charged him with reckless endangerment in the second degree and illegal discharge of a firearm within five hundred feet of a dwelling house and school building, both misdemeanors. *Id.* at ¶¶ 51-53 (citing N.Y. Pen. Law § 120.20 and N.Y. Envir. Cons. Law § 11-9031.4(a)(2)). Defendant Fake's accusatory instrument indicates that he based the

charges on Plaintiff's verbal statements and the depositions of Nicole Langlois, the owner of the dogs, Mark Appell, the pastor of Perth Bible Church, and Defendant Griffith. Dkt. No. 2-3. As a result of the charges and a securing order levying various conditions on Plaintiff, *see* Dkt. No. 2-4, Plaintiff alleges that he appeared in Northampton Town Court at least three times. Dkt. No. 2 at ¶ 72. On November 27, 2022, the town prosecutor issued Plaintiff an Adjournment in Contemplation of Dismissal for both charges, which were then dismissed on December 26, 2022. Dkt. No. 2-6; *see also* Dkt. No. 2 at ¶ 77.

### 2. August 10, 2022 Arrest

As to the second incident, Plaintiff alleges that on July 27, 2022, while Defendant Vannie was on her back porch with her two dogs, Plaintiff pulled up to her porch, informed her that he was the Dog Control Officer, and asked whether her dogs were licensed. Dkt. No. 2 at ¶¶ 93-94. After Defendant Vannie stated that they were not licensed, Plaintiff then alleges that he told Defendant Vannie that the law required her to license her dogs and provided her a handwritten note with his name, phone number, title, and the Town Hall hours of operation. *Id.* at ¶¶ 94-95.

During their interaction, Plaintiff alleges that Defendant Vannie asked for identification and Plaintiff responded by showing her his Town of Perth Dog Control Officer badge. *Id.* at ¶ 96. Plaintiff also alleges that he asked if Defendant Vannie wanted to see his identification card issued by FCSD, but she said no. *Id.* at ¶ 97. According to Plaintiff, FCSD issued him an identification card on January 20, 2000, identifying him as the "Perth Dog Control Officer," and some time after that, Plaintiff was issued a badge with the designation: "Town of Perth, Fulton County, New York, Dog Control Officer." *Id.* at ¶¶ 88-89; *see also* Dkt. Nos. 2-7, 2-8.

After that interaction, Defendant Vannie called FCSD and spoke with Defendant Jane Doe. Dkt. No. 2 at ¶ 102; *see* Dkt. No. 2-10 (call transcript). During the call, Defendant Vannie sought to confirm Plaintiff's identity, and also stated that Plaintiff had implied that Defendant Vannie might be ticketed if she didn't register her dogs and told her that he was "with the Sheriff's Department." *See* Dkt. No. 2-10. Jane Doe then expressed concern that Plaintiff purportedly identified himself as a member of FCSD and advised Defendant Vannie that their phone conversation would be forwarded to the administrative sergeant. *Id.* at 7:21-23, 9:14-18, 10:17-22. [2]

**\*3** On July 28, 2022, Defendant Vannie gave an in-person sworn deposition to Defendant Shannon. Dkt. No. 2 at ¶ 108; *see* Dkt. No. 2-11 (deposition transcript). During their conversation, Defendant Vannie recounts her version of the interaction with Plaintiff, specifically asserting that Plaintiff stated that he was "with the Sherriff's," that Plaintiff showed her his badge that "looked like any normal badge that a police officer would have," and that she believed that Plaintiff was functioning as a law enforcement official. Dkt. No. 2-11 at 18:11-24, 26:18-23.

On August 10, 2022, Defendant Shannon arrested Plaintiff outside of Plaintiff's home without a warrant and charged him with criminal impersonation of a law enforcement officer, a class E felony. Dkt. Nos. 2 at ¶ 125 (citing N.Y. Pen. Law § 190.26(1)); *see also* Dkt. No. 2-14. According to the accusatory instrument, Defendant Shannon based his arrest on Defendant Vannie's sworn deposition testimony. *See* Dkt. No. 2-14.

During the arrest, Plaintiff alleges that Defendant Shannon took Plaintiff's badge and never returned it. Dkt. No. 2 at ¶¶ 174-175. Plaintiff also alleges that Defendant Shannon initially agreed to not handcuff Plaintiff during transport for processing, but as they were walking to the police vehicle, Defendant Shannon grabbed Plaintiff by his left shoulder, shook him, and screamed, "stop resisting, stop resisting!" *Id.* at ¶ 182. Plaintiff then alleges that he told Defendant Shannon that he was hurting Plaintiff, but Defendant Shannon "continued to scream and shake [Plaintiff]." *Id.* At some point after, Defendant Shannon handcuffed Plaintiff. *Id.* at ¶ 195. Plaintiff alleges that Defendant Shannon knew that Plaintiff's left shoulder was injured, as evidenced by Defendant Shannon noting in his case report: Plaintiff "had informed me [that] he has a shoulder injury and could not be handcuffed from the back so I handcuffed [Plaintiff] from the front of his body." *Id.* at ¶ 183; *see* Dkt. No. 2-13 at 4.

Before and after processing, Plaintiff alleges that Defendant Shannon stated multiple times that Plaintiff would be lucky if Defendant Shannon did not also charge him with resisting arrest. Dkt. No. 2 at ¶¶ 184-185. Plaintiff then alleges that after Defendant Shannon brought him back home after processing, Plaintiff pointed to the security cameras around his house, and said: "[Y]ou have been caught doing dirty and a Black Sheriff Deputy can go to jail just as quick as a White man, so you have 10 seconds to arrest me for another bull charge or leave and always remember this!!" *Id.* at ¶

185. Plaintiff alleges that Defendant Shannon's actions during the arrest exacerbated his shoulder injury and caused "severe physical, mental, and emotional pain ... to such an extent that more than two years after the incident, [Plaintiff] is still receiving medical treatment." *Id.* at ¶ 188.

On September 1, 2022, Plaintiff resigned as the Town of Perth Dog Control Officer. Dkt. No. 2 at ¶ 137.

Plaintiff attended Northampton Town Court four times due to his criminal impersonation charge and a securing order imposing conditions on Plaintiff. *Id.* at ¶¶ 134-135; *see also* Dkt. No. 2-15. On June 6, 2024, the town prosecutor issued Plaintiff an Adjournment in Contemplation of Dismissal, and the criminal impersonation charge was dismissed on June 7, 2024. Dkt. No. 2-16 at 2; *see also* Dkt. No. 2 at ¶ 136.

### C. Plaintiff's Claims

As to the charges filed on April 7, 2021, Plaintiff brings malicious prosecution claims pursuant to Section 1983 against Defendants Fake, Giardino, Fulton County, and Griffith. *See* Dkt. No. 2 at ¶¶ 78-87. As to the arrest and charges filed on August 10, 2022, Plaintiff brings claims for malicious prosecution, unlawful search and seizure, excessive force, false arrest, and malicious abuse of legal process pursuant to Section 1983, as well as conspiracy claims pursuant to Section 1983 and 42 U.S.C. § 1985(3) ("Section 1985(3)"), against Defendants Shannon, Stemmler, Fake, Giardino, Fulton County, Vannie, and Jane Doe. *See id.* at ¶¶ 146-161, 169-220. Finally, Plaintiff brings a malicious prosecution claim under New York law against Defendant Vannie. *Id.* at ¶¶ 162-168.

### III. STANDARD OF REVIEW

**\*4** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This presumption, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even

if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers,* 282 F.3d at 152-53).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## IV. DISCUSSION [3]

### A. Fourth or Fourteenth Amendment

As an initial matter, "[w]hen a plaintiff brings both Fourth and Fourteenth Amendment claims that arise out of the same conduct by defendants, the two claims may not proceed simultaneously." *Fraser v. City of New York,* No. 20-cv-5741, 2022 WL 3045524, at *2 (E.D.N.Y. Aug. 1, 2022) (citations omitted). "In these circumstances, courts must identify the specific constitutional right allegedly infringed ... and judge the claim by reference to the specific constitutional standard which governs that right." *Id.* (internal quotation marks and citation omitted).

 **\*5** To the extent that Plaintiff's Section 1983 claims of malicious prosecution, false arrest, unlawful search and seizure, and excessive force are based on the Fourteenth Amendment, those claims must be dismissed. "[I]t is the Fourth Amendment, and not [the Fourteenth Amendment right to] substantive due process, under which a [Section] 1983 malicious prosecution claim must be analyzed." *Wagner*

*v. Hyra,* 518 F. Supp. 3d 613, 635 (N.D.N.Y. 2021) (internal quotation marks and citation omitted). Regarding Plaintiff's false arrest claim, "because claims for unlawful arrest are governed by the Fourth Amendment, Plaintiff may not seek relief for ... alleged unlawful arrest[s] under the rubric of a denial of his substantive due process rights." *Barkai v. Nuendorf,* No. 21-cv-4060, 2023 WL 2691712, at *32 (S.D.N.Y. Mar. 29, 2023) (quoting *Harford v. Cnty. of Broome,* 102 F. Supp. 2d 85, 95 (N.D.N.Y. 2000)). Similarly, "because the Fourth Amendment provides an explicit textual source of constitutional behavior against searches by law enforcement officials, Plaintiff's unlawful search claim cannot be analyzed under the Fourteenth Amendment." *Rosado v. Vill. of Goshen,* No. 16-cv-6916, 2019 WL 1437522, at *4 (S.D.N.Y. Mar. 31, 2019) (internal quotation marks and citations omitted). Furthermore, courts evaluate excessive force claims arising out of an arrest or seizure under the Fourth Amendment using an objective reasonableness standard. *See Figuereo v. City of Saratoga Springs,* No. 23-cv-922 (AMN/PJE), 2025 WL 460784, at *7 (N.D.N.Y. Feb. 11, 2025).

Additionally, to the extent that Plaintiff's Section 1983 claim of malicious abuse of process is based on the Fourth Amendment, that claim must also be dismissed. "[I]n the criminal context, malicious abuse of process is by definition a denial of procedural due process." *Zappin v. Cooper,* No. 23-165, 2024 WL 3084015, at *2 (2d Cir. June 21, 2024) (citation omitted). Thus, Plaintiff's claims for malicious abuse of process must be evaluated under the Fourteenth Amendment.

### B. Malicious Prosecution

"The elements of a [Section] 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Wagner,* 518 F. Supp. 3d at 633 (quoting *Bernshtein v. City of New York,* 496 F. App'x 140, 142 (2d Cir. 2012) (summary order)); *see also Rohman v. N.Y.C. Transit Auth. (NYCTA),* 215 F.3d 208, 215 (2d Cir. 2000).

Here, Plaintiff's malicious prosecution claim fails because the underlying state court actions were not terminated in Plaintiff's favor. Attached to the Complaint are the certificate of dispositions for the underlying state court actions, which indicate that the criminal charges brought against Plaintiff were adjourned in contemplation of dismissal pursuant New York Criminal Procedure Law § 170.55. *See* Dkt. Nos. 2-6, 2-16. "It has long been established that the acceptance of an adjournment in contemplation of dismissal does not constitute a favorable determination for purposes of a malicious prosecution claim." *Brill v. Ulster Cnty.*, 799 F. Supp. 3d 73, 85 (N.D.N.Y. 2025) (citations omitted); *see also Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (explaining that adjournment in contemplation of dismissal "is not a favorable termination because it leaves open the question of the accused's guilt and allows the state to pursue the criminal prosecution in the interests of justice during the conditional period") (citation omitted).

Accordingly, the Court dismisses Plaintiff's malicious prosecution claim under the Fourth Amendment.

### C. False Arrest

"A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. Aug. 20, 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)).

**\*6** Plaintiff alleges that Defendants confined Plaintiff without a warrant, without probable cause, and without his consent. Dkt. No. 2 at ¶¶ 195-198. County Defendants contend that Plaintiff's allegations fail to demonstrate that Defendant Shannon lacked probable cause to arrest Plaintiff and that Plaintiff fails to allege that Defendants Stemmler,

Giardino, and Fake were personally involved in Plaintiff's arrest. *See* Dkt. No. 10-1 at 16-17.

The Court agrees with the County Defendants. "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *Adams v. City of Syracuse*, No. 21-cv-650 (AMN/MJK), 2025 WL 2772081, at \*16 (N.D.N.Y. Sept. 29, 2025) (quoting *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022)).

Here, the Court finds that Defendant Shannon had probable cause to arrest Plaintiff on August 10, 2022 for criminal impersonation of a law enforcement officer based on Defendant Vannie's sworn deposition testimony. *See* Dkt. Nos. 2-11, 2-14. When an officer receives his information from a putative victim or eyewitness, probable cause is established "unless the circumstances raise doubt as to the person's veracity." *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (citation omitted); *see also Smith v. City of Utica*, No. 13-cv-767, 2015 WL 4366230, at \*2 (N.D.N.Y. July 16, 2015) (noting that "[i]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness" (citations omitted)). According to the Complaint and its attachments, Defendant Vannie gave a sworn deposition to Defendant Shannon, during which she specifically stated that she believed that Plaintiff was functioning as a law enforcement official because Plaintiff told her that he was "with the Sherriff's" and showed her his badge, which "looked like any normal badge that a police officer would have." *See* Dkt. No. 2 at ¶ 108; *see also* Dkt. No. 2-11 at 18:11-12, 26:18-23. Plaintiff also does not allege that he was a current member of the FCSD. Thus, Defendant Shannon had probable cause to arrest Plaintiff for criminal impersonation of a law enforcement officer.

With respect to Defendants Stemmler, Giardino, and Fake, Plaintiff fails to allege that these Defendants directly participated in Plaintiff's arrest. "A plaintiff cannot sustain a false arrest claim under New York law where there is no allegation that the defendant personally participated in the arrest or detention of the plaintiff." *Kweller v. Cnty. of Broome*, No. 24-cv-1328, 2025 WL 3280745, at \*5 (N.D.N.Y. Nov. 25, 2025) (collecting cases) (internal quotation marks and citations omitted). In opposition, Plaintiff asserts in a conclusory fashion that Defendants Stemmler, Giardino,

and Fake "participated in the unlawful conduct[ ]; and/or approved of it, and/or created the policies, practices, and customs that gave rise to the constitutional deprivations suffered by [Plaintiff]." Dkt. No. 19 at 23. Such general and conclusory assertions are insufficient to demonstrate Defendants' personal involvement. *See, e.g.*, *Daly v. Town of DeWitt*, No. 18-cv-845, 2019 WL 4170162, at *5 (N.D.N.Y. Sept. 2, 2019) (finding no plausible basis to hold defendant liable for false arrest where the complaint does not allege that defendant was an officer who arrived at the scene after plaintiff was pulled over or that defendant took any action to cause plaintiff's detention or instigate the charges against her).

**\*7** Accordingly, the Court dismisses Plaintiff's false arrest claim against the County Defendants.

### D. Unlawful Search and Seizure

First, to the extent that Plaintiff's unlawful search and seizure claim is predicated on the seizure of his person based on his August 10, 2022 arrest, the Court dismisses that claim as duplicative of his false arrest claim. *See Parkinson v. Town of Niskayuna*, No. 22-cv-70, 2023 WL 8574309, at *4 (N.D.N.Y. Dec. 11, 2023) ("To the extent Plaintiff premises his Fourth Amendment claim on the seizure of his person, such a claim is dismissed because it is tantamount to a claim for false arrest[.]"); *see also Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) (finding that plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims because plaintiff "does not allege a search or seizure beyond the actions supporting her false arrest claim").

To the extent that Plaintiff's unlawful search and seizure claim is predicated on the seizure of his property, the Court also dismisses that claim. Plaintiff alleges that Defendant Shannon seized his Town of Perth Dog Control Officer badge without a search warrant and without Plaintiff's consent during his arrest on August 10, 2022. *See* Dkt. No. 2 at ¶ 174. County Defendants argue that because Defendant Shannon had probable cause to arrest Plaintiff on August 10, 2022, and because Plaintiff was subsequently prosecuted for criminal impersonation after Plaintiff showed Defendant Vannie his badge, Plaintiff's badge was seized as evidence of a crime. Dkt. No. 10-1 at 13. In opposition, Plaintiff argues that the seizure of his badge was unreasonable because Defendant Shannon "invaded" Plaintiff's home without a warrant, without exigency, and without Plaintiff's consent and

searched and seized Plaintiff's property within the confines of his home. *See* Dkt. No. 19 at 18.

The Court agrees with the County Defendants. As a preliminary matter, the Complaint does not plausibly allege any facts suggesting that Defendant Shannon entered Plaintiff's home to seize Plaintiff's badge, or at any time during Plaintiff's arrest. According to the case report attached to the Complaint, upon Defendant Shannon's arrival at Plaintiff's residence, Plaintiff was sitting in his garage. *See* Dkt. No 2-13 at 4. After conducting his interview of Plaintiff and concluding that Plaintiff "would need to come with [him] to retrieve an [a]ppearance [t]icket for [f]alse impersonation," Defendant Shannon gave Plaintiff the opportunity to drop all items on his person in his garage. *Id.* Plaintiff proceeded to empty all items off his person and put them on his motorcycle in his garage. *Id.* Defendant Shannon subsequently placed Plaintiff under arrest, collected his badge as evidence, and then transported him to the Fulton County Sheriff's Office for processing. *See id.*

Here, as explained in *supra* Section IV(C), there was probable cause to arrest Plaintiff for impersonating an officer. "A police officer may seize personal effects discovered during a search incident to arrest if the officer[ ] find[s] that these are evidence of criminal conduct, even if unrelated to that for which a suspect had been arrested." *Henton v. City of New York*, No. 24-cv-2270, 2025 WL 1907004, at *4 (E.D.N.Y. July 10, 2025) (citing, *inter alia*, *United States v. Robinson*, 414 U.S. 218, 236 (1973)). Thus, Defendant Shannon lawfully seized Plaintiff's personal property, including his badge, incident to arrest, without violating Plaintiff's Fourth Amendment rights. *See Henton*, 2025 WL 1907004, at *4-5. Moreover, "the government's failure to return lawfully seized property is not an unreasonable seizure under the Fourth Amendment." *Harding v. Gould*, No. 22-cv-6285, 2024 WL 3742688, at *7 (S.D.N.Y. Aug. 9, 2024) (citing *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) ("Where, as in this case, an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure.")).

**\*8** Accordingly, the Court dismisses Plaintiff's unlawful search and seizure claim.

### E. Excessive Force

"When assessing whether force is unreasonable under the Fourth Amendment, a court should pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Baptist v. Wheeler*, No. 24-cv-1478 (AMN/TWD), 2025 WL 3120480, at *5 (N.D.N.Y. Nov. 7, 2025) (quoting *Soares v. Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993)). "In doing so, a court takes the perspective of 'a reasonable officer on the scene' rather than that of hindsight." *Id.* (quoting *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015)).

"The police are not required to utilize the least amount of force possible to place someone into custody." *Figuereo*, 2025 WL 460784, at *8 (citation omitted). Moreover, "[c]ourts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force." *Pesola v. City of New York*, No. 15-cv-1917, 2016 WL 1267797, at *7 (S.D.N.Y. Mar. 30, 2016) (collecting cases). However, regardless of the amount of force, "a show of force by an officer that is overly disproportionate to the risk of harm may support a claim for excessive force." *Figuereo*, 2025 WL 460784, at *8 (citation omitted).

### 1. Defendant Shannon

County Defendants contend that Plaintiff's excessive force claim against Defendant Shannon must be dismissed because Plaintiff failed to allege facts plausibly suggesting that Defendant Shannon used beyond *de minimis* force. *See* Dkt. No. 10-1 at 15. Plaintiff argues that the Complaint sufficiently alleges plausible facts in support of his excessive force claim. Dkt. No. 19 at 19-21.

The Court agrees with Plaintiff. Plaintiff alleges that, despite complying with Defendant Shannon's orders, Defendant Shannon, knowing that Plaintiff had an injured left shoulder, "violently grabbed [Plaintiff's] left shoulder and started to shake and squeeze" Plaintiff while "screaming, 'stop resisting, stop resisting!' " Dkt. No. 2 at ¶¶ 182-183. Plaintiff further alleges that he told Defendant Shannon that he was hurting him, but Defendant Shannon "continued to scream and shake [Plaintiff]," which "exacerbated" Plaintiff's existing shoulder injury and caused Plaintiff "significantly severe physical, mental, and emotional pain" for which he is still receiving medical treatment, more than two years

after the incident. *Id.* at ¶¶ 182, 188. Accepting these allegations as true, the Complaint plausibly alleges that Defendant Shannon used excessive force in the course of arresting Plaintiff. *See, e.g.*, *Goonewardena v. Spinelli*, No. 15-cv-5239, 2017 WL 9482109, at *13 (E.D.N.Y. Aug. 14, 2017) (recommending that excessive force claim against officer proceed where plaintiff alleged that officer's actions "resulted in plaintiff screaming for help in pain and caused injuries restricting plaintiff's ability to lift heavy objects for two months" (internal quotation marks and citations omitted)), *report and recommendation adopted*, 2017 WL 4280549 (E.D.N.Y. Sept. 26, 2017).

**\*9** Moreover, even in the context of an arrest, "[b]ecause of its intensely factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020) (citation omitted). "These principles apply with even greater force at the motion to dismiss stage, where a court must assume the truth of the plaintiff's allegations and avoid resolving factual disputes." *Id.*; *see also Phillips v. City of Middletown*, No. 17-cv-5307, 2018 WL 4572971, at *3 (S.D.N.Y. Sept. 24, 2018) ("When courts grant motions to dismiss an excessive force claim, it is because the force used was objectively reasonable as a matter of law." (citation omitted)).

Thus, after drawing all reasonable inferences in Plaintiff's favor and taking into account the totality of the circumstances of his arrest, the Court denies County Defendants' motion to dismiss Plaintiff's excessive force claim against Defendant Shannon. [4]

### 2. Defendants Giardino, Stemmler, and Fake

"It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show 'the defendant's personal involvement in the alleged constitutional deprivation.' " *Enders v. Boone*, 658 F. Supp. 3d 70, 90 (N.D.N.Y. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted)), *aff'd sub nom. Siano Enders v. Boone*, No. 23-823, 2024 WL 3518058 (2d Cir. July 24, 2024). A plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Pursuant to this requirement, a Section 1983 plaintiff must

allege a tangible connection between the acts of the defendant and the injuries suffered." *Keyes v. Venettozzi*, No. 18-cv-372, 2022 WL 991402, at *6 (N.D.N.Y. Mar. 31, 2022) (internal quotation marks and citation omitted). In other words, "the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained." *Durr v. Slator*, 558 F. Supp. 3d 1, 20 (N.D.N.Y. 2021) (citations omitted).

"Personal involvement of a supervisor may be established by direct participation in a constitutional violation or by showing that he created a policy or custom under which the violation occurred." *Rindgen v. Cnty. of Broome*, No. 24-cv-1325, 2025 WL 2772080, at *17 (N.D.N.Y. Sept. 29, 2025) (internal quotation marks and citation omitted); *see also Sanchez v. Nassau Cnty.*, 662 F. Supp. 3d 369, 416 (E.D.N.Y. 2023) ("Post-*Tangreti*, district courts in the Circuit have determined that personal involvement still may be established for a supervisory defendant if he or she 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.'") (collecting cases). However, "conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement." *Rindgen*, 2025 WL 2772080, at *17 (citation omitted).

**\*10** Thus, Plaintiff must allege facts suggesting that Defendants planned, directed, or authorized the excessive force against Plaintiff himself, or that they created or maintained policies which led to the use of excessive force against Plaintiff.

With respect to Defendant Giardino, Plaintiff alleges that Defendant Giardino "delegated authority to establish the policies, practices, supervision, implementation and conduct of all FCSD employees and agents." Dkt. No. 2 at ¶ 16. These allegations are unsupported by any specific facts, and thus insufficient to plausibly allege Defendant Giardino's personal involvement with respect to the alleged excessive force against Plaintiff. *See, e.g.*, *Baumeister v. Erie Cnty.*, No. 23-cv-1150, 2024 WL 4362311, at *10 (W.D.N.Y. Sept. 30, 2024) (finding that vague and conclusory allegations that sheriff and supervisory officer defendants were *inter alia* "responsible for the supervision, administration, policy practices, procedures, and customs of th[eir] offices," and "the pervasive and entrenched pattern of misconduct ... relating to utilizing force without justification, including the

use of excessive force in effectuating arrests," are insufficient to establish personal involvement).

Plaintiff further alleges that after his arrest on August 10, 2022, while Defendant Shannon was transporting him home, Defendant Giardino pulled up next to Defendant Shannon's vehicle, and the two smiled at each other. Dkt. No. 2 at ¶ 128. This allegation is also insufficient to plausibly allege Defendant Giardino's personal involvement. Defendant Giardino was not present during the alleged incident, and, even accepting Plaintiff's allegations as true, an allegation that Defendants Giardino and Shannon smiled at one another, without more, is insufficient to demonstrate that Defendant Giardino was personally involved in Defendant Shannon's alleged use of excessive force. *See, e.g.*, *Green v. Garcia*, No. 18-cv-1745, 2020 WL 1467359, at *5 (S.D.N.Y. Mar. 25, 2020) (dismissing excessive force claims against certain officers because plaintiff failed to plead that "each of them was individually present during the alleged assault").

Plaintiff also fails to allege that Defendants Stemmler and Fake were personally involved in the alleged use of excessive force. Plaintiff fails to allege that Defendants Stemmler and Fake participated in the alleged use of excessive force or were responsible for a policy or custom which led to the alleged use of excessive force. Beyond unparticularized allegations against all Defendants, with respect to Plaintiff's excessive force claims, the Complaint alleges, at most, that Defendant Fake supplied a false statement to Defendant Shannon that Plaintiff had a prior history of impersonating law enforcement, *see* Dkt No. 2 at ¶ 119, and Defendant Stemmler instructed Defendant Shannon to take a written statement from Defendant Vannie, *see id.* at ¶ 118, both of which supported Defendant Shannon's arrest and prosecution of Plaintiff. Even granting Plaintiff all favorable inferences, the Court cannot find that Plaintiff plausibly alleges that Defendants Stemmler and Fake were personally involved in any alleged use of excessive force. *See, e.g.*, *Powell v. City of Jamestown*, No. 21-cv-721, 2022 WL 1913581, at *10 (W.D.N.Y. June 3, 2022) (dismissing excessive force claims against chief, sheriff, and undersheriff because plaintiff failed to allege that they personally used any physical force against him, or that they were even present during the alleged incidents).

**\*11** Accordingly, the Court dismisses Plaintiff's excessive force claim against Defendants Giardino, Stemmler, and Fake.

## F. Malicious Abuse of Process

Plaintiff also asserts a claim for abuse of process. *See* Dkt. No. 2 at ¶¶ 200-205. Courts look to state law for the elements of a Section 1983 claim based on malicious abuse of process. *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391 (E.D.N.Y. 2013) (citing *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003)). In New York, in order to prevail on a claim for malicious abuse of process, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Wagner*, 518 F. Supp. 3d at 627 (quoting *Savino*, 331 F.3d at 76). "The third element, which forms the crux of this claim, requires that the defendants had an improper *purpose* in instigating the action, as opposed to merely a malicious motive." *Thorpe v. Delta Air Lines, Inc.*, No. 24-cv-1089, 2024 WL 5007423, at *8 (E.D.N.Y. Dec. 6, 2024) (internal quotation marks and citations omitted) (emphasis in original), *aff'd*, No. 25-58, 2025 WL 2868136 (2d Cir. Oct. 9, 2025). "The same elements apply to a [Section] 1983 claim for malicious abuse of process, but the plaintiff must also show the deprivation of a constitutional right." *Rivera v. Jahmi*, 801 F. Supp. 3d 129, 161 (E.D.N.Y. 2025) (internal quotation marks and citation omitted).

Here, regarding the third element, i.e., alleging a collateral objective, Plaintiff fails to state any facts, beyond conclusory allegations, that County Defendants pursued his prosecution for any improper purpose. *See* Dkt. No. 2 at ¶¶ 201-204. In opposition, Plaintiff contends that Defendants "employed the ... process of [a] felony complaint ... to force [P]laintiff out of his job as the Dog Control [O]fficer." Dkt. No. 19 at 25. But, in addition to being conclusory, this argument goes to Defendants' motive, and thus, does not satisfy the collateral objective requirement. *See LoPorto v. Cnty. of Rensselaer*, No. 15-cv-866, 2018 WL 4565768, at *14 (N.D.N.Y. Sept. 24, 2018) (noting that a malicious motive alone does not give rise to a cause of action for abuse of process and that plaintiff must instead claim that defendants "aimed to achieve a collateral purpose beyond or in addition to [plaintiff's] criminal prosecution"); *see also Savino*, 331 F.3d at 77-78 (finding that the plaintiff's allegation that an investigation of him "was solely motivated to seek vindication for the City's great political embarrassment and humiliation for allowing plaintiff to be the highest paid city employee" went just to the defendants' motive and thus fell short of creating liability);

*Zappin*, 2024 WL 3084015, at *2 (holding that allegations "suggest[ing] only that [defendant] acted maliciously in instigating the prosecution" are insufficient to state a claim of abuse of process).

Accordingly, the Court dismisses Plaintiff's abuse of process claim. [5]

## G. Conspiracy Claims

**\*12** "To prove a [Section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) (citations omitted); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). To state a conspiracy claim under Section 1985(3), a plaintiff must allege "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006) and citing 42 U.S.C. § 1985(3)). Under Section 1985(3), the conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Id.* (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)).

Here, the Complaint fails to allege a plausible conspiracy claim under either Section 1983 or Section 1985(3). Even read in the light most favorable to Plaintiff, the Complaint contains only conclusory allegations of a conspiracy. Plaintiff alleges that (i) Defendants "conspired and worked in concert to carry out the unlawful actions alleged in th[e] [C]omplaint"; (ii) "[t]he unlawful actions of each of the [D]efendants was a part and parcel of an agreement and conspiracy between the [D]efendants to maliciously violate [P]laintiff's constitutional rights"; and (iii) "[e]ach of the [D]efendants was aware, agreed to, approved of, and/or engaged in one or more of the overt acts in furtherance of the conspiracy." Dkt. No. 2 at ¶¶ 207-209, 213, 217-218. "Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either [Section] 1983 or [Section] 1985(3)." *Brill*, 799 F. Supp. 3d at 82 (quoting

*Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) and citing *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011)). Plaintiff does not provide any factual basis that supports a meeting of the minds between Defendants indicating that they entered into an express or tacit agreement to achieve some unlawful end. *See, e.g.*, *Brill*, 799 F. Supp. 3d at 83 (finding that plaintiff does not "allege any specific facts regarding a 'meeting of the minds' among any or all [d]efendants, nor does [p]laintiff set forth how [d]efendants acted in concert with one another to violate [p]laintiff's rights").

Moreover, regarding Plaintiff's Section 1985(3) conspiracy claim, the Complaint fails to plausibly allege that Defendants were motivated by racial animus. Plaintiff's allegation that Defendant Shannon, who is black, "was sent, encouraged, and emboldened by the agreement and actions of the other [D]efendants" to deprive Plaintiff, who is white, of his equal protection rights, is conclusory, and thus insufficient to plausibly suggest that Defendants were motivated by Plaintiff's race. *See* Dkt. No. 2 at ¶ 215; *see also Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 284 (S.D.N.Y. 2019) (dismissing Section 1985(3) claim because plaintiff, *inter alia*, has not shown that racial animus accounts for defendants' conduct). Plaintiff also has not alleged membership in a protected class under Section 1985(3). To the extent that Plaintiff claims that Defendants were motivated by class-based discriminatory animus due to Plaintiff's employment as a dog control officer, *see* Dkt. No. 19 at 28, dog control officers are not a protected class because they "plainly do not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement." *Dolan*, 794 F.3d at 296; *cf. Berenson v. Biden*, 791 F. Supp. 3d 398, 423-24 (S.D.N.Y. 2025) (noting that courts in this Circuit have found protected classes to include political affiliation, gender, religion, and disability, but not vaccination status, in the context of Section 1985(3)).

**\*13** Accordingly, the Court grants County Defendants' motion to dismiss Plaintiff's Section 1983 and Section 1985(3) conspiracy claims.

### H. *Monell* Claim

Lastly, Plaintiff's Section 1983 claims against Fulton County must also be dismissed because Plaintiff has not plausibly pled a *Monell* claim.

Municipalities are not liable under Section 1983 "unless action pursuant to official municipal policy of some nature causes a constitutional tort." *Glassman v. City of New York*, 557 F. App'x 97, 98 (2d Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "To bring a claim for municipal liability under *Monell*, [a plaintiff] must plausibly allege the existence of an official policy or custom that caused him to be denied a constitutional right." *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 138 (N.D.N.Y. 2024) (citations omitted). "*Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them; or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y. 2020) (internal quotation marks omitted) (citing *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (summary order)). "Boilerplate statements that county employees were acting in accord with a municipal policy, with no facts to support those statements, are not sufficient to support a *Monell* claim." *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 76 (N.D.N.Y. 2023) (internal quotation marks and citation omitted).

Here, Plaintiff's allegations are conclusory and fail to sufficiently plead a *Monell* claim against Fulton County. Specifically, Plaintiff alleges that "Fulton County and its decision-making officials instituted and carried out policies, practices, and/or customs of conducting [unlawful] search and seizures[.]" Dkt. No. 2 at ¶ 146. However, Plaintiff fails to allege any specific facts from which any policy, practice, or custom could be inferred that could support a plausible *Monell* claim. *See, e.g.*, *Dougal v. Lewicki*, No. 23-cv-1167, 2023 WL 6430586, at *10 (N.D.N.Y. Oct. 3, 2023) (recommending dismissal of *Monell* claims because plaintiff "does not include any allegations in his complaint concerning municipal conduct that states a *Monell* claim[,] ... does not allege what actions were taken by the County, or by its employees[,] [or] which [actions] the County knew about"), *report and recommendation adopted*, 2023 WL 7013384 (N.D.N.Y. Oct. 25, 2023).

In opposition, Plaintiff contends that Defendant Giardino, as "the final policymaker" for law enforcement in Fulton County, "established unconstitutional policies, practices and/

or customs," as evidenced by Defendant Giardino, on at least one previous occasion, ordering his deputies to break into a home without a warrant to seize an unlicensed dog that was locked in a home without food or water for one week. Dkt. No. 19 at 32; *see also* Dkt. No. 2 at ¶¶ 32-39. Even assuming that such act was unlawful, a single instance of alleged misconduct is insufficient to infer a policy or custom under *Monell. See Taranto v. Putnam Cnty.*, No. 21-cv-2455, 2023 WL 6318280, at *16 (S.D.N.Y. Sept. 28, 2023) (noting that "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality" (citations omitted)); *see also Boddie v. City of New York*, No. 15-cv-4275, 2016 WL 1466555, at *3 (S.D.N.Y. Apr. 13, 2016) (holding that pleading only "two or three instances" of a constitutional violation falls "far short of showing a policy, custom, or usage"). Accordingly, Plaintiff's conclusory allegations are insufficient to support a *Monell* claim against Fulton County.

**\*14** For these reasons, the Court dismisses Plaintiff's claims against Fulton County.

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the County Defendants' motion to dismiss, Dkt. No. 10, is **GRANTED in part and DENIED in part**, and the Court further

**ORDERS** that Plaintiff's excessive force claim shall proceed against Defendant Shannon; and the Court further

**ORDERS** that the remainder of Plaintiff's claims against the County Defendants are **DISMISSED** in accordance with this Memorandum-Decision & Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 817990

---

## Footnotes

1       Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2       Plaintiff contends that based on Defendant Shannon's case report, the administrative sergeant was Defendant Stemmler. Dkt. No. 19 at 27 n.5; *see also* Dkt. No. 2-13 at 2.

3       When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). Here, Plaintiff attaches numerous state court documents to the Complaint that he relies upon in support of his allegations. *See* Dkt. Nos. 2-1-2-17. Neither party challenges the relevance, authenticity, or accuracy of these documents. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (noting that if "there is a dispute as to the relevance, authenticity, or accuracy of the documents relied upon, the district court may not dismiss the complaint with those materials in mind"). Accordingly, the Court finds that it may consider these documents for purposes of deciding the County Defendants' Motion.

4       In the alternative, County Defendants contend that Defendant Shannon is entitled to qualified immunity. *See* Dkt. No. 10-1 at 24. "[A]ny adjudication as to the applicability of the qualified immunity defense would be premature at this juncture, since resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Keir v. Donaldson*, No. 25-cv-542, 2025 WL 3442904, at *14 (N.D.N.Y. Dec. 1, 2025) (internal quotation marks, citation, and brackets omitted);

*see also O'Brien v. City of Syracuse*, No. 22-cv-948, 2023 WL 6066036, at *14 (N.D.N.Y. Sept. 18, 2023) (noting that "[a] defendant asserting a qualified immunity defense on a motion to dismiss ... 'faces a formidable hurdle and is usually not successful,' " as such defense " 'will succeed only where entitlement to qualified immunity can be established based solely on facts appearing on the face of the complaint' " (quoting *Barnett v. Mount Vernon Police Dept.*, 523 F. App'x 811, 813 (2d Cir. 2013) (alterations omitted)).

5    Because the Court dismisses Plaintiff's abuse of process claim, the Court does not reach the issue of whether such claim is time-barred, or whether Plaintiff has sufficiently alleged each Defendant's personal involvement.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Rich v. New York, Not Reported in Fed. Supp. (2022)

2022 WL 992885
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Benjamin Samuel RICH, formerly
known as Samuel Guillaume, Plaintiff,
v.
State of NEW YORK, New York City; New
York City Police Department; New York County;
New York County District Attorney's Office;
Detective Michael Miller, Vincent Corrando, John
Passementi, Cyrus Vance, Jr., Shipla Kalra, David
Nasar, and Does 1–100, Inclusive., Defendants.

21 Civ. 3835 (AT)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Benjamin Samuel Rich, Staten Island, NY, Pro Se.

Gee Won Cha, Julinda A. Dawkins, New York State Office of the Attorney General, New York, NY, for Defendant State of New York.

Andrew B. Spears, New York City Law Department, New York, NY, for Defendants City New York, Michael Miller, Vincent Corrando, John Passementi.

Patricia Jean Bailey, New York County District Attorney's Office, New York, NY, for Defendants Cyrus Vance, Jr., David Nasar.

## ORDER

ANALISA TORRES, District Judge:

**\*1** This action arises from a 2016 arrest and prosecution of Plaintiff *pro se*, Benjamin Samuel Rich, in New York County. He brings claims against the State of New York (the "State"); former New York County District Attorney ("DA") Cyrus R. Vance, Jr. and two Assistant District Attorneys ("ADAs"), Shilpa Kalra and David Nasar, (collectively, the "DA Defendants"); and the City of New York (the "City"), the New York City Police Department (the "NYPD"), and NYPD officers Michael Miller, Vincent Corrando, and John Passementi (collectively, the "City Defendants"), pursuant to,

*inter alia*, 42 U.S.C. §§ 1983, 1985, and 1986, the New York State Constitution, and New York common law. *See generally* Compl., ECF No. 1. Before the Court are three motions to dismiss Plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, brought by the State, ECF No. 20, the DA Defendants, ECF No. 22, and the City Defendants, ECF No. 32.

For the reasons stated below, the State's motion to dismiss is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

## BACKGROUND [1]

On January 6, 2016, Plaintiff was at the Highline Ballroom ("the Highline"), a nightclub in Manhattan, as an invited guest of Wasief Quahtan, a Highline employee. Compl. ¶ 24. Quahtan and the club owner began arguing over "Quahtan['s] [having brought] Plaintiff to the party." *Id.* ¶ 25. Security staff, and an individual named Avery Jackson, asked Plaintiff to leave. *Id.* ¶ 26. Plaintiff alleges that he was "forcibly escorted" from the club, and that Jackson became "belligerent and aggressive" towards him. *Id.* ¶ 27. Shortly thereafter, a shooting occurred outside the Highline. *Id.* ¶ 28.

Plaintiff believes that Jackson "ran down the street and jumped into a black sedan ... at the time the shots were fired." *Id.* ¶ 37. He also states that there were "numerous witnesses" to the shooting, including a "female 911 caller," who lived "next door" to the Highline. *Id.* ¶ 36. In that 911 call, the witness said that she had seen a "man jump into a black sedan speeding down the street" after shots were fired. *Id.* Based on this call, Plaintiff believes "it was more likely that it was [ ] Jackson who fired the shots before jumping into the black sedan to chase Plaintiff down." *Id.* ¶ 37.

**\*2** The shooting was investigated by Detective Michael Miller, who interviewed Jackson. *Id.* ¶¶ 29–30. Jackson told

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 136 of 181

Rich v. New York, Not Reported in Fed. Supp. (2022)

Miller that he saw Plaintiff go to a car, "pull out a gun, and shoot in the direction of the Highline," and that Jackson "ran back into the club" when shots were fired. *Id.* ¶¶ 30, 37. But, Plaintiff alleges that many of Jackson's representations to Miller contradicted his initial statements to the NYPD officers who first responded to the shooting, as well as other eyewitness accounts. *See, e.g.*, ¶¶ 30–32. For instance, Plaintiff alleges that Jackson told the responding officers that Plaintiff was "escorted from the club because he was intoxicated," and that Plaintiff then "went to his car, [a Rolls Royce] removed a firearm ... and fired several shots." *Id.* ¶¶ 31, 46. But, Jackson told Miller that Plaintiff was "forcibly ejected from the club" after an altercation with its manager, that Plaintiff was "belligerent," and threatened that he had a gun. *Id.* ¶ 32. Plaintiff also contends that Jackson's statements were demonstrably false, because surveillance videos showed that Jackson "was the aggressor towards Plaintiff," and that Plaintiff was "calm, peaceful, and cooperative" when escorted from the club. *Id.* ¶¶ 32, 41.

Plaintiff alleges that Miller failed to conduct a thorough and complete investigation of the shooting, because he did not interview several witnesses, including the 911 caller. *Id.* ¶¶ 36–37, 39. Plaintiff also suggests that Miller obtained—but disregarded—surveillance video from the inside and the outside of the club that would have corroborated Plaintiff's version of events. *See id.* ¶¶ 40–43. Plaintiff also complains that Officer Vincent Corrando, Miller's supervisor, "approved all [of the] reports written" in the investigation and "should have notice[d] or known of all the inconsistencies and contradictory statements" in Miller's reports. *Id.* ¶ 95. And, Plaintiff alleges that Officer John Passementi "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." *Id.* ¶ 96.

On January 9, 2016, Miller obtained a search warrant for Plaintiff's car, based on what Plaintiff contends were "false, misleading and/or embellished information" in the underlying affidavits. *Id.* ¶ 46. The next day, Jackson picked Plaintiff's mugshot out of a photo lineup. *Id.* ¶ 92. Plaintiff appears to argue that this lineup was unduly suggestive, because his "mugshot had a lighter background than the other photographs." *Id.* ¶ 92. The same day, Miller obtained a warrant for Plaintiff's arrest for attempted murder, assault, and weapons possession, and in February obtained additional search warrants for Plaintiff's cell phone and laptop, allegedly based, again, on false and misleading statements provided by Miller and Jackson. *Id.* ¶¶ 45, 47. According to Plaintiff, no "physical evidence [ ] tie[d] him to any part of the shooting,"

*id.* ¶ 81, and the police did not recover a gun or find gunshot residue in Plaintiff's car, *id.* ¶ 91.

On January 22, 2016, a grand jury indicted Plaintiff for second-degree attempted murder, first-degree assault, and two counts of criminal possession of a weapon. *See id.* ¶¶ 45, 51. On January 27, 2016, Plaintiff was arrested. *Id.* ¶ 51. He was incarcerated until February 18, 2016, when he was released on bail. *Id.* ¶ 52.

In November 2016, Plaintiff was taken back into custody on suspicion of witness tampering, after Jackson allegedly made a "false[ ]" report to the DA's Office that Plaintiff had tried to contact him. *Id.* ¶¶ 53, 103. Plaintiff remained in jail until his trial, which began in June 2017. *Id.* ¶¶ 54, 64; *see also* Trial Tr. at 1, ECF No. 22-3. [2]

On March 26, 2016, ADAs Shilpa Kalra and David Nasar provided surveillance videos from the Highline to Plaintiff's counsel. Compl. ¶ 64. Plaintiff alleges, however, that the relevant video showed only "one (1) camera angle [out] of 14 camera angles." *Id.* He alleges that prosecutors did not provide videos from the thirteen additional camera angles until a week after trial commenced, even though these videos were collected from the Highline eighteen months earlier. Compl. ¶ 64. The trial court accordingly granted counsel's request to review the additional videos before conducting Jackson's cross-examination. Trial Tr. at 3. On direct examination, Jackson testified that he did not participate in escorting Plaintiff out of the club. *Id.* at 47–48.

**\*3** On June 12, 2017, prior to Jackson's cross-examination, Plaintiff's counsel reported to the trial court that Jackson could be identified in the additional videos based on his clothing. *Id.* at 135. Nasar acknowledged that if Jackson was indeed visible in the videos, he was "doing a bunch of things contrary to what he testified about." *Id.*; *see also id.* at 136. The trial court then determined that Jackson should be questioned, under oath, outside the jury's presence, about his clothing on the night in question, and whether he could identify himself on the videos, among other matters. *See id.* at 146–50, 152–54. Jackson was brought in, and warned about perjury. *See id.* at 154–56. Jackson identified himself on the videos wearing a jacket and a light-colored shirt. *See id.* at 156–59. The court then adjourned the proceedings. *See id.* at 159. When the court resumed, Jackson, through counsel, invoked his Fifth Amendment right against self-incrimination, *id.* at 176, and the court declared a mistrial, *id.* at 186–88.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 137 of 181

Rich v. New York, Not Reported in Fed. Supp. (2022)

Plaintiff's counsel then moved to dismiss the indictment against Plaintiff on two grounds: first, that it was based on false testimony, and second, because of prosecutorial misconduct. Compl. ¶ 100. On October 17, 2017, Kalra consented to dismissal of the indictment on the first ground, but opposed the assertion of prosecutorial misconduct. Dismissal Tr. at 12–13, 15–16. The court dismissed the indictment, but the presiding judge stated he did not "see any prosecutorial misconduct." *Id.* at 16.

On March 12, 2021, over three years after the indictment was dismissed, Plaintiff commenced this action. Compl. Defendants move separately to dismiss the claims against them. ECF Nos. 20, 22, 32. The Court considers each motion in turn.

## DISCUSSION

I. Legal Standard

   A. Rule 12(b)(1)

An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court lacks subject matter jurisdiction—that is, the statutory or constitutional power—to adjudicate it. *See* Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal. *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

On a Rule 12(b)(1) motion, the Court must accept all material factual allegations as true. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). It may not, however, "draw inferences ... favorable to [the] plaintiff[ ]" on such a motion. *Id.* And, the Court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction. *See id.*

   B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide

"detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Additionally, because Plaintiff proceeds *pro se*, the Court is obligated to construe his submissions "liberally and interpret[ ] [them] to raise the strongest arguments they suggest." *Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted). And, on a motion to dismiss, the Court may appropriately consider a *pro se* plaintiff's opposition papers to "supplement or clarify" the allegations in their complaint. *Sommersett v. City of N.Y.*, No. 09 Civ. 5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) (citation omitted).

II. Duplicative and Improper Claims

 **\*4** Count 7 of the complaint asserts a claim under 18 U.S.C. § 245 for the deprivation of rights under the color of law. Compl. ¶¶ 148–51. But, no private right of action exists under this federal criminal statute, and accordingly, Plaintiff cannot raise a cognizable claim under it. *See Corrado v. State of N.Y. Univ. Stony Brook Police*, No. 15 Civ. 7443, 2016 WL 4179946, at *3 (E.D.N.Y. Aug. 5, 2016). Count 7 is, accordingly, DISMISSED with prejudice.

Further, the Court finds that Count 9 of the complaint—fraudulent misrepresentation under § 1983, Compl. ¶¶ 157–63—is duplicative of Count 4—deprivation of a fair trial under § 1983, *id.* ¶¶ 133–37—because both seek redress for violations of Plaintiff's liberty interests arising from the alleged "fabrication of evidence by a government officer." *See Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). Count 9 is, accordingly, DISMISSED with prejudice.

Finally, three of Plaintiff's claims—Counts 4, 5, and 6—include both federal constitutional claims and analogous state constitutional claims. Compl. ¶¶ 133–47. The New York State Constitution "provides a private right of action where remedies are otherwise unavailable at common law or under § 1983." *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016). But, where alternative remedies are available under the federal civil rights statutes, including § 1983, courts must

Case 3:25-cv-01218-GTS-ML     Document 6     Filed 07/02/26     Page 138 of 181

dismiss the plaintiff's state constitutional claims. *Id.* Because § 1983 provides a remedy for all of Plaintiff's alleged federal constitutional violations, any analogous state constitutional claims are duplicative. Accordingly, the state constitutional claims pleaded in Counts 4, 5, and 6 are DISMISSED with prejudice.

III. The State's Motion

The State moves to dismiss the complaint under Rule 12(b)(1), on the ground that the Eleventh Amendment bars Plaintiff's claims against it by virtue of sovereign immunity. State Mem. at 3, ECF No. 21. The Court agrees.

The Eleventh Amendment bars federal courts from exercising jurisdiction over claims against states. U.S. CONST. AMEND. XI. This extends to a state sued by its own citizens, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000), and state agencies, *see Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987). There are only limited exceptions to this rule, none of which are applicable here.

First, a state may waive its Eleventh Amendment defense. *See Coll. Sav. Bank v. Fla. Prepaid Postsec. Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the State has not explicitly waived its immunity, or consented to be sued. *See* State Mem. at 3. And, by filing a motion to dismiss, rather than an answer to the complaint, the State cannot be said to have taken actions inconsistent with an assertion of immunity. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) (finding waiver of immunity where state removed action to federal court, then asserted immunity).

Second, Congress may abrogate the states' immunity from suit through statute. *Kimel*, 528 U.S. at 80. But, Congress has not done so for claims brought under § 1983, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990), § 1985, *see Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013), or § 1986, *Medina v. Cuomo*, No. 15 Civ. 1283, 2015 WL 13744627, at *6–7 (N.D.N.Y. Nov. 9, 2015). In the "absence of [the State's] consent," accordingly, such claims are "proscribed by the Eleventh Amendment." *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977).

**\*5** Finally, the Eleventh Amendment does not bar a "suit against a state official when that suit seeks prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996); *see also Ex parte Young*, 209 U.S. 123 (1908). But here, Plaintiff seeks only money damages, and retrospective declaratory and equitable relief. Compl. § IX. And, Eleventh Amendment immunity shields states from claims for money damages, *Liner v. Hochul*, No. 21 Civ. 11116, 2022 WL 826342, at *1 (S.D.N.Y. Mar. 17, 2022), and "declaratory relief dealing solely with past violations," *Medina*, 2015 WL 13744627, at *7. Although Plaintiff demands "affirmative relief necessary to eradicate the effects of Defendants' unlawful practices," *see* Compl. § IX(B), he does not allege any present violations of his rights, *see id. See Medina*, 2015 WL 13744627, at *7 (noting that "declaratory relief where there is no present violation, is also barred under the Eleventh Amendment"). Accordingly, this exception does not preclude the State's immunity defense in this matter.

Where a defendant is found to have sovereign immunity from suit, the Court is deprived of subject-matter jurisdiction under Rule 12(b)(1). *McGinty v. New York*, 251 F.3d 84, 89, 101 (2d Cir. 2001). Accordingly, because the State is immune from liability on all of Plaintiff's claims under the Eleventh Amendment, its motion to dismiss is GRANTED. And, because amendment would be futile, Plaintiff's claims against the State are DISMISSED with prejudice to renewal.[3]

IV. The DA Defendants' Motion

Plaintiff raises claims against the DA Defendants "in their individual capacities"[4] arising *inter alia* under § 1983, § 1985, and § 1986,[5] based on three main factual assertions. *See generally* Compl. First, Plaintiff alleges that Kalra and Nasar wrongfully chose to prosecute him, despite the lack of physical evidence tying him to the shooting. Compl. ¶ 81. Second, Plaintiff asserts that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of his trial, *see id.* ¶¶ 75–76, 78. Third, Plaintiff alleges that the "[p]rosecuting [a]ttorneys" "coached" Jackson to give false testimony to the grand jury that indicted him. *Id.* ¶¶ 50–51.

A. Absolute Immunity

**\*6** The DA Defendants argue that Plaintiff's claims are barred by absolute and qualified prosecutorial immunity. DA Defs. Mem. at 10–12, ECF No. 22-1. To the extent Plaintiff's claims are predicated on his allegations that Kalra and Nasar wrongfully chose to prosecute him and withheld allegedly exculpatory evidence, the Court agrees.

Rich v. New York, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 139 of 181

1. Federal Claims

Although § 1983 has no immunities on its face, the Supreme Court has held that, when Congress initially enacted the statute, it did not intend to abrogate existing immunities established at common law. *See Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). Thus, both absolute and qualified immunity are applicable defenses to § 1983 claims. *See Bernard v. Cty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). Prosecutors are entitled to "absolute immunity" from liability when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. But, prosecutors are entitled only to "qualified immunity" when they perform "investigative functions" normally undertaken by a police officer. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Under the doctrine of qualified immunity, an official is immune from liability "only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful." *Hill v. City of N.Y.*, 45 F.3d 653, 663 (2d Cir. 1995).

Courts employ a "functional approach" to determine the availability of absolute immunity, looking to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations omitted). And, although the party claiming absolute immunity bears the burden of establishing its applicability, *see Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), if the court finds that that the conduct at issue is covered by absolute immunity, then the actor is shielded from liability for damages no matter "how[ ] erroneous the act ... and how[ ] injurious ... its consequences." *Cleavinger v. Saxner*, 474 U.S. 193, 199–200 (1985) (citation omitted); *see also Anilao v. Spota*, No. 19 Civ. 3949, 2022 WL 697663, at *4 (2d Cir. Mar. 9, 2022).

Plaintiff first alleges that Kalra and Nasar improperly chose to prosecute him, despite a lack of physical evidence tying him to the crime. Compl. ¶ 81. But, prosecutors are immune from suit for decisions regarding "whether and when to prosecute," *Imbler*, 424 U.S. at 430–31 n.32–33, even where they may prosecute an innocent individual, *Schmueli*, 424 F.3d at 237–39. Kalra and Nasar are, therefore, entitled to absolute immunity to the extent Plaintiff's claims are based on their decision to prosecute him. [6]

Second, Plaintiff alleges that Kalra and Nasar intentionally withheld exculpatory surveillance videos until the middle of trial, Compl. ¶¶ 75–76, 78. But again, prosecutors are entitled to absolute immunity for all decisions taken "in their prosecutorial capacity, including decisions regarding which evidence should be disclosed to a criminal defendant." *Newson v. City of N.Y.*, No. 16 Civ. 6773, 2019 WL 3997466, at *3 (E.D.N.Y. Aug. 23, 2019). This is true even where information was deliberately withheld, *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 640 (E.D.N.Y. 2017), or where such withholding violated the defendant's constitutional rights, *see Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009). Accordingly, Kalra and Nasar have absolute immunity to the extent any of Plaintiff's claims are predicated on a violation under this factual allegation.

**\*7** Finally, Plaintiff alleges that the "Prosecuting Attorneys" coached Jackson to give false testimony to the grand jury, which then formed the basis for his indictment. Compl. ¶¶ 50–51. Prosecutors generally only have qualified immunity for actions taken before there is probable cause to arrest a defendant, because they are performing an investigative function, rather than acting as advocates. *See Hill*, 45 F.3d at 661; *Buckley*, 509 U.S. at 273. And, although "knowingly presenting evidence" to a grand jury is considered the "core of a prosecutor's role as an advocate," *Bernard*, 356 F.3d at 503, the Second Circuit has distinguished between a prosecutor's knowing presentation of false evidence to the grand jury—which is still entitled to absolute immunity —from a prosecutor's deliberate fabrication of evidence, *Hill*, 45 F.3d at 662–63 (finding that where prosecutor deliberately manufactured evidence to establish probable cause for plaintiff's arrest, his conduct was investigatory, regardless of whether, when the evidence was manufactured, the prosecutor intended to present it to the grand jury). In *Hill*, the Second Circuit also established that "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of qualified immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Id.* at 663.

As in *Hill*, Plaintiff alleges that the prosecutors deliberately participated in the fabrication of false evidence by coaching a material witness to give perjured testimony to the grand jury, so that the jury would return an indictment. Compl. ¶¶ 50–51. Allegations that the prosecution falsified evidence are distinct from allegations that the prosecution merely presented evidence they knew to be false. *Compare Hill,*

45 F.3d at 662–63, *with* Urrego v. United States, No. 00 Civ. 1203, 2005 WL 1263291, at \*2 (E.D.N.Y. May 27, 2005) (prosecutors receive absolute immunity for claims predicated on "false presentation of evidence to a grand jury"). And, considering the Court's obligation to liberally construe Plaintiff's pleadings and afford every reasonable inference in his favor at this stage, the Court concludes the DA Defendants have not established that they were acting as "advocates," rather than "investigators," when they engaged in the challenged conduct. *Hill*, 45 F.3d at 660 (officials asserting absolute immunity bear the burden of establishing it for the action in question). And, accepting the facts in the complaint as true, the DA Defendants would not be entitled to even qualified immunity, because it is objectively unreasonable for them to have knowingly coached a witness to give false testimony before a grand jury. *See* Cipolla v. Cty. of Rensselaer, 129 F. Supp. 2d 436, 456 (N.D.N.Y. 2001) (not "objectively reasonable" to believe presenting or soliciting perjured testimony did not violate plaintiff's clearly established rights). Accordingly, to the extent that Counts 3, 4, 5, 6, and 8 are predicated on the claim that the DA Defendants coached Jackson to give false testimony, they are not entitled to either absolute or qualified immunity.

### 2. State Claims

Plaintiff raises state-law claims against the DA Defendants in Counts 10 and 14 of the complaint. Compl. ¶¶ 164–67, 182–85. As with federal law, under New York law, a district attorney prosecuting crime is performing a quasi-judicial function, and, as such, is entitled to absolute immunity. *Arteaga v. State*, 72 N.Y.2d 212, 217 n.1 (N.Y. 1988). But, unlike federal law, prosecutors are absolutely immune for official acts in both the prosecution and investigation of criminal charges. *See* Moore v. Dormin, 173 Misc. 2d 836, 843, (N.Y. Sup. Ct. 1997), *aff'd as modified*, 252 A.D.2d 421 (N.Y. App. Div. 1998). A prosecutor does not receive absolute immunity, however, "when knowingly acting in violation of law." *Id.* As with Plaintiff's federal claims, to the extent his state law claims against the DA Defendants are predicated on his allegations that they improperly targeted him for prosecution or deliberately withheld exculpatory evidence, the DA Defendants are entitled to absolute immunity. But, construing Plaintiff's third allegation liberally, he essentially claims that the prosecutors knowingly acted in violation of the law by suborning perjury. The Court cannot conclude, therefore, that the DA Defendants are entitled to absolute

immunity as a matter of state law to the extent Counts 10 and 14 rest on this allegation. [7]

### B. Time Bar

**\*8** The DA Defendants argue that Plaintiff's claims are untimely. DA Defs. Mem. at 6–8. With the exception of Counts 3 (§ 1983 malicious prosecution) and 4 (§ 1983 deprivation of a fair trial), the Court agrees.

### 1. Federal Claims

Claims arising under §§ 1983 and 1985, when brought in this district, are governed by New York's three-year statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214; *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citation omitted); *Hernandez-Avila v. Averill,* 725 F.2d 25, 27 n.3 (2d Cir. 1984). But, claims under § 1986 have a one-year statute of limitations, *see* 42 U.S.C. § 1986. Federal courts are also obligated to apply New York's tolling rules. *Bd. of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic. 9 N.Y.C.R.R. § 8.202.8. Subsequent orders extended the tolling period until November 3, 2020. Exec. Order 202.67 (Oct. 4, 2020). Contrary to the DA Defendants' assertion, *see* DA Defs. Mem. at 7–8, other courts in this district have uniformly concluded that Executive Order 202.8 applies to federal cases applying New York's statute of limitations, including for § 1983 claims. *See, e.g.*, Lewis v. Westchester Cnty., No. 20 Civ. 9017, 2021 WL 3932626, at \*2 n.3 (S.D.N.Y. Sept. 2, 2021). [8] The Court concludes, therefore, that Executive Order 202.8 tolls the statute of limitations for Plaintiff's §§ 1983 and 1985 claims, which apply New York's three-year limitations period —but not Plaintiff's § 1986 claims, because the applicable statute of limitations for that claim is found in the federal statute itself.

Section 1983 claims based on malicious prosecution or deprivation of a fair trial accrue when the underlying criminal action against the plaintiff is "favorably" terminated, rather than at the time of arrest. *Sharp v. Cnty. of Putnam*, No. 18 Civ. 780, 2019 WL 2250412, at \*4 (S.D.N.Y. May 24, 2019); *Shabazz v. Kailer*, 201 F. Supp. 3d 386, 394 (S.D.N.Y. 2016). The dismissal of an indictment constitutes

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 141 of 181

Rich v. New York, Not Reported in Fed. Supp. (2022)

the termination of a proceeding. *Sharp*, 2019 WL 2250412, at \*4–5. Applying these principles, Plaintiff's § 1983 claims for malicious prosecution (Count 3) and denial of a fair trial (Count 4) accrued on October 17, 2017, the date the trial court dismissed the indictment against him. Dismissal Tr. at 5. And, although the statute of limitations would have expired on October 17, 2020, New York's COVID-19 tolling rule extended the limitations period until June 2, 2021.[9] Because Plaintiff commenced this suit on March 12, 2021, Counts 3 and 4 are timely.

**\*9** By contrast, a § 1983 abuse-of-process claim accrues when the criminal process is "set in motion—typically at arrest—against the plaintiff." *Hadid v. City of N.Y.*, No. 15 Civ. 19, 2015 WL 7734098, at \*5 (E.D.N.Y. Nov. 30, 2015), *aff'd* 730 F. App'x 68 (2d Cir. 2018). Because Plaintiff was arrested on January 27, 2016, the relevant statute of limitations for Count 8, § 1983 abuse of process, expired on January 27, 2019, and COVID-19 tolling provisions are, therefore, inapplicable. Accordingly, this claim is DISMISSED with prejudice as untimely.

Section 1985(3) conspiracy claims accrue "at the time of the events that caused the injury." *Panetta v. Cassel*, 20 Civ. 2255, 2020 WL 2521533, at \*5 (S.D.N.Y. May 18, 2020). The existence of a conspiracy "does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable, whether the act is labelled a tort or a violation of [federal civil rights statutes]." *Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980) (citation omitted). As discussed, the single allegation that escapes absolute immunity—and therefore is the only remaining basis for Plaintiff's claims against the DA Defendants—is that those defendants suborned perjury in the grand jury proceedings by coaching Jackson to give false testimony, resulting in Plaintiff's indictment and arrest. Plaintiff's § 1985(3) claim—Count 5 of the complaint—accrued no later than January 27, 2016, the date of his arrest—which again, applying a three-year statute of limitations untouched by COVID-19 tolling provisions, renders it untimely. Count 5 is, accordingly, DISMISSED with prejudice.

Similarly, Count 6, Plaintiff's § 1986 conspiracy claim, accrued when Plaintiff knew, or had reason to know of the harm or injury. *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). Plaintiff knew of the injury by his arrest date. Applying § 1986's one-year statute of limitations, any § 1986 claim Plaintiff brought after January 27, 2017,

is untimely.[10] Accordingly, Count 6 is DISMISSED with prejudice.

#### 2. State Claims

Counts 10 and 14 of the complaint—both state common-law claims—are also time-barred. "Under New York law, a plaintiff asserting tort claims against the City or its employees," as well as against municipal officials like district attorneys, "must file a notice of claim within [90] days after the incident giving rise to the claim and commence the action within a year and [90] days from the date of the incident." *Brown v. City of N.Y.*, No. 18 Civ. 3287, 2020 WL 1819880, at \*7 (S.D.N.Y. Apr. 9, 2020) (citing N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1)); *see also Gonzalez v. City of N.Y.*, No. 94 Civ. 7377, 1996 WL 227824, \*2 (S.D.N.Y. May 3, 1996). Plaintiff asserts that he filed the requisite notice of claim with the City on January 16, 2018—720 days after his arrest, and 91 days after the dismissal of the indictment. Compl. ¶ 16. Plaintiff did not commence this action until March 12, 2021. *See* Compl. Therefore, Plaintiff neither timely filed a notice of claim within 90 days, nor did he commence this lawsuit within a year and 90 days after the date the indictment was dismissed—the last date that could possibly serve as the trigger for the statute of limitations. Failure to comply with the mandatory notice of claim requirements is a basis for dismissal of a plaintiff's claims. *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). The Court, accordingly, concludes that Counts 10 and 14 are also time-barred, and therefore, these claims are DISMISSED with prejudice.

#### C. Personal Involvement

**\*10** Liability under § 1983 must be premised on a defendant's direct, personal involvement in the alleged violations. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). A defendant cannot be held vicariously liable under § 1983 for employing or supervising an employee that violated the plaintiff's rights—rather, a plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

As to Vance, Plaintiff only alleges that he served as the DA of New York County. Compl. ¶ 11. Vance may not be held liable for merely employing or supervising Kalra and Nasar. *See Iqbal*, 556 U.S. at 676. And, Plaintiff neither pleads that Vance was personally involved in investigating the shooting

Rich v. New York, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 142 of 181

or prosecuting him, nor is there any evidence in the record to support such a finding. Accordingly, Plaintiff's claims against Vance are DISMISSED with prejudice, because given the lack of evidence of Vance's personal involvement, the Court finds that granting leave to amend would be futile. *Hill v. Curcione,* 657 F.3d 116, 123–24 (2d Cir. 2011).

Plaintiff similarly fails to specify Kalra and Nasar's personal involvement in his claimed constitutional violations, stating only that the "Prosecuting Attorneys" coached Jackson to provide testimony. Compl. ¶ 50. But, given Plaintiff's position as a *pro se* litigant, the Court recognizes that there may be additional information made available to Plaintiff through discovery that would enable Plaintiff to assert claims directly against Kalra and Nasar, such as if, for example, either of them prepared Jackson to testify. By **April 15, 2022**, accordingly, the DA Defendants shall, through counsel, inform Plaintiff and the Court whether Kalra or Nasar prepared Jackson to testify before the grand jury with respect to any potential criminal charges against Plaintiff, and/or conducted an examination of Jackson before the grand jury. No later than **May 16, 2022**, Plaintiff shall file an amended complaint, alleging with specificity Kalra and Nasar's direct, personal involvement in either "coaching" Jackson to testify falsely before the grand jury, or deliberately eliciting false testimony from Jackson during the grand jury proceedings. In addition, because, as detailed *infra* at 25–26, the Court finds that Plaintiff's malicious prosecution claim is deficient because he failed to allege that the underlying criminal proceedings terminated in his favor, an argument raised by the City Defendants but not the DA Defendants, any amended malicious prosecution claim that Plaintiff wishes to assert against Kalra and Nasar should also address this issue. Failure to do so shall result in dismissal with prejudice of Plaintiff's remaining claims against Kalra and Nasar.

## V. City's Motion to Dismiss

Plaintiff brings claims against the City Defendants, on the grounds that (1) Miller failed to conduct a thorough and complete investigation of the shooting, by not interviewing several witnesses, including the 911 caller, Compl. ¶¶ 36–37, 39; (2) in his investigation, Miller obtained—but disregarded—surveillance video from both the inside and outside of Highline Ballroom, *id.* ¶¶ 40–43; (3) that Miller "used his own added facts and embellished statements" in his investigative reports to target Plaintiff as the sole suspect in the shooting, *id.* ¶ 44, *see also* ¶ 39; (4) that Corrando, as Miller's supervisor, approved his investigative reports but failed to notice the inconsistencies and contradictions therein, *id.* ¶ 95; and (5)

that Passamenti "authorized DNA tests," which revealed that the DNA evidence recovered at the scene "did not match Plaintiff," *id.* ¶ 96. The Court addresses each remaining [11] cause of action.

### A. Time Bar

#### 1. Section 1983 Claims

**\*11** Plaintiff brings claims under § 1983 for unlawful search and seizure (Count 1); false arrest (Count 2); malicious prosecution (Count 3); deprivation of a fair trial (Count 4); and abuse of process (Count 8). As noted, § 1983 claims are subject to a three-year statute of limitations in this district. *See supra* at 15. And, for the reasons discussed with respect to the DA Defendants, the Court concludes that Counts 3 and 4 were timely pleaded. *See supra* at 16–17.

A § 1983 unlawful search and seizure claim, however, accrues on the date the allegedly unlawful search occurred. *McClanahan v. Kelly*, No. 12 Civ. 5326, 2014 WL 1317612, at \*4 (S.D.N.Y. Mar. 31, 2014). Plaintiff alleges that his property was searched on January 9, February 12, and February 15, 2016. Compl. ¶¶ 46–47. The applicable statute of limitations, therefore, expired no later than February 15, 2019, nearly two years before Plaintiff brought suit. Plaintiff's claims are, therefore, untimely, and Count 1 is DISMISSED with prejudice as time-barred.

Section 1983 false arrest claims and abuse-of-process claims accrue from the date of Plaintiff's arrest. *See Rivera v. City of N.Y.*, No. 16 Civ. 9709, 2019 WL 252019, at \*4 (S.D.N.Y. Jan. 17, 2019) (false arrest); *Anderson v. Cnty. of Putnam*, No. 14 Civ. 7162, 2016 WL 297737, at \*3 (S.D.N.Y. Jan. 22, 2016) (abuse-of-process). Plaintiff was arrested on January 27, 2016, and therefore, any such claims should have been brought no later than January 27, 2019. Counts 2 and 8 are, accordingly, DISMISSED with prejudice as untimely.

#### 2. Sections 1985(3) and 1986 Claims

Liberally construing the complaint, in Count 5, Plaintiff sets forth a conspiracy cause of action under § 1985(3), alleging that the City Defendants engaged in a conspiracy to have Plaintiff wrongfully convicted, *see* Compl. ¶ 97. This claim appears predicated on the NYPD investigation into the January 6, 2016 shooting, and Miller's alleged embellishment

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 143 of 181

Rich v. New York, Not Reported in Fed. Supp. (2022)

of information, and focus on Plaintiff as the sole suspect. *Id.* ¶¶ 36–37, 39, 46, 90. Plaintiff also raises a failure-to-intervene claim under § 1986 (Count 6), seemingly arising from Corrando's alleged failure to notice the inconsistencies and contradictory statements allegedly included in Miller's police reports. *Id.* ¶ 95.

Section 1985(3) claims accrue "at the time of the events that caused the injury," and are subject to a three-year statute of limitations, *Panetta*, 2020 WL 2521533, at *5. Section 1986 claims based on a failure to intervene accrue when the defendant fails to intervene, *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018), and must be brought within one year, *see* 42 U.S.C. § 1986. Plaintiff's claims each began accruing no later than January 27, 2016, the date of Plaintiff's arrest, because Plaintiff does not suggest that any investigation took place after that date. The applicable limitations period extends no later than January 27, 2019, for Plaintiff's § 1985(3) claim, and January 27, 2017 for Plaintiff's § 1986 claim, two and four years, respectively, before the complaint was filed. Counts 5 and 6 are, therefore, DISMISSED with prejudice as time-barred.

### 3. State Claims

To the extent Plaintiff's state common-law claims, asserting various types of negligence, arise from the NYPD investigation into the shooting on January 6, 2016; the searches of Plaintiff's property on January 9, February 12, and February 15, 2016; and Plaintiff's arrest on January 27, 2016, Plaintiff was required to file a notice of claim within 90 days of those events, *see* N.Y. Gen. Mun. L. § 50-e. As noted, Plaintiff did not file a notice of claim with the City until January 16, 2018—one year and eleven months after the latest of those dates. Compl. ¶ 16. Accordingly, each of Plaintiff's negligence claims (Counts 10–14) are DISMISSED with prejudice. [12]

### B. Claim Against the City [13]
 **\*12** The Court reads Plaintiff's complaint as claiming, under *Monell v. Department of Social Services*, 436 U.S. 658, that the City is liable for the allegedly unlawful conduct of the named NYPD officers. *See* Compl. ¶ 179. The City Defendants argue that Plaintiff does not include sufficient factual allegations to support a municipal liability claim. City Defs. Mem. at 20–22, ECF No. 34. The Court agrees.

To bring a municipal liability claim under § 1983, the plaintiff must "prove the existence of a municipal policy or custom," then demonstrate a causal connection between the policy and the alleged constitutional deprivation. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). Plaintiff pleads neither, offering only conclusory allegations that the City Defendants "engaged in a pattern and practice to commit the aforementioned unlawful acts," Compl. ¶ 179, and that a policy is "inferred" because the City Defendants "took no steps to reprimand or discharge the officers involved," ECF No. 39 at 27. These allegations cannot, without more, state a claim for municipal liability. *E.g.*, *Fleming v. City of New York*, No. 18 Civ. 4866, 2020 WL 5522871, at *6 (S.D.N.Y. July 23, 2020). Because Plaintiff offers no facts which suggest that the deficiencies in his *Monell* claim may be cured by amendment, any such claim is DISMISSED with prejudice. *Strong v. City of Syracuse*, No. 16 Civ. 1054, 2020 WL 137250, at *3–4 (N.D.N.Y. Jan. 13, 2020) (dismissing *Monell* claim, with prejudice, given "[p]laintiff's conclusory allegations are insufficient to plausibly infer a custom or policy to support municipal liability").

### C. Passamenti's Personal Involvement
Plaintiff's remaining claims are Counts 3 (malicious prosecution) and 4 (denial of a fair trial). As to Defendant Passamenti, Plaintiff alleges that Passamenti authorized DNA tests, which revealed that the DNA evidence recovered at the scene "did not match Plaintiff." Compl. ¶ 96. Plaintiff does not allege that Passamenti was involved in falsification of evidence, that he attempted to hide the results of the relevant DNA tests, or that he was otherwise responsible for, or even aware of, the alleged "embellishment" of statements in the NYPD's investigative reports. Plaintiff has not, therefore, sufficiently alleged Passamenti's direct, personal involvement in any constitutional violations under § 1983. *Tangreti*, 983 F.3d at 618. And, because the record does not establish that Plaintiff could cure this pleading defect by amendment, Plaintiff's claims against Passamenti are DISMISSED with prejudice.

### D. Malicious Prosecution
A claim for malicious prosecution under § 1983—Count 3 of the complaint—requires the plaintiff to show that the criminal proceedings against him were terminated "in his favor," typically by an acquittal or another form of dismissal of the charges on the merits. *Janetka v. Dabe*, 892 F.2d 187, 189–90 (1989). The City Defendants argue that Plaintiff has not made such a showing. City Defs. Mem. at 10, 14–17. The

Court agrees. Plaintiff asserts—citing no authority in support—that the dismissal of the indictment was a "termination in his favor" because dismissals that "include constitutional privilege assertions are considered favorable terminations." ECF No. 39 at 7, 10 (quotation marks omitted). It is not clear what Plaintiff means by this. And, from the Court's review of the state court transcript, it appears that, in dismissing the indictment, neither the prosecution, nor the court, made any statements indicating a belief in Plaintiff's innocence. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) (looking to the "reasons ... stated on the record for dismissing the charges" in determining whether the termination of the criminal case was in plaintiff's favor). Indeed, Kalra expressly declined to concede that Plaintiff was innocent, instead reaffirming her belief that Plaintiff "was the shooter." Dismissal Tr. at 15. The presiding judge similarly stated on the record that dismissal of the indictment was warranted even though he did not "see any prosecutorial misconduct." *Id.* at 16. The dismissal of the indictment, therefore, left open the question of Plaintiff's guilt or innocence, and Plaintiff cannot, accordingly, assert on that basis alone, that the proceedings were terminated in his favor.

**\*13** The Court notes, however, that because four years have passed since the dismissal of the indictment, Plaintiff may be able to plead additional facts from that time that support this relevant element of his claim. There is no information before the Court as to whether, for example, Plaintiff was ever informed by the prosecutors that he had been cleared of wrongdoing, whether Jackson or anyone else was later prosecuted for the shooting, or whether the state court made any further statements regarding the merits of the charges against Plaintiff. Count 3 is, accordingly, DISMISSED without prejudice, to provide Plaintiff with an opportunity to plead additional facts to support this claim.

### E. Denial of Fair Trial

To state a claim under § 1983 for denial of a fair trial based on the fabrication of evidence by a police officer—Count 4 of the complaint—a plaintiff must allege that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted). The plaintiff need not show a favorable termination indicative of innocence to state such a claim. *Smalls v. Collins*, 10 F. 4th 117, 142–43 (2d Cir. 2021). The City Defendants argue that Plaintiff has failed to show a deprivation of his

liberty interests because there was probable cause for his prosecution, in the form of corroborative ballistics evidence. City Defs. Mem. at 16 (citing Dismissal Tr. at 15); City Defs. Reply at 6–7, ECF No. 46.

Probable cause is not a complete defense to a fair trial claim. *Torres v. City of N.Y.*, No. 16 Civ. 6719, 2017 WL 4325822, at \*5 (E.D.N.Y. Sept. 27, 2017) (noting that where "independent probable cause exists for the prosecution," a plaintiff must "show that the misconduct caused some deprivation above and beyond the fact of the prosecution itself." (citation omitted)). Plaintiff plausibly alleges that Miller fabricated and "embellished" Jackson's statements in his investigative report; that Miller provided these reports to prosecutors to secure Plaintiff's indictment and arrest; and that Corrando, as Miller's supervisor, reviewed and approved these reports without identifying any "embellishments" or obvious factual contradictions. *See* Compl. ¶¶ 44–49, 95. On a motion to dismiss, the Court cannot take as true the City Defendants' factual assertion that, regardless of any alleged fabrications in Miller's reports, the prosecution had independent ballistics evidence to satisfy the probable cause standard. *Compare* City Defs. Reply at 6–7, *with* ECF No. 39 at 9–12. It cannot, therefore, find as a matter of law, that the City Defendants had probable cause for Plaintiff's indictment and prosecution. *See Bullard v. City of N.Y.*, 240 F. Supp. 2d 292, 299 (S.D.N.Y. 2003). The Court concludes, therefore, that Plaintiff has sufficiently alleged a § 1983 denial of fair trial claim against Miller and Corrando. The City Defendants' motion to dismiss Count 4 of the complaint is, accordingly, DENIED.

### CONCLUSION

For the reasons stated above, the State's motion to dismiss, ECF No. 20, is GRANTED, and Plaintiff's claims against the State are DISMISSED. The DA Defendants' motion to dismiss, ECF No. 22, is GRANTED—Plaintiff's claims against Vance are DISMISSED; and his claims against Kalra and Nasar are DISMISSED except for Counts 3 and 4, which are DISMISSED without prejudice to renewal in an amended complaint. By **April 15, 2022,** the DA Defendants shall make the disclosures directed in this order. The City Defendants' motion to dismiss is DENIED as to Count 4, and GRANTED in all other respects. Plaintiff's claims against Passamenti, the NYPD, and the City are DISMISSED; and his claims against Miller and Corrando are DISMISSED, except for Count 3, which is DISMISSED without prejudice to renewal in an amended complaint.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 145 of 181

Rich v. New York, Not Reported in Fed. Supp. (2022)

**\*14** By **May 16, 2022**, Plaintiff shall file an amended complaint as to Counts 3 and 4, with the additional factual allegations detailed in this order. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 20, 22, and 32, and mail a copy of this order to Plaintiff *pro se.* The Court shall separately provide Plaintiff with a copy of all unpublished cases cited herein.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 992885

---

**Footnotes**

1    Unless otherwise stated, the following facts are taken from the complaint and assumed, for purposes of this motion, to be true. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

2    The relevant state court trial transcripts were submitted by the DA Defendants in their motion to dismiss. *See* Trial Tr.; Dismissal Tr., ECF No. 22-4. The Court may take judicial notice of these transcripts as a matter of public record. *See Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005).

3    Because the Court concludes that it lacks jurisdiction over Plaintiff's claims against the State under Rule 12(b)(1), it need not reach the State's alternative ground for dismissal, that Plaintiff's § 1983 and § 1985 claims must be dismissed because the State is not a suable "person" within the meaning of those statutes. State Mem. at 3–4.

4    Plaintiff makes this clarification for the first time in his opposition papers. ECF No. 28 at 14. The Court notes that because, as discussed, the Eleventh Amendment bars suits against states, *see supra* at 8–10, when a defendant is sued in his official capacity, the court treats the suit as one against the "entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Serves*, 436 U.S. 658, 690 n.55 (1978)). And, where a "district attorney or an assistant district attorney acts as a prosecutor, she is an agent of the State, and therefore immune from suit in her official capacity." *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 8 (2d Cir. 2017). Accordingly, any claims Plaintiff may raise against the DA Defendants in their "official capacity" would be precluded by immunity under the Eleventh Amendment. *See id.*

5    Although Plaintiff asserts that he pleads each of his claims against "all Defendants," even a liberal read of the complaint makes clear that certain of Plaintiff's claims cannot implicate the DA Defendants' conduct, including counts 1 (unreasonable search and seizure); 2 (false arrest/imprisonment); 11 (personal injury); 12 (property damage) and 13 (negligent hiring, training, supervision, and discipline of officers). Compl. ¶¶ 117–27, 168–81. As the Court has already dismissed Counts 7 and 9, *see supra* at 7–8, it only considers Counts 3 (malicious prosecution); 4 (deprivation of fair trial); 5 (conspiracy); 6 (failure to intervene); 8 (abuse of process); 10 (negligent misrepresentation); and 14 (negligent infliction of emotional distress) against the DA Defendants.

6    Because the Court finds that the DA Defendants are entitled to absolute immunity on any claims arising from the withholding of exculpatory evidence, the Court does not reach their alternative argument that Plaintiff fails to state a claim for an alleged *Brady* violation, *see* DA Defs. Mem. at 12–15.

---

Rich v. New York, Not Reported in Fed. Supp. (2022)

7    As noted, the parallel state-law constitutional claims in Counts 4, 5, and 6 are dismissed with prejudice. *See supra* at 8.

8    The DA Defendants' reliance on *Johnson v. Fargione* is unavailing. In that case, the court found that the plaintiff's claims, which had expired weeks before the issuance of Executive Order 202.8, could not "be said to have been tolled" by that Executive Order, as the time for filing had already passed and the plaintiff had offered no excuse for the delay. 20 Civ. 764, 2021 WL 1406683, at *3 (N.D.N.Y. Feb. 17, 2021), *report and recommendation adopted* 2021 WL 1404554 (Apr. 14, 2021). Although *Johnson* is instructive with respect to how claims that may have expired *before* the issuance of Executive Order 202.8 (*i.e.*, before March 20, 2020) should be treated, it does not address the applicability of the Executive Order to federal claims that, like Plaintiff's, had not yet expired by that date.

9    Executive Order 202.8 tolled applicable limitations periods from March 20, 2020 to November 3, 2020. The order amounted to a "pause" in the limitations period—that is, during the duration of the toll, the clock to file [did] not run," but "[o]nce the toll end[ed,] the clock resume[d] from where it was when the toll began, and the plaintiff ha[d] the rest of his limitations period to file his complaint," *Johnston v. City of Syracuse*, No. 20 Civ. 1497, 2021 WL 3930703, at *6 (N.D.N.Y. Sept. 2, 2021). Because, as of March 20, 2020, when the clock was "paused," Plaintiff had 211 days remaining before the expiration of the limitations period on October 17, 2020, the Court calculates 211 days after November 3, 2020, as the end of the relevant limitations period when tolled—which is June 2, 2021.

10    Even assuming, *arguendo*, that Plaintiff would not have had reason to know of the harm or injury that was the basis of his Section 1986 claim until the date the indictment was dismissed (October 17, 2017), the claim would still be time-barred, because this would only extend the limitations period to October 17, 2018—nearly three years before the commencement of this action.

11    As noted, the Court dismissed Count 7 for relying on a statute that does not provide a private right of action, *see supra* at 7; Count 9 for being duplicative of Count 4, *see id.* at 8, and all the state constitutional claims Plaintiff asserts analogously to his federal constitutional claims, *see id.*

12    As discussed *supra* at 18–19, even if the Court construes Plaintiff's notice of claim as timely based on the dismissal of Plaintiff's criminal case on October 17, 2017, Plaintiff still failed to commence this action within one year and 90 days, as required by statute. This provides an alternative ground for dismissal.

13    Plaintiff also names the NYPD as a defendant. *See* Compl. But, the NYPD is a non-suable agency of the City, and thus, to the extent any of Plaintiff's claims are brought against it, they fail as a matter of law. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Any such claims are, accordingly, DISMISSED with prejudice.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7291417
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emily SEARS, Plaintiff,
v.
Geoffrey P. CARMICHAEL, et al., Defendants.

8:18-CV-909 (DNH/CFH)
|
Signed 08/06/2018

**Attorneys and Law Firms**

OF COUNSEL: NOREEN A. MCCARTHY, ESQ., Office of Noreen E. McCarthy, P.O. Box 756, Keene Valley, New York 12943, Attorney for plaintiff.

### REPORT-RECOMMENDATION AND ORDER

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff Emily Sears, represented by counsel, commenced this action on August 2, 2018 with the filing of a complaint. Dkt. No. 1 ("Compl."). In lieu of paying this Court's filing fee, plaintiff filed a motion for leave to proceed in forma pauperis ("IFP"). Dkt. No. 2. Upon review of plaintiff's IFP application, the undersigned concludes that she may properly proceed with this matter IFP. [1]

### I. Initial Review

### 1. Applicable Law

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain her complaint before permitting her to proceed with her action.

### 2. Complaint

Plaintiff, purporting to commence this action pursuant to 42 U.S.C. § 1983, contends that defendants violated her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution

> for Unlawful Arrest and Imprisonment, Unlawful Home Invasion, Unlawful Arrest, Illegal Search of Home without Probable Cause, Assault, Battery, Harassment, Sexual Harassment, Use of Excessive Force, Intentional Infliction of Emotional Distress, Malicious Prosecution, Invasion of Privacy, Unjustified Restrain [sic], Trespass, and Incompetent and Negligent Supervision and Training Of Law Enforcement Personnel, and for Violation of Plaintiffs' [sic] rights under the constitution of the State of New York, including Article 1, § 8 and Article § 12.

Compl. at 1. Plaintiff contends that on or about August 3, 2015, [2] defendant Cromb and "others known and unknown to Plaintiff" forcibly entered plaintiff's apartment without a warrant and without plaintiff's permission and conducted an unlawful search of the apartment. Id. at 8 ¶ 22. Plaintiff contends that officers were searching for her boyfriend, Thomas Collins, who was not present in the home, in order to arrest him on an outstanding warrant for contempt. Id. Plaintiff alleges that, during this search, defendant Carmichael demanded that plaintiff present herself to him immediately, even though she was not fully dressed and had informed him of this. Id. at 9-10. Defendant Carmichael placed plaintiff in handcuffs, hurting her while doing so. Id. Plaintiff contends that Carmichael searched the home, in the dark, with his gun drawn, while her four young children were in the home, creating "an unreasonable risk of serious injury and death to Plaintiff and to her young children and other occupants of the home." Id. at 10. Defendants Carmichael, Wenske, and Moody arrested plaintiff, transported her to the police station, and held her for fourteen days at the

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 148 of 181

**Sears v. Carmichael, Not Reported in Fed. Supp. (2018)**

Franklin County Jail. Id. at 11. Plaintiff was convicted as a result of the arrest on August 3, 2015. Id. at 11. The New York State Appellate Division, Third Department reversed the conviction. Id. at 11; Dkt. No. 1-1. Plaintiff purports to bring the action against the individual defendants in their personal and official capacities.

### 3. **Analysis**

**\*2** To the extent plaintiff seeks to bring her claims against defendants Carmichael, Wenske, Crumb, Moody, and the John Doe defendants in their official capacities, this District has held that " 'claims against municipal officers in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant.' " Wallikas v. Harder, 67 F.Supp. 2d 82, 83 (N.D.N.Y. Oct. 25, 1999) (citing Busby v. City of Orlando, 931 F.2d 764, 766 (11th Cir. 1991) ). This is because "[t]he real party in interest in an official capacity suit is the governmental entity and not the named official." Booker v. Board of Educ., Baldwinsville Cent. Sch. Dist., 238 F.Supp. 2d 469 (N.D.N.Y. 2002) (citing Union Pacific R.R. v. Village of S. Barrington, 598 F. Supp. 1285 (N.D. Ill. 1997) ). Here, in addition to naming the individual defendants, plaintiff named the Saranac Lake Police Department, Tupper Lake Police Department, Town of Tupper Lake, and Town of Saranac Lake. See Compl. Because plaintiff appears to have commenced this action against Doe #1, Doe #2, and Doe #3 – "supervisors of the TLPD and SLPD" as Monell claims – it is recommended that plaintiff's Monell claims against the individual defendants in their official capacities be dismissed as "redundant." Id. at 7-8. To the extent plaintiff attempts to bring the remaining claims in his complaint against all of the individual defendants in their official capacities, it is also recommended that such claims be dismissed because "[n]either a state nor one of its agencies nor an official of that agency sued in his or her official capacity is a 'person' under § 1983." Spencer v. Doe, 139 F.3d 107, 111 (2d Cir. 1998) (citations omitted). Accordingly, claims against the individual defendants in their official capacities must fail as a matter of law as they cannot be brought under § 1983, and should be dismissed with prejudice.

Next, plaintiff contends that defendants have violated the Eighth and Fourteenth Amendments, apparently in "using excessive force against plaintiff, subjecting Plaintiff to humiliating and degrading treatment, and sexually harassing Plaintiff." Compl. at 1, 12-13 ¶ 35. However, as plaintiff alleges that the excessive force occurred at the time of her arrest/detention, the Eighth and Fourteenth Amendments do not apply to these claims.

> The Eighth Amendment standard "applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions;" i.e., during the post-conviction stages ... Whereas the substantive due process rights provided by the Fourteenth Amendment apply only in situations where the protections provided by the Fourth and Eighth Amendments are not applicable. County of Sacramento v. Lewis, 523 U.S. 833, 844-45, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Here, Plaintiff complains of abuses that occurred during his arrest and are properly analyzed under the Fourth Amendment.

Williams v. Falkowski, No. 9:11-CV-826 GLS/RFT, 2013 WL 5423703, at *4 (N.D.N.Y. Sept. 26, 2013) (internal citation omitted); Porath v. Bird, 9:11-CV-963 (GLS/CFH), 2013 WL 2418253, at *16 ("If excessive force was allegedly used before arraignment, the Fourth Amendment standards govern.") (citing Graham v. Connor, 490 U.S. 386, 394 (1989) ). Accordingly, it is recommended that, to the extent plaintiff has attempted to raise Eighth and Fourteenth Amendment excessive force claims, such claims be dismissed with prejudice. [3]

Finally, the undersigned observes that plaintiff has named three John Doe defendants: Doe #1, Doe #2, and Doe #3. In the event that the District Judge permits this complaint to proceed, should plaintiff wishes to pursue this claim against these defendants, she must take reasonable steps to ascertain their identities. [4]

## II. Conclusion

**\*3 WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED**; and it is

**RECOMMENDED**, that all claims brought in plaintiff's complaint (Dkt. No. 1) against the individual defendants in their official capacities be **DISMISSED WITH PREJUDICE**; and it is further

Case 3:25-cv-01218-GTS-ML   Document 6   Filed 07/02/26   Page 149 of 181

Sears v. Carmichael, Not Reported in Fed. Supp. (2018)

**RECOMMENDED**, that plaintiff's Eighth Amendment and Fourteenth Amendment excessive force claims be **DISMISSED WITH PREJUDICE**, and it is further

**RECOMMENDED**, that the remainder of plaintiff's complaint – sans official capacity claims and Eight Amendment claims – be permitted to proceed; and it is

**ORDERED**, if the District Judge adopts this Report-Recommendation and Order, permitting the remaining causes of action to proceed, the Clerk of the Court the Clerk, following the adoption of the Report-Recommendation and Order, shall, without additional order of the Court, issue the summonses, along with a copy of the amended complaint and a packet containing General Order 25, which sets forth the Civil Case Management Plan used by the Northern District of New York, and USM-285 form, to the United States Marshal for service upon the defendants; and it is

**ORDERED**, that the Clerk of the Court serve this Report-Recommendation and Order upon plaintiff in accordance with local rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D. L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C) ). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7291417

---

**Footnotes**

1    Plaintiff is advised that, although she has been granted IFP status, she is still required to pay all copying fees, witness fees, and other fees that she may incur in this action.

2    Elsewhere in the complaint, plaintiff contends the incidents occurred "on or about August 18, 2015." Compl. at 7 ¶ 20, 8 ¶ 23.

3    Plaintiff also alleges excessive force under the Fourth Amendment. The undersigned recommends the Fourth Amendment excessive force claim proceed for the reasons stated herein.

4    If the District Judge, upon Review of this Report-Recommendation and Order, determines that the Complaint may proceed, and plaintiff then decides she wants to proceed against the John Doe defendants, once she ascertains such defendants identities, plaintiff may file a motion seeking the Court's permission to amend her pleadings which would seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is advised that, should the District Judge determine, on review of this Report-Recommendation and Order, that this action can proceed, failure to timely serve these currently unidentified defendants will result in this action being dismissed as against the John Doe defendants.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1555364
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jesse D. WEST, Plaintiff,
v.
John HARKNESS, #0304, Police Officer; and
John Harriman, #0463, Police Officer, Defendants.

9:17-CV-0621 (GTS/DJS)
|
Signed 05/17/2022

**Attorneys and Law Firms**

JEFFREY PARRY, ESQ., OFFICE OF JEFFREY PARRY,
Counsel for Plaintiff, 730 East Genesee Street, Fayetteville,
NY 13066.

JARROD W. SMITH, ESQ., OFFICE OF JARROD W.
SMITH, Co-counsel for Plaintiff, 11 South Main Street, P.O.
Box 173, Jordan, NY 13080.

TODD M. LONG, ESQ., Assistant Corporation Counsel,
HON. JOSEPH BARRY, Acting Corporation Counsel, City
of Syracuse Counsel for Defendants, 233 East Washington
Street, 300 City Hall, Syracuse, NY 13202.

### DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this civil rights action filed
by Jesse D. West ("Plaintiff") against City of Syracuse police
officers John Harkness and John Harriman ("Defendants"), is
Defendants' second motion for summary judgment. (Dkt. No.
150.) For the reasons set forth below, Defendants' motion is
granted.

## I. RELEVANT BACKGROUND

### A. Relevant Procedural History
Surviving the Court's Decision and Order of September
21, 2021, are Plaintiff's claims against Defendants for
unreasonable search and failure to intervene under the Fourth
Amendment arising from the events that occurred inside a
prisoner transport van on February 24, 2017. (Dkt. No. 124,
at 2, 21-30.) [1]

### B. Parties' Arguments on Defendants' Second Motion for Summary Judgment
Generally, in their memorandum of law, Defendants argue
that Plaintiff's claims for unreasonable search and failure
to intervene should be dismissed for three reasons: (1)
Defendants acted reasonably in light of the exigent safety
risks existing at the time and Plaintiff's failure to comply
with commands to submit to a search and stop reaching;
(2) portions of Plaintiff's testimony are so inconsistent,
contradictory and incomplete that they permit (and indeed
require) the Court to render a credibility determination
pursuant to *Jeffreys v. City of New York*, 426 F.3d 549 (2d
Cir. 2005); and (3) in any event, Defendants are protected
from liability as a matter of law by the doctrine of qualified
immunity, because no reasonable police officer would have
believed that the conduct alleged was unconstitutional in
light of Plaintiff's combative and suggestive behavior, the
reported information known to Defendants at the time of
Plaintiff possessing a gun and menacing people with it, and
the cumulative exigent safety risks existing at the time. (Dkt.
No. 150, Attach. 21.)

Generally, in his opposition memorandum of law, Plaintiff
argues that Defendants' motion should be denied for three
reasons: (1) Defendants' search of Plaintiff was unreasonable
as a matter of law, because his hands were cuffed behind
his back at the time of the search and thus a simple
pat frisk would have sufficed, but instead he was strip
searched in a public place; (2) *Jeffreys*' exception (to the
prohibition on rendering credibility determinations when
deciding a summary judgment motion) does not apply to
this case, because Plaintiff's testimony is accompanied by
ample supporting evidence, and any inconsistencies in that
testimony are explained by his little education and poor
vocabulary; and (3) Defendants are not protected from
liability as a matter of law by the doctrine of qualified
immunity, because the Court already decided this issue
on Defendants' first motion for summary judgment, which
presented the same facts as does the current motion. (Dkt.
No. 156.)

 **\*2** Generally, in their reply memorandum of law, Defendants
assert three arguments: (1) most of Plaintiff's Local Rule
56.1 Response should be rejected because he fails (as
he did when responding to Defendants' first motion for
summary judgment) to properly respond to Defendants'
Local Rule 56.1 Statement of Material Facts; (2) Plaintiff
mischaracterizes the search in question as an established

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 151 of 181

West v. Harkness, Not Reported in Fed. Supp. (2022)

form of "strip search" and fails to acknowledge the perceived exigent circumstances existing at the time; (3) Plaintiff's response highlights even more examples of why the *Jeffreys* exception should be applied; and (4) Plaintiff's qualified immunity argument is misguided because the Court previously acknowledged that Defendants would have an opportunity to renew their request as to the claim that it reframed when deciding Defendants' first motion for summary judgment. (Dkt. No. 160.)

### C. Statement of Undisputed Material Facts

Generally, unless otherwise noted, the following facts have been asserted and supported by Defendants in their Statement of Material Facts and admitted by Plaintiff in his Response thereto (either expressly or due to his failure to support a denial with a citation to admissible record evidence). (*Compare* Dkt. No. 150, Attach. 20 [Defs.' Rule 56.1 Statement] *with* Dkt. No. 157 [Plf.'s Rule 7.1 Response].)

Events Prior to Plaintiff's Arrest

1. On February 23, 2017, Syracuse Police Department ("SPD") Officer Cody Nellis responded to 217 Aberdeen Terrace in Syracuse, New York, regarding a verbal domestic incident. Upon arrival, Officer Nellis spoke to S.V., who reported that she has "a full stay away order" against her ex-boyfriend, Plaintiff.

2. S.V. told Officer Nellis that Plaintiff had been calling her continuously for the previous 24 hours, and she showed Officer Nellis her cell phone, which showed more than 40 unanswered calls from a land-line telephone number assigned to 1313 Grant Boulevard in Syracuse, New York.

3. S.V. told Officer Nellis that Plaintiff had been physically violent with her in the past (with numerous physical altercations dating back several years) and that she finally had had enough of the abuse, so she had ended the relationship approximately a month before. S.V. also reported that, after she had left Plaintiff, he had started using drugs frequently and becoming increasingly hostile towards her. She described him as "going crazy."

4. S.V. told Officer Nellis that she had answered one of these phone calls from Plaintiff in an attempt to direct him to stop calling her. She reported that, during the call, Plaintiff had claimed that he had recently came into possession of a

handgun from his cousin and that he was going to kill her, their child, and the police when they came for him, because he had "nothing else to live for" and was adamant about "going out with a bang." S.V. said that she believed Plaintiff was "very unstable" and that his threats were sincere.

5. Thereafter, Officer Nellis obtained a sworn statement from S.V. regarding Plaintiff and her desire for prosecution against him.

6. Officer Nellis learned from S.V. that Plaintiff had been staying with family members at 1313 Grant Boulevard in Syracuse, New York. Officer Nellis advised her to get in touch with Vera House or other related services with regard to domestic violence. She said she would be unable to leave her parents' residence because she feared for their safety as well.

7. After speaking with S.V., Officer Nellis prepared a warrant application for Plaintiff's arrest based on evidence that he had violated a protective order. As a part of this process, SPD issued notice to the Onondaga County 9-1-1 Center to flag any potential calls in connection with Plaintiff.

SPD's Response to Report of
Suspicious Person with a Weapon

8. The following day, February 24, 2017, at or around 5:06 PM, Officer Nellis and multiple other SPD units responded to 1313 Grant Boulevard regarding a Suspicious Person With a Weapon call.

**\*3** 9. The caller, S.V., had reported to 911 that Plaintiff was standing outside 1313 Grant Boulevard with a gun and threatening to shoot everyone. S.V. had also reported that Plaintiff was on "molly" and had threatened to come "mess up her van," and that her friend had seen Plaintiff display what she believed to be a handgun earlier that day.

10. Around the time Officer Nellis arrived at 1313 Grant Boulevard, he was joined by SPD Officer Michael Shannon, Sergeant David Hart, and Defendant Harriman. After establishing a perimeter around the residence, the three officers approached the front door and ordered the occupants to exit.

11. Three individuals exited the residence, including Plaintiff's father (Jesse West Jr.), who gave the officers permission to enter the residence.

West v. Harkness, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML     Document 6     Filed 07/02/26     Page 152 of 181

12. Officers Nellis and Shannon entered the residence and began clearing rooms. As Officer Nellis entered the kitchen area, he observed a closed door in the rear of the kitchen. When he attempted to open the door, it appeared to be held shut from the other side.

13. Officer Nellis called for assistance and was joined by Officer Shannon and Sergeant Hart, all three of whom drew their SPD-issued weapons (due to the nature of the call indicating that a weapon might be involved) and ordered the individual inside to exit with his hands in the air. When Plaintiff came out from the room, he was placed under arrest, handcuffed, and escorted outside.

14. Outside of the residence, as the officers attempted to place Plaintiff into the back of Defendant Harriman's nearly patrol vehicle, he "bucked" the officers. Plaintiff was, in his own words, "struggling to get free" because he was in pain.

15. Plaintiff was eventually brought to the ground by officers.

16. At approximately this time, Defendant Harkness arrived on the scene and observed Plaintiff laying on the pavement in a prone position "thrashing his body from side to side." Defendant Harkness then helped gain control of Plaintiff.

17. By the time Plaintiff was under control, an SPD prisoner transport van had arrived on scene. The prisoner transport van is larger than a patrol car and therefore much easier to place individuals inside.

18. Defendants Harkness and Harriman escorted Plaintiff to the transport van.

### Defendants' Search of Plaintiff

19. SPD's operations policy titled "Arrest, Processing & Transporting Prisoners" (Art. III, Sec. 9.17) states, in pertinent part, that "[a]ll persons taken into custody will be thoroughly searched for weapons, evidence, means of escape, and/or contraband prior to being transported."

20. A mere "pat down" or "pat-frisk" search may be unable to detect weapons such as handguns, knives or sharp objects; thus, before transport, a more thorough search may be required, especially where the individual has exhibited violent behavior and/or is suspected of having weapons.

21. Before the arrival of the prisoner transport van, Plaintiff had not been searched beyond being pat-frisked.

22. In addition, at the time that Plaintiff's arrival at the transport van, both Defendants Harriman and Harkness were aware of the 911 call of February 24, 2017, about an individual with a weapon. In particular, they had been advised by an SPD dispatcher that Plaintiff had been standing outside with a gun and stating that he was going to shoot everyone–including police–if they showed up. They had also been advised that the 911 caller had complained that Plaintiff had displayed and pointed the gun at a woman who had driven by him.

 *4  23. The prisoner transport van is divided roughly in two sections: the front section for the driver and front seat passenger, and the rear section for the prisoners. The rear (or prisoner) section is at least ten feet long with two parallel benches running lengthwise. A metal grate wall separates the driver-and-front passenger section from the prisoner section.

24. While outside the van, near the open doors, Defendant Harriman stated (to one or more other officers) that Plaintiff had not been searched thoroughly and that he would need to be searched again before transport.

25. Upon seeing Defendants coming into the van for him, Plaintiff stated words to the effect of "That's not going to happen" or "Nobody is going to search me," [2] and he "slid" to the portion of the prisoner section that is separated from the front section by a metal grate wall.

26. Plaintiff leaned himself against the metal grate wall, away from approaching Defendants.

27. As Plaintiff's hands were cuffed behind his back, he tucked his head to his chest and grabbed onto his jeans. [3]

28. Defendant Harkness asked Plaintiff what he was reaching for; Plaintiff said that he had nothing; Defendant Harkness said that he had something; and Plaintiff said again that he had nothing. [4]

29. A struggle ensued between Plaintiff and Defendant Harkness. [5]

**\*5** 30. Upon seeing this struggle, Defendant Harriman climbed into the van to help Defendant Harkness.

31. During the physical contact, Defendant Harriman yelled at Plaintiff, "[S]top reaching!"

32. Defendant Harkness unfastened Plaintiff's belt and pulled his pants down while Defendant Harriman searched the interior of Plaintiff's pants and pockets. That search yielded negative results.

33. Defendant Harriman then directed his attention to the waistband of Plaintiff's boxer briefs.

34. Defendant Harriman ran his right hand along Plaintiff's waistband to confirm whether he was concealing anything inside his boxer briefs. [6] This search yielded negative results.

35. The parties dispute whether, either before or after doing so, Defendant Harriman also ran a bare hand between Plaintiff's buttocks and over his anus (although Plaintiff admits Defendants' factual assertion that at no time did Defendants or any officer "penetrate" Plaintiff's anus).

36. At the time of the search, Plaintiff was turned facing the wall, away from Defendants.

37. Based on Plaintiff's position during this search, and the fact that Defendants were standing between Plaintiff and the doors, it would have been extremely difficult for any bystander on the street to see him with his pants down.

38. Plaintiff has identified no witnesses (other than Defendants) to the search.

39. As Defendant Harriman started to follow Defendant Harkness out of the van, Plaintiff lunged at him and attempted to headbutt him. [7] In response, Defendant Harriman pushed his right forearm towards Plaintiff to deflect the blow.

40. Defendant Harriman then removed his pepper spray, pointed it at Plaintiff, and informed him that he would be sprayed if he did not sit down. [8] Plaintiff obeyed this command and Defendant Harriman exited the van.

41. Plaintiff was then transported by van to the Onondaga County Justice Center.

**\*6** 42. Plaintiff was charged with Resisting Arrest and Harassment in the Second Degree with regard to his conduct on February 24, 2017. He was also charged with Aggravated Harassment in the Second Degree and Criminal Contempt in the First Degree with regard to his conduct on February 23, 2017.

43. Under two addition case numbers, Plaintiff was further charged with Aggravated Harassment in the First Degree, Criminal Contempt in the First Degree, and Criminal Contempt in the Second Degree with regard to conduct involving S.V.

44. In his Rule 33 responses in this action, Plaintiff responded (through counsel) that he had been "rape[d]" by Defendant Harriman. In his second deposition, Plaintiff withdrew that response.

## II. GOVERNING LEGAL STANDARD

### A. Procedural Legal Standard

Because this Decision and Order is intended primarily for the review of the parties, the Court will incorporate by reference the procedural legal standard set forth in Part II of its Decision and Order of September 21, 2021. (Dkt. No. 18, at 18-21.)

### B. Substantive Legal Standard

Generally, the elements of a claim for an unreasonable search are the following: (1) the defendant willfully conducted a search of the plaintiff; and (2) the search was objectively unreasonable under the circumstances. In deciding whether the second element has been satisfied, a fact finder must consider the following: (a) the scope of the particular intrusion; (b) the manner in which it is conducted; (c) the justification for initiating it; and (d) the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Generally, "[t]o establish such a claim of failure to intervene, a plaintiff must prove the following four elements: (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 296 (N.D.N.Y. 2018) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 [2d Cir. 2001]; *Anderson v. Branen*, 17 F.3d 552, 557 [2d Cir. 1994].)

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 154 of 181

West v. Harkness, Not Reported in Fed. Supp. (2022)

## III. ANALYSIS

### A. Defendants' First and Third Arguments

The Court begins its analysis by addressing Defendants' first and third arguments, which are summarized above in Part I.B. of this Decision and Order: (1) that they are entitled to judgment as a matter of law on Plaintiff's claims, because, based on the admissible record evidence, it is undisputed that Defendants acted reasonably in light of the exigent safety risks facing them at the time and Plaintiff's failure to comply with their commands to submit to a search and stop reaching, and (2) that, in any event, they are entitled to judgment as a matter of law on Plaintiff's claims, because no reasonable police officer would have believed that the conduct alleged was unconstitutional in light of Plaintiff's combative and suggestive behavior, the reported information known to Officers at the time of Plaintiff possessing a gun and menacing people with it, and the cumulative exigent safety risks (thus entitling Defendants to qualified immunity).

After carefully considering the matter, the Court must reject both arguments because neither one could succeed if a reasonable jury were to credit Plaintiff's testimony that, during the search of Plaintiff's boxer briefs, Defendant Harriman made "contact with" Plaintiff's anus (albeit without "penetration [of]" it) [9] "barehanded[ly]," [10] for between 20 and 40 seconds. [11] More specifically, the Court has trouble finding that exigent safety risks and Plaintiff's failure to comply with commands could and do justify, as a matter of law, such a barehanded, slow contact with his anus, as well as the idea that reasonable police officers could have believed such contact was constitutional (especially where, as here, they claim that no such contact occurred).

### B. Defendants' Second Argument

**\*7** Apparently anticipating this trouble, Defendants' second argument essentially asks the Court to disregard the above-described testimony under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). Generally, of course, credibility issues, which are questions of fact for resolution by a jury, may not be decided by a court on motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The Second Circuit, however, has recognized a very limited exception to this general rule in *Jeffreys*, 426 F.3d 549. In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations

of the defendants' constitutional violations, aside from his own contradictory and incomplete testimony, and, even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the his testimony. *Id.* at 554-55.

To apply the *Jeffreys* exception, the following three requirements must be met: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, 04-CV-1159, 2009 WL 3486379, at \*20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., adopting Report-Recommendation on clear-error review) (quoting *Jeffreys*, 426 F.3d at 554).

Here, Defendants specifically argue as follows: (1) Plaintiff relies exclusively on his own testimony, which is uncorroborated by any other evidence; (2) his testimony is incomplete in that he still does not know (a) which Defendant made contact with his anus, and which Defendant failed to intervene in that contact, (b) whether he expressed a verbal objection to the officers searching him, and (c) whether the officers said anything to him in the rear of the van immediately before and during the search; and (3) even if Plaintiff's testimony is complete, his testimony is internally contradictory in that (a) it inexplicably states he could not have reached toward the waistband of his pants because his hands were cuffed there, (b) it states both that there was a digital penetration of his anus and that there was no such penetration, and (c) it states that the contact lasted "slowly," for 30-40 seconds, for 20 seconds, for "a few seconds," and for an unknown length of time.

### 1. Whether Plaintiff Is Relying Almost Exclusively on His Own Testimony

With regard to whether Plaintiff is relying "almost exclusively on his own testimony" (in attempting to prove that one of the Defendants made contact with his anus during their search of him inside the prisoner transport van on February 24, 2017), the Court finds that he is doing so. Granted, in addition to his own testimony, Plaintiff relies on the testimony of his aunt that, after the search, he had told her that one of the officers had stuck some sort of object "in his butt." (Dkt. No. 150, Attach. 11, at 7-8 [Depo. Tr. of Nedra Pettiford].) In addition, Plaintiff is free to rely on the testimony of Custody Department Sergeant Jeffrey Wick that a "rape kit"

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 155 of 181

West v. Harkness, Not Reported in Fed. Supp. (2022)

examination was performed at a hospital as a result of one or more unidentified statements made by him at, or on the way to, the Onondaga County Justice Center. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; *accord*, Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].)

However, Ms. Pettiford's testimony appears to be inadmissible hearsay, a fact that Plaintiff at one point expressly concedes. (Dkt. No. 157, at 25-27 [Plf.'s Response to Question of Fact No. 73].) [12] Moreover, the evidence regarding a "rape kit" examination appears conspicuously devoid of (1) testimony that the results of the examination were positive, and (2) testimony that the examination was even performed at Plaintiff's insistence. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing]; Dkt. No. 150, Attach. 2, at 38-43, 97-98, 104 [Plf.'s First Depo. Tr.]; Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl.].) Indeed, to the contrary, it appears the examination may have been required by Sergeant Wick out of an abundance of caution. (Dkt. No. 150, Attach. 19, at ¶¶ 5-8 [Affid. of Jeffrey Wick]; Dkt. No. 8, at 8 [Plf.'s Verified Am. Compl., swearing that "the Justice Center would not accept me until I went to the hospital and was checked out by a doctor and had a rape kit done by doctors"].) [13]

**\*8** In any event, even if Plaintiff could be found to be partially relying on either of the two above-referenced forms of evidence, the Court would (and does) still find that Plaintiff is relying on his own testimony "almost exclusively." In particular, as discussed above in Part III.A. of this Decision and Order, Plaintiff chiefly relies on his testimony that, during the search of his boxer briefs, Defendant Harriman made "contact with" his anus (albeit without "penetration [of]" it) "barehanded[ly]," for between 20 and 40 seconds.

### 2. Whether Plaintiff's Testimony Is "Contradictory or Incomplete"

With regard to whether Plaintiff's testimony is "contradictory or incomplete," the Court finds that it is. Granted, with regard to the testimony's purported incompleteness, the fact that Plaintiff does not know which of the two Defendants took which actions while searching his boxer briefs is immaterial, because (1) he was facing away from them when the contact occurred (and thus relieved of the duty to identify his alleged

assailant), [14] and (2) in any event, Defendants themselves have provided evidence of which Defendant conducted the search of his boxer briefs (i.e., Defendant Harriman). *See, e.g., supra,* Statement of Undisputed Material Fact No. 34 in Part I.C. of this Decision and Order. Moreover, the fact that Plaintiff does not know whether he expressed a verbal objection to the officers searching him, and whether they said anything to him, is similarly immaterial, because no evidence has been adduced (or argument has been made) that Defendants requested permission to run a bare hand over his anus and that Plaintiff consented to that request.

However, the Court must reach a different conclusion regarding the internal contradictions in Plaintiff's testimony. More specifically, the Court finds three such internal contradictions. First, Plaintiff has testified that he could not possibly have reached his hands into the rear of his boxer briefs (and thus give Defendants reason to believe he harbored in them either a weapon or suicide-enabling drugs) because his hands were cuffed behind his back. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, containing the following questions and answers: "Q. At any point were your hands at all near the waistband of your pants? A. No, sir. My hands was cuffed behind my back, sir."]; Dkt. No. 150, Attach. 10, at 7, 9 [Plf.'s Second Depo. Tr., testifying, "I don't understand how I was reaching with my hands cuffed behind my back.... How can I search for something when my hands is [sic] cuffed behind my back?"].) There is no indication that Plaintiff could *not* reach his cuffed hands inside the waistband of his boxer briefs; indeed, such a suggestion would appear undermined by Plaintiff's testimony that, when seated, he could reach down to under his knees. (Dkt. No. 150, Attach. 22, at 60 [Plf.'s Rule 50-h Hearing, testifying, "When I sat down, I put my hands under my knees, because they way they had cuffed me was tight"].) [15] Simply stated, Plaintiff's testimony that his hands were cuffed behind his back contradicts his testimony that he could not possibly have reached his hands into the rear of his boxer briefs (because they were cuffed there).

**\*9** Second, Plaintiff has testified both that there was digital penetration of his anus and that there was no such penetration. (*Compare* Dkt. No. 8, at 8, 9 [Plf.'s Verified Am. Compl., swearing that at the hospital he "had a rape kit done by doctors," and "I was took [sic] to the hospital to have the rape kit done"] *and* Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I told her ... I just want the [rape] kit"] [16] *with* Dkt. No. 150, Attach. 2, at 56 [Plf.'s First Depo. Tr.] *and* Dkt. No. 15, Attach. 10, at 17-18 [Plf.'s Second Depo. Tr.].)

Third, and most importantly, Plaintiff has testified that the offending Defendant's bare hand "swiped" Plaintiff's anus only "one time" [17] but essentially lingered there for the following durations: "slowly," [18] 30-40 seconds, [19] 20 seconds, [20] "a few seconds," [21] long enough to "swipe" a credit card "from the top of the ass crack to the bottom," [22] and "I don't know" (whether the duration was less than one second, less than 10 seconds, a "consistent motion," or "a slow prolonged motion"). [23] Because of these contradictions in this testimony, the very act of determining whether a jury could reasonably find for Plaintiff based on the testimony necessarily involves a credibility assessment of the testimony. *See Jeffreys*, 426 F.3d at 554 ("[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, ... and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account.") (internal citation and quotation marks omitted).

### 3. Whether Plaintiff's Testimony Has Been Contradicted by Evidence Produced by the Defense

**\*10** With regard to whether Plaintiff's testimony has been contradicted by evidence produced by the defense, the Court finds that it has. (*See, e.g.,* Dkt. No. 150, Attach. 17, at ¶ 15 [Harriman Decl., testifying, "[W]hile I searched Mr. West's waistband with my barehand, I did not make 'skin-to-skin' contact with his buttocks area. At all times my hand remained on the exterior surface of his boxer briefs. I have never, and would never, run my barehand 'skin-to-skin' in contact with a suspect's buttocks area out of concerns for safety and hygiene."]; Dkt. No. 150, Attach. 17, at ¶ 7 [Harkness Decl., testifying, "While I held Mr. West into position, Officer Harriman began to search the *inside of his pants near the waistband* of his boxers"] [emphasis added]; Dkt. No. 150, Attach. 23, at 2 [Def. Harriman's CNYLEADS Narrative Supplement 1, stating, "Knowing that the waistband is a common spot utilized by criminals to conceal weapons or other contraband I then directed my attention to the waistband of West's boxers which he was still wearing. I then ran my right hand along the exterior of the West's waistband to confirm that he was not still concealing anything, this too yielded [sic] negative results"].)

### 4. Result of Application of *Jeffreys* Exception

As a result, the Court finds that no reasonable jury could find that any such contact with Plaintiff's anus took longer than one or two seconds. This finding is highly material, because, when part of a search incident to a lawfully executed arrest that poses exigent safety risks, an officer's brief contact with an arrestee's genitalia (when unaccompanied by sexually offensive words, and when out of public view) is simply not unreasonable under the Fourth Amendment. *See, e.g., United States v. Levy,* 217 F. Supp.3d 643, 668 (E.D.N.Y. 2016) ("Once defendant was arrested on probable cause for possessing a firearm, the police required no further justification to carry out a search of his person incident to arrest ... The crack cocaine and marijuana found on defendant's person during this [strip] search [at the police station] are therefore admissible evidence at trial.") (citing *United States v. Robinson*, 414 U.S. 218, 235 [1973]). [24] The Court emphasizes that Defendants unquestionably had grounds to believe that Plaintiff was concealing a weapon or other contraband inside the van based on (1) the four crimes for which he was arrested, (2) his particular characteristics (as communicated by S.V. and observed by Defendants), and (3) the circumstances of the arrest (which first involved "buck[ing]" and then involved declared resistence and physical evasion). *See Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) ("We hold that the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest.").

Finally, the parties are respectfully advised that, even if the Court were to deny Defendants' second motion for summary judgment, it would find that the parties have narrowed the issues to be tried through their briefing of Defendants' two motions for summary judgment, and that it would be a waste of a jury's time to make them decide facts that have been undisputed by the parties. As a result, the Court would find that an Order pursuant to Fed. R. Civ. P. 56(g) would be warranted (accepting as undisputed at trial Paragraph Numbers 1-34 and 36-44 above in Part I.C. of this Decision and Order).

**\*11  ACCORDINGLY**, it is

**ORDERED** that Defendants' second motion for summary judgment (Dkt. No. 150) is **GRANTED**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1555364

---

## Footnotes

1      The Court notes that, although Plaintiff sometimes argues in his opposition memorandum of law that he is also asserting a claim of excessive force (*see, e.g.,* Dkt. No. 156, at 5, 8), that claim was converted to one of unreasonable search in the Court's Decision and Order of September 21, 2021, and neither Plaintiff nor Defendants successfully moved for reconsideration of that conversion. (Dkt. No. 132, at 5-6.)

2      Plaintiff's response that "I can't recall. I don't know.... I don't recall that" (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.]) is insufficient to dispute the above-stated factual assertion. *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge ... are insufficient to create a genuine dispute."); *Faruki v. City of New York*, 10-CV-9614, 2012 WL 1085533, at *5 (S.D.N.Y. Mar. 30, 2012) ("Plaintiff's statement that she does not recall whether Defendants asked her to leave the store does not create a genuine dispute on that material issue."). In addition, Plaintiff's deposition testimony that such a search is "not the normal procedure" is not sufficient to dispute the above-stated factual assertion (and, indeed, such a belief at the time would explain his resistence to a search). (Dkt. No. 150, Attach. 2, at 84 [Plf.'s First Depo. Tr.].)

3      (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.].) Plaintiff's response, "I don't understand how I was reaching with my hands cuffed behind my back" does not controvert the above-stated factual assertion, especially given the proximity of his hands to the rear of his pants and/or waist band. (Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.].) *See, supra,* cases cited in note 2 of this Decision and Order.

4      (Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.]; Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.].)

5      Plaintiff characterizes this struggle as the result of the officers "jump[ing] me," while Defendants characterize it as the result of Plaintiff "charging" at Defendant Harkness. (*Compare* Dkt. No. 150, Attach. 10, at 7 [Plf.'s Second Depo. Tr.] *with* Dkt. No. 150, Attach. 16, at ¶ 5 [Harkness Affid.] *and* Dkt. No. 150, Attach. 17, at ¶ 10 [Harriman Affid.].)

6      (Dkt. No. 150, Attach. 17, at ¶ 14 [Harriman Affid.].) Plaintiff's assertion that Defendant Harriman "credit card swipe[d] me" does not controvert the above-stated asserted fact. (Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr.].)

7      (Dkt. No. 150, Attach. 17, at ¶ 47 [Harriman Affid.].) Plaintiff's denial of the headbutting attempt without a supporting record citation is ineffective. (Dkt. No. 157, at ¶ 47 [Plf.'s Rule 7.1 Response].) In addition, his response that he was never asked to deny this question in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion. (*Id.*) The Court notes that Plaintiff does not cite to an affidavit denying the headbutting attempt.

Case 3:25-cv-01218-GTS-ML    Document 6    Filed 07/02/26    Page 158 of 181

West v. Harkness, Not Reported in Fed. Supp. (2022)

(Dkt. No. 150, Attach. 17, at ¶ 48 [Harriman Affid.].) Plaintiff's denial of the above-stated factual assertion without a supporting record citation is ineffective. (Dkt. No. 157, at ¶ 48 [Plf.'s Rule 7.1 Response].) In addition, his response that he was never asked about being threatened with pepper spray in his Rule 50H Hearing does not constitute a citation to admissible record evidence controverting the above-stated factual assertion. (*Id.*) The Court notes that Plaintiff does not cite to an affidavit denying the assertion.

(Dkt. No. 117, Attach. 2, at 21-22, 50, 55-56, 70 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "hand down the crack of my ass ... touch[ing] ... my rectum ... on the outside [of it] ... touching my anal [sic]" ... [running] his hand down my cheeks and touch[ing] my anal [sic] ..."]; Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area"].)

(Dkt. No. 8, at 4, 6, 7, 9 [Plf.'s Verified Am. Compl., swearing that the touching was done "barehanded"]; Dkt. No. 122, Attach. 3, at 62, 66 [Plf.'s 50-h Hearing, testifying that the "swipe" was done with "bare hands" or "bare handed"]; Dkt. No. 117, Attach. 2, at 50, 56 [Plf.'s First Depo. Tr., testifying that one of the defendants ran his "bare hand down the inside of my buttocks, my butt cheeks, touching my rectum ... with his bare hands"].) The Court notes that a Verified Complaint has the force and effect of an affidavit or declaration for purposes of a motion for summary judgment. *See, e.g., Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.").

(Dkt. No. 122, Attach. 3, at 62, 65-66 [Plf.'s 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"]; Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

The Court notes that the material cited to support or dispute a fact on a motion for summary judgment must be able to "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

As a result, the Court has some trouble understanding how this evidence could have a "tendency to make [the search of his anus] more or less probable than it would be without the evidence" under Fed. R. Evid. 401.

"A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Jeffreys v. Rossi*, 275 F. Supp.2d 463, 474 (S.D.N.Y. 2003); *see, e.g., Gonzalez v. Waterbury Police Dep't*, 199 F. Supp.3d 616, 622 (D. Conn. July 29, 2016) ("[T]estimony from the officers that they were in the immediate vicinity of the arrest, coupled with testimony by the plaintiff that he saw the faces of each of the defendants while he was being punched and kicked, was sufficient for a reasonable jury to conclude that the officers were liable *even though the plaintiff could not identify which officers struck him*.") (emphasis added); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 297-98 (S.D.N.Y. 2009) (denying summary judgment to defendant-officers where plaintiff testified that *she could not identify which officer had assaulted her* but defendant-officers testified they were all present during the assault, and thus "it is possible that all of the officers saw what happened" to her yet "failed to intervene") (emphasis added); *Skorupski v. Cnty. of Suffolk*, 652 F.Supp. 690, 694 (E.D.N.Y. 1987) (rejecting defendants' argument that they were entitled to summary judgment because *plaintiff cannot specify which of the officers struck him* and finding that all of the officers were potentially liable because they have an affirmative duty to intervene) (emphasis added).

There is also an indication that the discomfort of the cuffs may have caused Plaintiff to move around uneasily before the search, giving Defendants reason to believe he was reaching for something behind his back. (Dkt.

West v. Harkness, Not Reported in Fed. Supp. (2022)

Case 3:25-cv-01218-GTS-ML   Document 6   Filed 07/02/26   Page 159 of 181

No. 150, Attach. 22, at 74 ["So when I was sitting back it was hurting me, so for me to get comfortable, stood up, I put my hands right here."].)

16      (*Cf.* Dkt. No. 150, Attach. 15, at ¶ 4.b. [Plf.'s Rule 33 Response to Harriman's Interrogatories, identifying his injuries as including "rape"].) The Court notes that, although Plaintiff's interrogatory responses were not signed by him personally (as they must be under Fed. R. Civ. P. 33[b][1][A] and [b][5]), they were signed by his attorney, who was Plaintiff's agent. As a result, they may be used by Defendants as evidence. *See* Fed. R. Civ. P. 33(c) ("An answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."); Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: ... The statement is offered against an opposing party and ... was made by the party's agent or employee on a matter within the scope of that relationship and while it existed....").

17      (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., testifying, "He swiped me one time"].)

18      (Dkt. No. 150, Attach. 22, at 80-82 [Plf.'s Rule 50-h Hearing, testifying, "I wouldn't say insertion, I would say like I said, his fingers slowly rubbed against my rectal area"].)

19      (Dkt. No. 150, Attach. 10, at 14-15 [Plf.'s Second Depo. Tr., testifying that the defendant's physical contact with his anus lasted "about, like, 30 seconds, 40 seconds"].)

20      (Dkt. No. 150, Attach. 22, at 62, 65-66 [Plf.'s Rule 50-h Hearing, testifying that the "swipe" involved "touching my rectum" or "rectal area," and was done "slowly," taking "20 seconds"].)

21      (Dkt. No. 150, Attach. 10, at 16 [Plf.'s Second Depo. Tr., containing following questions and answers: "Q. Mr. West, what you're describing to me sounds like almost a split second or a – no longer than a few seconds.... A. Even if it was a few seconds, it's still wrong, though, like. What is you looking for?"].)

22      (Dkt. No. 150, Attach. 22, at 62-63 [Plf.'s Rule 50-h Hearing]; *cf.* Dkt. No. 150, Attach. 2, at 70 [Plf.'s First Depo. Tr., testifying, "That's what I meant by credit card swipe me, ran his hand down my cheeks and touched by anal [sic], and that was it"].)

23      (Dkt. No. 150, Attach. 10, at 15-16 [Plf.'s Second Depo. Tr., containing the following question and answer: "Q. How long did that swipe take? A. I don't – that, I don't know, I mean. I don't know that. I can't answer that question because I don't know"]; Dkt. No. 150, Attach. 22, at 64 [Plf.'s Rule 50-h Hearing, testifying, "I don't know no time limit"].)

24      *Cf. Scalpi v. Amorim*, 14-CV-2126, 2018 WL 1606002, at *18-19 (S.D.N.Y. Mar. 29, 2018) (granting defendant's motion for summary judgment on plaintiff's Fourth Amendment claim, because, during her search of plaintiff's groin area "lasting at most a few seconds," defendant had "no more than brief contact with Plaintiff's genital area"); *Garcia v. New York State Police Investigator Aguiar,* 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (McAvoy, J.) (granting defendants' motion for summary judgment on plaintiff's Fourth Amendment claim, because searching "the crotch area, pockets, and the legs," including "cleavage and under each breast," was reasonable under the Fourth Amendment); *Lamore v. Vermont*, 12-CV-0059, 2013 WL 3560969, at *4 (D. Vt. July 11, 2013) (granting defendants' motion to dismiss plaintiff's Fourth Amendment claim under Fed. R. Civ. P. 12[b][6], because, even though the search "involved contact with [the plaintiff's] genitals," it did "not rise to the level of a Fourth Amendment claim").

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2026  Thomson Reuters. No claim to original U.S. Government Works.      10

KeyCite Yellow Flag

Declined to Extend by    Jordan v. County of Chemung,    W.D.N.Y.,
September 5, 2017

2014 WL 1293527

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Guynell WRIGHT, Plaintiff,

v.

CITY OF SYRACUSE; Jeffrey T. Wright;
Andrew Nolan; Donald Thompson; Robert
Calkin; John Doe(s); Jane Doe(s); John M.
O'Connor, III; and Thomas Simone, Defendants.

No. 5:10–CV–0661 (GTS/TWD).

|

Signed March 31, 2014.

**Attorneys and Law Firms**

Bosman Law Firm, L.L.C., A.J. Bosman, Esq., Daniel W.
Flynn, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Robert P. Stamey, James P. McGinty, Esq., Aimee M.
Paquette, Esq., of Counsel, Syracuse, NY, for City of Syracuse
Counsel for Defendants.

Hancock Estabrook LLP, John G. Powers, Esq., of Counsel,
Syracuse, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment
discrimination action filed by Guynell Wright ("Plaintiff")
against the City of Syracuse, six of its employees and an
unstated number of John and Jane Does ("Defendants")
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 95.) For the reasons set forth
below, the motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, in his Third Amended Complaint, Plaintiff, an
African–American man who was formerly employed by the
City of Syracuse ("the City") as a laborer for the Department
of Public Works ("the Department"), alleges that, throughout
his employment with the City, he was treated differently than
similarly situated white employees in the form of promotions,
work assignments and discipline; he was retaliated against for
his complaints of racial discrimination; and he was subject
to continuous hostile work environment conditions. (Dkt. No.
45.)

Based on the factual allegations of Plaintiff's Third Amended
Complaint, he asserts the following twenty-one claims: (1)
a claim against all Defendants alleging race discrimination
in violation of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); (2) a
claim against all Defendants alleging race discrimination in
violation of the New York Human Rights Law, N.Y. Exec.
Law § 296 ("NYHRL"); (3) a claim against all Defendants
alleging hostile work environment in violation of Title VII;
(4) a claim against all Defendants alleging hostile work
environment in violation of NYHRL; (5) a claim against all
Defendants alleging retaliation in violation of Title VII; (6)
a claim against ll Defendants alleging retaliation in violation
of NYHRL; (7) a claim against all Defendants alleging
race discrimination in violation of Plaintiff's right to equal
protection under the Fourteenth Amendment pursuant to 42
U.S.C. § 1983 ("Section 1983"); (8) a claim against all
Defendants alleging hostile work environment in violation
of Plaintiff's right to equal protection under the Fourteenth
Amendment pursuant to Section 1983; (9) a claim against
all Defendants alleging retaliation in violation of Plaintiff's
right to freedom of speech under the First Amendment
pursuant to Section 1983; (10) a claim against the City
alleging municipal liability on Plaintiff's Section 1983 claims
against the individually named Defendants; (11) a claim
alleging breach of contract against all Defendants; (12) a
claim against all Defendants alleging race discrimination in
violation of 42 U.S.C. § 1981 ("Section 1981"); (13) a claim
against all Defendants alleging hostile work environment in
violation of Section 1981; (14) a claim against all Defendants
alleging retaliation in violation of Section 1981; (15) a claim
against all Defendants alleging the deprivation of Plaintiff's
property interest in his continued employment in violation
of his right to due process under the Fourteenth Amendment
pursuant to Section 1983; (16) a claim against all Defendants
alleging the deprivation of Plaintiff's property and liberty
interest in his good name and reputation in violation of
his right to due process under the Fourteenth Amendment

pursuant to Section 1983; (17) a claim against all Defendants alleging the deprivations of Plaintiff's rights under Article I of the New York State Constitution; (18) a claim against all Defendants alleging retaliation in violation of Title VII based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (19) a claim against all Defendants alleging retaliation in violation of Section 296 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; (20) a claim against all Defendants alleging retaliation in violation of Plaintiff's right to freedom of speech under the First Amendment pursuant to Section 1983 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits; and (21) a claim against all Defendants alleging retaliation in violation of Section 1981 based on the Defendants having successfully contested Plaintiff's unemployment compensation benefits. (*Id.*)

**B. Undisputed Material Facts**

**\*2** The following material facts [1] are gleaned from Defendants' Local Rule 7.1 Statement of Undisputed Material Facts, and Plaintiff's response thereto. (*See* Dkt. No. 100–7 [Defs.' Rule 7.1 Statement]; Dkt. No. 105 [Pl.'s Rule 7.1 Response Statement].) Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). It further provides that, to the extent that the nonmoving party fails to do so, the facts asserted in the movant's Statement of Material Facts will be deemed admitted, as long as they are supported by the record. *Id.*

MINOR OFFENSES

| | | |
|---|---|---|
| FIRST, SECOND, THIRD | - | Write up |
| FORTH | - | Write up and one day suspension |
| FIFTH | - | Write up and three day suspension |
| SIXTH | - | Write up and five day suspension |
| SEVENTH | - | Write up and ten day suspension |
| EIGHTH | - | Write up and termination |

Plaintiff was employed as a "Laborer I" in the Department's Street Cleaning Bureau from at least June of 2006 until his termination in February of 2010. [2] Laborer I is a civil service classified job title that includes a written job description and written qualifications. The Laborer I position is covered within the American Federation of State, County and Municipal Employees ("AFSCME") Local 400 ("Local 400") bargaining unit, of which Plaintiff was a member.

The collective bargaining agreement ("CBA") for the relevant period between the City and Local 400 provides that the City shall furnish each employee member of Local 400 with a copy of the existing Work Rules and that any amendments or additions to the Work Rules shall be discussed with Local 400 and published to its members prior to becoming effective and that thereafter, any complaint shall be resolved through the grievance procedure. (*See* Dkt. No. 96–2, at 64 [Ex. B to Decl. of Donald Thompson, June 13, 2013].) Section 8.1.4 of the CBA also provides that, "[i]n the event that an employee receives a written reprimand and one (1) year elapses without any other disciplinary action being imposed on the employee, such reprimand shall be removed from the employee's personal file.

The Work Rules provide, in relevant part, at follows:

VII. Employee Discipline

The City shall not exercise its right to discharge or otherwise discipline an employee without just cause. Whenever reasonable, the City shall subscribe to the principles of progressive discipline. Set forth below are the guidelines used by the City in enforcing progressive discipline and determining the appropriate disciplinary penalty in any particular circumstance. These guidelines may be deviated from when, in the City's opinion, circumstances warrant.

MAJOR OFFENSES

FIRST                                    -    Write up and suspension or termination

SECOND                                   -    Write up and suspension or termination

THIRD                                    -    Write up and termination

**\*3** Notwithstanding the provisions of Article 8.1.4 of the parties ['] collective bargaining agreement, the discipline imposed for those violations considered to be 'minor' shall be determined by reviewing the number of such violations for which an employee has been disciplined in the twelve (12) months preceding the current violation;

However, upon committing a fourth (4th) 'minor' violation within the above stated twelve (12) month[ ] period, then that minor violation and each succeeding 'minor' violation shall be based on discipline[ ] received within the preceding eighteen (18) month period. The discipline imposed for each succeeding violation shall be in accordance with progressive discipline as outlined in the above guidelines;

In all cases of 'major' violations which are subject to suspension and/or termination, the preceding eighteen (18) months disciplinary record (including 'minor' violations) shall be considered in determining the discipline to be imposed in accordance with those outlined in the above guidelines.

(Dkt. No. 107–1, at 9–10 [Ex. 1 to Flynn Aff. ].) The Work Rules expressly provide that "[i]nsubordination is a major ... violation." (*Id.,* at 7.) To be sure, the Work Rules provide that "[t]heft of any City property or services is prohibited[,]" the level of violation attached to such conduct is not specified. (*Id.*) However, Section 9.2.1 of the CBA refers to fighting, theft, substance abuse and insubordination as "serious violations." (*See* Dkt. No. 96–2, at 53.)

From July 2006 until he was terminated, Plaintiff was subject to a series of disciplinary actions by the City. First, in July 2006, Plaintiff was given a one-day suspension for insubordination. In February 2007, Plaintiff was given a 20–day suspension for fighting with another employee. [3] In July 2007, Plaintiff was given a 20–day suspension for theft of City property. In January 2009, Plaintiff was terminated for insubordination, but then was brought back to work through a "last chance" agreement between the City and Local 400. [4] Finally, on February 24, 2010, Plaintiff was terminated for

theft of City Property. Plaintiff does not dispute the fact of these disciplinary actions, but disputes the bases for the actions and/or argues that the City applies their policies inconsistently, discretionarily and disparately.

Defendant, John M. O'Connor, III ("O'Connor") made the decision to terminate Plaintiff. O'Connor was appointed Commissioner of the Department in January 2010 and had no involvement in Plaintiff's discipline or any employment actions regarding Plaintiff prior to his termination in February 2010. Defendant, Jeffrey Wright ("Wright") was the Commissioner of the Department through December 2009 and had no involvement in the decision to terminate Plaintiff in February 2010. Defendant, Thomas Simone, III ("Simone") has been the First Deputy Commissioner of the Department since January 2010. He was not a decision maker regarding the determination to terminate Plaintiff in February 2010.

**\*4** Defendant, Donald Thompson ("Thompson") was the Director of Personnel during the relevant period. Thompson asserts by Declaration that he agreed that it was appropriate to terminate Plaintiff under the circumstances and concurred with O'Connor's decision in that regard. (*See* Dkt. No. 96 at ¶¶ 34–35 [Decl. of Donald Thompson, June 13, 2013].) At his deposition, O'Connor testified regarding his communication with Thompson prior to terminating Plaintiff, as follows: "I had [a] conversation with Don Thompson, who told me the level of progression [Plaintiff] was at and [sic] was instructed and encouraged that I should investigate, and most likely there would be termination here." (Dkt. No. 112, at 56 [Dep. of John M. O'Connor, III, at 152: 4–8, Jan. 4, 2013].) According to Plaintiff, O'Connor told him that Don (meaning Thompson) "said to fire you." (Dkt. No. 106 at 7–8 [Aff. of Guynell Wright at ¶ 41].)

During the relevant time period, Defendant, Robert Culkin ("Culkin") was the Acting Assistant Superintendent of the Department's Street Cleaning Bureau and Defendant, Andrew Nolan ("Nolan") was Acting Superintendent. Both Culkin and Nolan assert that they did not initiate the discipline leading up to Plaintiff's termination, did not participate in the

pretermination hearing and played no role in the decision to terminate Plaintiff, nor were they consulted by O'Connor for their input regarding Plaintiff's discipline. (*See* Dkt. No. 98 at 8 [Decl. of Andrew Nolan at ¶ 49, June 13, 2013]; Dkt. No. 100 at 5 [Decl. of Robert Culkin at ¶ 32, June 13, 2013].) Plaintiff counters that he "personally observed [ ] O'Conn[o]r go to [ ] Nolan and [ ] C[u]lkin for advice on how to perform his duties as Commissioner." (Dkt. No. 106 at 8 [Wright Aff. ¶ 42].)

Prior to his termination in February 2010, Plaintiff was provided a copy of the notice of the disciplinary charges against him as well as the possibility that termination would be considered as a result. Plaintiff was afforded a disciplinary hearing at which he was given the chance to respond to the disciplinary charges against him and was permitted to have union representation present to advocate on his behalf. Simone was present at Plaintiff's disciplinary hearing. Although Simone has the authority to advise regarding discipline, his role at Plaintiff's hearing was as an observer and gatherer of information.

Also, Plaintiff exercised his procedural right to grieve his termination. That procedure ran its course according to the grievance procedure set forth in the CBA and terminated prior to the final step, when Local 400 voted not to take the grievance to arbitration.

Plaintiff ultimately filed complaints with the New York State Division of Human Rights ("DHR") on March 26, 2010 and April 28, 2010 challenging his February 2010 termination.[5] (*See* Dkt. No. 96–33 [Ex. GG to Thompson Decl.].) In those complaints, Plaintiff alleges that he was suspended and terminated based on his race and that he was retaliated against for his prior DHR complaints. Plaintiff alleges that white employees are treated differently than black employees in terms of employee discipline. (*See id.*) On June 3, 2010 and June 10, 2010, respectively, the DHR dismissed those complaints for administrative convenience. (*See* Dkt. No. 9'–13 [Ex. L to Decl. of Aimee Paquette, June 14, 2013]; Dkt. No. 96–34 [Ex. HH to Thompson Decl.].)

**\*5** After Plaintiff was terminated, he filed a claim for unemployment benefits with the Department of Labor ("DOL"). When the DOL inquired about the circumstances of Plaintiff's termination, the City responded that he had been terminated for cause. Plaintiff availed himself of the administrative appeal process to challenge the DOL's determination, which was ultimately overturned. Plaintiff received full payment of back benefits owed.

### C. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law
Generally, in their memorandum of law, the Defendants assert twelve arguments with regard to Plaintiff's claims against them. (Dkt. No. 100–8 [Defs.' Mem. of Law].)

First, argue the Defendants, Plaintiff's employment discrimination claims based on his termination may be dismissed for the following three reasons: (1) the discriminatory determination claim against Simone, Wright, Culkin, Thompson and Nolan should be dismissed because each was either not the decision maker or was not otherwise actionably involved in the decision to terminate Plaintiff; (2) the discriminatory determination claim against O'Connor and the City should be dismissed because (a) Plaintiff cannot make out a prima facie case that his termination was discriminatory, (b) Defendants have come forward with legitimate, nondiscriminatory reasons for Plaintiff's termination, and (c) Plaintiff has no evidence that Defendants' stated reasons for his termination are a pretext for discrimination; and (3) absent individual liability for discriminatory termination, no liability will lie against the City pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018 (1978). (*Id.* at 14–25.)

Second, argue the Defendants, Plaintiffs 18th, 19th, 20th and 21st causes of action alleging discrimination against the City for opposing his application for unemployment benefits may be dismissed for the following three reasons: (1) there is caselaw supporting the legal conclusion that an employer's opposition of a former employee's application for unemployment benefits is not adverse employment action; (2) where an employer opposes a former employee's unemployment application, but the employee is ultimately awarded those benefits, no adverse employment action occurs in any event; and (3) Plaintiff cannot prove discriminatory animus in the opposition of his unemployment application because he failed to seek any discovery or deposition from the City employee responsible for responding to DOL inquiries. (*Id.* at 26–27.)

Third, argue the Defendants, Plaintiff's hostile work environment claims may be dismissed as a matter of law for the following five reasons: (1) Plaintiff's Title VII and NYHRL claims of hostile work environment must be

Wright v. City of Syracuse, Not Reported in F.Supp.3d (2014)

dismissed for failure to exhaust his administrative remedies before the DHR; (2) Plaintiff's NYHRL claim must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) all of Plaintiff's hostile work environment claims must be dismissed because Plaintiff has failed to identify evidence that his workplace was permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of his employment; (4) Plaintiff's hostile work environment claims against Simone, O'Connor, Wright and Thompson must be dismissed because there is a lack of evidence of their personal involvement or discriminatory purpose; and (5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 27–36.)

**\*6** Fourth, argue the Defendants, there is no claim for discriminatory overtime in this action for the following six reasons: (1) the Third Amended Complaint does not include a claim for discriminatory overtime; (2) any claim for discriminatory overtime under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (3) any discriminatory overtime claim under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (4) Plaintiff cannot identify any evidence that he was denied overtime due to discrimination; (5) Plaintiff cannot identify any evidence that he was denied overtime because of his race or protected activity; and (6) any claim of discriminatory overtime against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory overtime assignments. (*Id.* at 36–43.)

Fifth, argue the Defendants, Plaintiff's discrimination and retaliation claims based on less desirable work assignments must be dismissed for the following five reasons: (1) Plaintiff's claimed discriminatory work assignments fail or do not constitute adverse employment action; (2) any claim of discriminatory work assignments against Simone, O'Connor, Wright and Thompson must be dismissed because none of them was a decision maker or involved in setting Plaintiff's alleged discriminatory work assignments; (3) any claim for discriminatory work assignments under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (4) any discriminatory claim for discriminatory work assignments under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; and

(5) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 43–48.)

Sixth, argue the Defendants, Plaintiff's discriminatory and retaliatory discipline claims must be dismissed for the following six reasons: (1) Plaintiff's claim for discriminatory and retaliatory discipline under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory and retaliatory discipline under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) some or all of Plaintiff's claims for discriminatory and retaliatory discipline are barred by the relevant statute of limitations; (4) Plaintiff cannot established that the challenged disciplinary actions were premised on discriminatory or retaliatory animus; (5) discriminatory discipline claim against Simone, O'Connor, Nolan, Culkin and Thompson must be dismissed because none of them was a decision maker or involved in the discipline of Plaintiff; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 48–57.)

**\*7** Seventh, argue the Defendants, Plaintiff's claims of discriminatory and retaliatory denial of promotion may be dismissed for the following six reasons: (1) Plaintiff's claims for discriminatory denial of promotion under Title VII and NYHRL must be dismissed for failure to exhaust administrative remedies before the DHR; (2) Plaintiff's claim for discriminatory denial of promotion under NYHRL must be dismissed for failure to file a Notice of Claim under Section 8–115(2) of the City's Charter; (3) Plaintiff's claims for discriminatory denial of promotion under Title VII, NYHRL and Section 1983 must be dismissed because they are timebarred; (4) Plaintiff cannot establish that the claimed promotions for which he was passed over were filled based on discriminatory or retaliatory intent; (5) Plaintiff's claims for discriminatory denial of promotion against Simone, Nolan, Culkin, Thompson and O'Connor should be dismissed because none of them was a decision maker or involved in the alleged failure to promote Plaintiff to crew leader; and (6) absent individual liability, no liability will lie against the City under Section 1981 or 1983 pursuant to *Monell.* (*Id.* at 57–67.)

Eighth, argue the Defendants, Plaintiff's breach of contract claim must be dismissed because Plaintiff has failed to file a claim against Local 400, which is a prerequisite to a breach

of contract claim based on a union's breach of its duty of fair representation. (*Id.* at 67–68.)

Ninth, argue the Defendants, Plaintiff's 15th and 16th causes of action, brought under Section 1983 for violation of his Fourteenth Amendment right to Due Process may be dismissed because (1) municipal employees hold no due process rights to promotions, overtime, discipline or work assignments; and (2) a municipal employee's liberty interest in keeping his employment is adequately served where there is a process available to challenge the employer's deprivation, such as a grievance procedure. (*Id.* at 68–70.)

Tenth, argue the Defendants, Plaintiff's 17th cause of action for violations of the New York State Constitution must be dismissed because no private right of action exists under the New York State Constitution where a claim based on the same allegations is asserted under Section 1983. (*Id.* at 70–71.)

Eleventh, argue the Defendants, Plaintiff's claim for punitive damages must be dismissed because no such claim may be maintained against the City as a matter of law and because Plaintiff has failed to identify any evidence to establish that the individual Defendants acted with evil motive or intent. (*Id.* at 71.)

Twelfth, argue the Defendants, Plaintiff's claims against John and Jane Doe defendants must be dismissed because Plaintiff failed to identify them through amendment of his pleading prior to the close of discovery. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts eleven arguments: (1) because Plaintiff asserts claims under the NYHZL and the New York State Constitution, this Court should apply New York procedural law when deciding the pending motion for summary judgment; (2) Defendants' motion should be denied because there are triable issues of fact to support Plaintiff's claims that he was unlawfully discriminated against; (3) Defendants' arguments of failure to exhaust should be rejected because they rely only on the formal charges to the DHR rather than Plaintiff's intake form and handwritten submissions; (4) Plaintiff's hostile work environment claims should not be dismissed because there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation, ridicule and insult that the terms and conditions of his employment were altered for the worse; (5) the City Charter's Notice of Claim

provision does not apply to Plaintiff's NYHRL claims; (6) Plaintiff's claims relating to his unemployment benefits should not be dismissed because the City's opposition of Plaintiff's unemployment applications should be deemed adverse employment action under *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006); (7) Plaintiff has viable due process claims because the CBA here only allows Local 400 to seek a post-termination hearing through arbitration; (8) Plaintiff's breach of contract claim should not be dismissed because it is a matter of fact for the jury to decide whether Local 400 breached its duty of fair representation; (9) Plaintiff's claims under the New York State Constitution should not be dismissed because the availability of a federal constitutional or statutory claim does not render a claim under the New York State Constitution subordinate; (10) Plaintiff's entitlement to punitive damages is not suitable for resolution at the summary judgment stage; and (11) Defendants lack standing to seek dismissal of the John and Jane Doe defendants. (*See* Dkt. No. 104 [Pl.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply Memorandum of Law

**\*8** Generally, in their reply memorandum of law, the Defendants assert eleven arguments: (1) Plaintiff mischaracterizes his summary judgment burden; (2) Plaintiff fails to meet his burden with respect to his wrongful termination claim; (3) Plaintiff fails to oppose, and therefore concedes, Defendants' argument that no claim exists based on discriminatory overtime; (4) Plaintiff fails to meet his burden on his discriminatory promotion claim; (5) Plaintiff fails to meet his burden on his excessive discipline claim; (6) Plaintiff fails to meet his burden on his hostile work environment claim; (7) Plaintiff effectively concedes he has no discriminatory assignments claim; (8) post-employment contestation of unemployment benefits is not actionable; (9) Plaintiff is barred from asserting a contract claim against the City; (10) Plaintiff does not have a viable due process claim; and (11) Plaintiff has failed to establish sufficient evidence to support a *Monell* claim against the City. (Dkt. No. 124 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Motion for Summary Judgment

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine

dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598 (1970)). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348 (1986)).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 (citation omitted).

As for the genuineness requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted; emphasis added). [6] Similarly, inadmissible hearsay is insufficient to create a genuine issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). [7]

### B. Legal Standard Governing Unopposed Motions

**\*9** In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases);

*Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y.Aug.7, 2009) (Suddaby, J.) (collecting cases).

### C. Plaintiff's Claims

#### 1. Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's race, color, religion, sex, or national origin." 42 U .S.C. § 2000e–2(a)(1). Liability under Title VII is limited to employers, not individuals. *See Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012).

Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII. *See Morgan v. NYS Attorney Gen.'s Office,* No. 11–CV–9389, 2013 WL 491525, at *6 (S.D.N.Y. Feb. 8, 2013) (citing *Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 135, 146 (2d Cir.2012) (citing 42 U.S.C. §§ 2000e–5(e) (1), (f)(1))). Claims not raised before the EEOC may still be brought in federal court as long as they are "reasonably related" to the claims that were filed with the agency. *See id.* (quoting *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as recognized in *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684 (2d Cir.1998)). A claim is "reasonably related" where the conduct complained of "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts,* 990 F.2d at 1402. When determining whether a claim is reasonably related to the claims filed with the EEOC, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Housing Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (internal alteration and citation omitted). "[I]t is the substance of the charge and not its label that controls." *Mathirampuzha v. Potter,* 548 F.3d 70, 76–77 (2d Cir.2008) (quoting *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003)). "The central question is whether the complaint filed with the [EEO] gave th[e] agency adequate notice to investigate discrimination on both bases." *Mathirampuzha,* 548 F.3d at 76–77 (citing *Williams,* 458 F.3d at70).

#### a. Hostile Work Environment

**\*10** In enacting Title VII, Congress intended to protect against "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 174–175 (2d Cir.2012) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 (1993)).

In order to establish a claim for a hostile work environment under Title VII, the underlying harassment alleged "must be sufficiently severe or pervasive," both subjectively and objectively, "to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Redd,* 678 F.3d at 175 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U .S. 57, 67, 106 S.Ct. 2399 (1986); *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). Further, the plaintiff must establish that the hostile or abusive treatment was because of his membership in a class of persons protected by Title VII. *See Redd,* 678 F.3d at 175.

A determination of whether an environment is objectively hostile or abusive requires an evaluation of all the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Redd,* 678 F.3d at 175 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Whether an environment is subjectively hostile or abusive may be determined by the effect on the plaintiff's psychological well-being, although no single factor is required. *See id.*

In order to establish his claim for hostile work environment, a plaintiff need not show that his "working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd,* 678 F.3d at 175 (quoting *Pucino v. Verizon Commc'ns, Inc.,* 618 F.3d 112, 119 (2d Cir.2010)). Typically, isolated incidents will not suffice to establish a hostile work environment, "although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd,* 678 F.3d at 175–176 (citing, inter alia, *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004) ("[A] single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." (internal quotation marks omitted)). "For racist comments, slurs, and jokes to constitute a hostile work environment, there [generally] must be more than a few

isolated incidents of racial enmity." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quotation marks omitted).

It is important to keep in mind, however, that "while the central statutory purpose of Title VII was eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd,* 678 F.3d at 176 (quoting *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251 (1976); *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). Title VII is "meant to protect individuals from abuse and trauma that is severe[, but is] not intended to promote or enforce civility, gentility or even decency." *Taylor v. New York City Dept. of Educ .,* No. 11–CV–3582, 2012 WL 3150388, at \*8 (E.D.N.Y. Aug. 2, 2012) (quoting *Curtis v. DiMaio,* 46 F.Supp.2d 206, 213–14 (E.D.N.Y.1999)). Thus, "the 'mere utterance of an epithet which engenders offensive feelings' is insufficient to sustain a hostile work environment claim." *Tolbert v. Smith,* 09–CV–6579, 2014 WL 906158, at \*19 (W.D.N.Y. Mar. 7, 2014) (quoting *Hannon v. Wilson Greatbatch, Ltd.,* No. 00–CV–0203, 2002 WL 1012971, \*7 (W.D.N.Y. Apr. 24, 2002). *See also Brown v. Coach Stores, Inc.,* 163 F.3d 706 (2d Cir.1998) (occasional offensive racial comments are not sufficiently severe or pervasive to establish a hostile work environment).

**\*11** In addition to showing that he was subjected to a hostile work environment, a plaintiff must also establish that the conduct which created the hostile environment may be imputed to his employer. *See Shiner v. State Univ. of New York,* No. 11–CV–1024, 2012 WL 5398658, at \*4 (W.D.N.Y. Nov. 2, 2012) (citing *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d. Cir.2001)).

The actions of a plaintiff's coworkers will be imputed to the employer if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Wiercinski v. Mangia 57, Inc.,* No. 09–CV–4413, 2012 WL 2319142, at \* 10 (E.D.N.Y. June 19, 2012) (quoting *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)).

However, the actions of a plaintiff's supervisor are "automatically imputed to the employer unless the employer is able to successfully raise an affirmative defense that examines the reasonableness of the conduct of both the employer and the employee." *Shiner,* 2012 WL 5398658, at \*4. This defense requires the employer to show that it "exercised reasonable care to prevent and correct any

harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257 (1998).

Where an employer "maintains a policy against [ ] harassment and provides a process through which employees can complain about violations of that policy," it will have met the first prong of its affirmative defense. *Joyner v. City of New York,* No. 11–CV–4958, 2012 WL 4833368, at *3 (S.D.N.Y. Oct. 11, 2012). Further, where a plaintiff fails to take advantage of that system until more than a year after the alleged harassment began, and where the offensive conduct ceased once plaintiff reported it, an employer will establish the second prong of its defense. *See Joyner,* 2012 WL 4833368, at *3 (citing *Leopold,* 239 F.3d at 246).

### b. Race Discrimination and Disparate Treatment

At the summary judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), and its progeny. *See Mathirampuzha,* 548 F.3d at 78 citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089 (1981)). At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden to show that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013) (quoting *Reynolds v. Barrett,* 685 F.3d 193, 202 (2d Cir.2012) (internal quotation marks and alteration omitted)). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003).

**\*12** In order to establish a prima facie case of discrimination based on failure to promote under Title VII, a plaintiff ordinarily must demonstrate that: "(1) [he] is a member of a protected class; (2)[he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Yu v. New York City Housing Development Corp.,* 494 F. App'x 122, 124–125 C.A.2 (2d Cir.2012) (quoting *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir.2010) (quotation marks omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate non-discriminatory reason for the employment action at issue. *See Bir,* 2013 WL 362973, at*1 (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). If the employer makes this showing, the burden then shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for discrimination. *Id.* (citing *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010)).

" 'A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.' A change that is 'materially adverse' could consist of, inter alia, 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Morgan,* 2013 WL 491525, at *5 (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)).

### c. Retaliation

To make out a prima facie case of retaliation under Title VII, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two." *Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d

203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law," *id.* (quoting *Sumner,* 899 F.2d at 209). The reasonableness of a plaintiff's belief is to be assessed in light of the totality of the circumstances. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996).

**\*13** Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640; *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at \*4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered.").

A plaintiff may establish a causal connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 (S.D.N.Y.2004)).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 (E.D.N.Y.2003)).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

Claims of retaliation under Title VII are governed by the burden-shifting analysis announced in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. *See Guzman v. News Corp.,* No. 09–CV–9323, 2013 WL 5807058, at \* 19 (S.D.N.Y. Oct. 28, 2013) (citing *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010); *Lennert–Gonzalez v. Delta Airlines, Inc.,* No. 11–CV–1459, 2013 WL 754710, at \*9 (S.D.N.Y. Feb. 28, 2013)). *See also Puglisi v. Town of Hempstead,* 545 F. App'x 23, ——, 2013 WL 5663223 (2d Cir. Oct. 18, 2013) (discussing Title VII retaliation claim in context of *McDonnell–Douglas* burden-shifting framework).

"Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343.

**\*14** If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, 'but for' the protected activity, she would not have been terminated. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). The Supreme Court recently clarified that 'a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit. *Id.* at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006).

*Guzman,* 2013 WL 5807058, at \* 19. *See also Puglisi,* 2013 WL 5663223; *Leacock v. Nassau Health Care Corp.,* No. 08–CV–2401, 2013 WL 4899723, at \*11 (E.D.N.Y. Sept. 11, 2013); *Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.,* —— F.Supp.2d. ——, ——, 2013 WL 5338516, at \*18 (S.D.N.Y.2013).

**2. NYHRL**

"Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII," those claims may be analyzed in tandem. *Leopold v. Baccarat, Inc.* 174 F.3d 261, 264, n. 1 (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304, n. 4 (2d Cir.1995), abrogated on other grounds by *Burlington Indus.,* 524 U.S. 742, 118 S.Ct. 2257). *See also Salmon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 226, n. 2 (2d Cir.2008). Accordingly, a

court's ruling regarding a plaintiff's Title VII claims applies with equal force to those claims under the NYHRL. *See Leopold,* 174 F.3d at 264, n. 1.

Under the NYHRL, however, a plaintiff may allege claims against an individual defendant as an aider or abettor of NYHRL violations. In order for a plaintiff to recover against an aider or abettor of NYHRL violations, she must establish "(1) that [ ]he engaged in conduct protected by the NYHRL; (2) there is a causal connection between the protected conduct and the alleged [violations] of the NYHRL; and (3) that [the defendant] 'actually participated' in the discrimination." *Beattie v. Guilderland Cent. Sch. Dist.,* 124 F.Supp.2d 802, 805 (N.D.N.Y.2000) (citations omitted). *See also* N.Y. Exec. Law § 296.1(a) (McKinney 2012). Further, a plaintiff must show that the defendant "aided or abetted a primary violation of the NYHRL committed by another employee or the business itself." *Jordan v. Cayuga Cnty.,* No. 01–CV1037, 2004 WL 437459, at *4 (N.D.N.Y. Feb. 9, 2004) (quoting *Bennett v. Progressive Corp.,* 225 F.Supp.2d 190, 213 (N.D.N.Y.2002) (internal quotation and emphasis omitted)). *See DeJohn v. Wal–Mart Stores East, LP,* No. 09–CV–1315, 2012 WL 3679204, at * 16 (N.D.N.Y. Aug. 17, 2012). However, an individual cannot be held liable for aiding and abetting their own violations of the NYHRL. *See Reid v.. Ingerman Smith LLP,* 876 F.Supp.2d 176, 186 (E.D.N.Y.2012). Finally, an employee is not individually subject to suit as an aider or abettor under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Miotto v. Yonkers Public Schools,* 534 F.Supp.2d 422, 427 (S.D.N.Y.2008) (quoting *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)). *See also Tomka,* 66 F.3d at 1317.

### 3. 42 U.S.C. § 1983

**\*15** In order to establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must show "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York,* 821 F.Supp.2d 651, 655–656 (S.D.N.Y.2011) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (internal quotation marks omitted)). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant: "(1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act." *Kregler,* 821 F.Supp.2d at 655–56 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501).

A municipality may only be liable on a § 1983 claim "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978)). In the absence of such a custom or policy, a municipality may not be held liable on a § 1983 claim for the actions of its employees under a theory of vicarious liability. *See Jones,* 691 F.3d at 80 (citing *Monell,* 436 U.S. at 691, 98 S.Ct.2018). Thus, isolated acts of municipal employees are typically not sufficient to establish municipal liability. However, acts done "pursuant to municipal policy, or [that] were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware" would justify liability of the municipality. *Jones,* 691 F.3d at 81. Further, "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Id.*

#### a. First Amendment Retaliation

**\*16** "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Dillon v. Suffolk Cnty. Dep't of Health Servs.,* 917 F.Supp.2d 196, 205 (E.D.N.Y.2013) (quoting *Garcetti v. Caballus,* 547 U.S. 410, 417, 126 S.Ct. 1951 (2006)). In order to establish a claim for First Amendment retaliation, a public employee must show that (1) he engaged in "constitutionally protected speech" because

he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. *Dillon,* 2013 WL 208950, at \*6 (quoting *Johnson v.. Ganim,* 342 F.3d 105, 112 (2d Cir.2003)). The threshold inquiry is whether the employee spoke as a citizen on a matter of public concern. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti,* 547 U.S. at 418. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684 (1983)).

In the context of a First Amendment retaliation claim, an adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights [.]" *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir.2006). Such actions can include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand," or may include "lesser actions" such as "negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

### b. Equal Protection

A plaintiff may establish a claim for the violation of her right to equal protection under the Fourteenth Amendment based on race discrimination, since the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (quoting *Feingold,* 366 F.3d at159 & n. 20). Thus, claims for hostile work environment and disparate treatment may be brought under § 1983 as equal protection claims. *See Demoret,* 451 F.3d at 149. However, a claim of retaliation for complaining of race discrimination is not properly brought

under the Equal Protection Clause. *See Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996).

### c. Due Process

**\*17** The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Thus, in order to prevail on a due process cause of action, a plaintiff must establish the deprivation of some tangible property or liberty interest. *See Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); *DeMuria v. Hawkes,* 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite consciousshocking behavior on the part of the government); *McMenemy v. City of Rochester,* 241 F.3d 279, 285–286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

When an individual claims to have a property interest related to employment, courts may look to the relevant contract of employment-either explicit or implicit-or its functional equivalent to determine whether the individual has such a property interest. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701 (1972); *Ciambriello v. County of Nassau,* 292 F.3d 307, 314 (2d Cir.2002).

Where a government employee has a constitutionally protected property interest in his employment, "some kind of hearing [is required] prior to [termination]." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (internal quotation marks and citation omitted).

> However, in general, something less than a full evidentiary hearing is sufficient prior to adverse action. Before being terminated, the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. As long as a full post-termination hearing

is provided for, the pre-termination
hearing may be minimal.

*Arteta v. Cnty. of Orange,* 141 F. App'x. 3, 7 (2d Cir.2005) (citing *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487; *Locurto v. Safir,* 264 F.3d 154, 173–74 (2d Cir.2001)) (quotations omitted).

It is a well-established legal principle in the Second Circuit "that there is no [procedural] due process violation where ... pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi,* 517 F.3d 124, 128 (2d Cir.2008) (citing cases). *See also Coollick v. Hughes,* 699 F.3d 211, 217 (2d Cir.2012).

A government employee may have a cause of action for violation of his right to substantive due process where a government defamation occurs in the course of dismissal from employment resulting in a deprivation of a liberty interest, commonly referred to as a stigma plus claim. *See Lawson v. Rochester City Sch. Dist.,* 446 F. App'x. 327, 329 (2d Cir.2011) (citing *Patterson,* 370 F.3d at 330). In order to prevail on such a claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *See Monserrate v. N.Y. State Senate,* 599 F.3d 148, 158 (2d Cir.2010). "An employee's liberty interest is not ordinarily implicated by statements in connection with his termination of employment if there has been no public disclosure of the reasons for the discharge." *Walsh v. Suffolk Cnty. Police Dep't,* 341 F. App'x 674, 675 (2d Cir.2009) (citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 (1976) ("Since the ... communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Moreover, a plaintiff cannot prevail on a substantive due process claim unless he shows that the defendants infringed a liberty interest in an arbitrary or irrational manner and in such a way as to "shock the conscience." *Smith v. Half Hollow Hills Cent. School Dist.,* 298 F.3d 168, 173 (2d Cir.2002). *See also Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001).

**4. 42 U.S.C. § 1981**

**\*18** Employment discrimination claims brought under Section 1981, like those brought under Section 1983, are subject to the same substantive standards as claims brought pursuant to Title VII and NYHRL. *See Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4 (E.D.N.Y. Mar. 17, 2014). Procedurally, employment discrimination claims brought pursuant to Sections 1981 and 1983 are also analyzed under the *McDonnell Douglas* framework. *See id.*[8] Finally, Section 1981 claims against a municipality, like Section 1983 claims, are subject to analysis under *Monell. See Lang. v. New York City Health & Hosps. Corp.,* No. 12–CV–5523, 2013 WL 4774751, at * 5 (S.D.N.Y. Sept. 5, 2013).

**5. New York State Constitution**

Where claims are brought pursuant to the New York State Constitution that mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. *See Canzoneri v. Incorporated Vill. of Rockville Ctr.,* 2013 WL 6330671, at *11 (E.D.N.Y. Dec. 5, 2013) (citing *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 247–48 (N.D.N.Y.2008)). *See also Clayton v. City of Poughkeepsie,* 2007 WL 2154196, at *7 (S.D.N.Y. June 21, 2007) (quoting *De Vito v. Barrant,* No. 03–CV–1927, 2005 WL 2033722, at *6–7 (E.D.N.Y. Aug. 23, 2005)); *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446–47 (S.D.N.Y.1999).

**II. ANALYSIS**

**A. Whether A Discriminatory Overtime Claim Exists in This Action**

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 36–43 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

Plaintiff fails to plead a claim for discriminatory overtime in his Third Amended Complaint. Moreover, Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met

the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The only evidence of Plaintiff being denied overtime occurred in January 2006, before the period that is relevant to the claims in this action. Moreover, the evidence reflects that Plaintiff grieved the issue, which was resolved in his favor. Accordingly, there is no evidence that Plaintiff endured a materially adverse change in the terms and conditions of his employment as it relates to overtime. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory denial of overtime is granted.

### B. Whether Plaintiff's Claims Under Article I of the New York State Constitution Must Be Dismissed

**\*19**  After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 70–71 [Defs.' Mem. of Law].) To those reasons, the Court adds the following points.

First, Plaintiff's purported claim under the New York State Constitution is that Defendants deprived him of his rights under Article I, essentially claiming a violation of the entire Bill of Rights. Accordingly, Plaintiffs' New York Constitutional claim is overly broad and therefore, should be dismissed for failure to state a claim. In an abundance of caution, the Court interprets Plaintiff's Third Amended Complaint to allege claims under Article I, Sections 6 (due process), 8 (freedom of speech), and 11 (equal protection).

Second, and in any event, as indicated above in Point II.C.5. of this Decision and Order, where Plaintiff's state constitutional claims mirror claims brought under Section 1983, courts in this Circuit have held that there is no private right of action on the state constitutional claims. Accordingly, for this reason alone, Defendants' motion for summary judgment on Plaintiff's 17th cause of action under the New York State Constitution is granted.

### C. Whether Plaintiff's Claims Against John Doe(s) and Jane Doe(s) Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at

71 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' legally supported motion for summary judgment seeking dismissal of the John and Jane Doe defendants Plaintiff makes the bald and completely unsupported assertion that Defendants "have no standing" in that regard. (Dkt. No. 104 at 22 [Pl.'s Mem. of Law].) Plaintiff does not dispute that discovery in this action, which lasted in excess of two years, is complete, nor does he argue that further discovery would reveal the identity of these unnamed defendants. Accordingly, the completion of discovery and Plaintiff's failure to identify the John and Jane Doe defendants mandates their dismissal. *See Epps v. City of Schenectady,* No. 10–CV–1101, 2013 WL 717915, at \*5 (N.D.N.Y. Feb. 27, 2013). Therefore, Defendants' motion for summary judgment is granted in this regard.

### D. Whether Plaintiff's Breach of Contract Claim Against Defendants Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, for the reason stated by Defendants in their memorandum of law. (Dkt No. 100–8 at 67–68 [Defs.' Mem. of Law].) To that reason, the Court adds the following point.

In opposition to Defendants' motion in this regard, Plaintiff cites inapposite caselaw and fails to address the point made by Defendants, which is that in order to pursue a breach of contract claim against the City under the undisputed facts of this case, Plaintiff must have also pursued a claim against Local 400 for breach of the duty of fair representation. *See Lore v. City of Syracuse,* 670 F.3d 127, 151 (2d Cir.2012). Plaintiff fails to identify any such claim against Local 400, nor has he alleged such a claim against Local 400 in this action. Accordingly, the caselaw Plaintiff cites, for the proposition that whether a union has breached its duty of fair representation is a fact question for a jury to decide, is irrelevant to the pending issue before the Court. (*See* Dkt. No. 104 at 20 [Pl.'s Mem. of Law citing *Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1244–45 (8th Cir.1980) ].) Finally, it is worth noting that Plaintiff's misunderstanding of the law in this regard is dubious considering the supporting legal authority cited by Defendants, *Lore v. City of Syracuse,* is a case out of the Second Circuit Court of Appeals, a party to which was represented by Plaintiff's counsel in this action.

**\*20**  Therefore, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is granted.

**E. Whether Plaintiff's Claims Alleging Discrimination and Retaliation Due to the City's Contestation of His Application for Unemployment Benefits Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 26–27 [Defs.' Mem. of Law]; Dkt. No. 124 at 14–15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff opposes Defendants' motion in this regard, arguing that the City's contestation of his application for unemployment benefits was an adverse action. However, Plaintiff concedes that his retaliation claims in this regard are asserted solely against the City, despite the allegations in the Third Amended Complaint.

Plaintiff acknowledges that courts disagree whether an employer's decision to contest unemployment benefits constitutes an adverse action, but cites only one case in support of his argument that opposing unemployment benefits is adverse action, ostensibly suggesting that this Court should decide the issue here accordingly. *See Brown v. JP Morgan Chase Bank,* No. 12–CV–544, 2013 U.S. Dist. LEXIS 95946, at *21–22 (E.D.N.Y. Apr. 10, 2013). [9]

Nonetheless, this Court finds instructive and persuasive the caselaw holding that an employer's opposition of a terminated employee's application for unemployment benefits is not adverse action for purposes of a retaliation claim. *See Burnett v. Trinity Inst. Homer Perkins Ctr., Inc.,* No. 10–CV–681, 2011 WL 281023, at *3 (N.D.N.Y. Jan. 25, 2011) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997); *U.S. v. N.Y. City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996)). *See also Belardo v. Con–Way Transp. Servs., Inc.,* No. 02–CV5406, 2005 WL 885016, at *8 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's actions in objecting to the provision of unemployment benefits to a former employee is not an adverse employment action cognizable under the employment discrimination laws."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y.

Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim, failed to award severance pay, and informed the EEOC that the plaintiff resigned); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action).

Therefore, Defendants' motion for summary judgment regarding Plaintiff's retaliation claims as it relates to the City's contestation of his unemployment benefits is granted.

**F. Whether Plaintiff's Hostile Work Environment Claims Must Be Dismissed**

**\*21** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 31–34 [Defs.' Mem. of Law]; Dkt. No. 124 at 12–14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Defendants point to Plaintiff's deposition testimony to demonstrate the lack of evidence supporting Plaintiff's hostile work environment claim. Specifically, Plaintiff testified that he felt his employment environment was hostile because nobody on his crew liked him nor would they communicate with him, despite the fact that they never made any racial comments to him. (*See* Dkt. No. 108 at 264–264 [Dep. of Guynell Wright, Jan. 18, 2013].) Plaintiff further testified that he felt like he was walking on egg shells at work because he feared being disciplined for things that other people were not disciplined for, and that despite being a victim when a white employee lifted his leg up behind Plaintiff's head and when another employee patted his butt, Plaintiff was still disciplined. [10] (*Id.,* at 267–268.) Defendants argue that these instances do not rise to the level of severity or pervasiveness to establish hostile work environment and that Plaintiff has not established that the alleged hostile or abusive treatment was because of his race.

Plaintiff, in opposition, fails to identify any evidence in the record to create a question of fact on the issues of severity or pervasiveness or the issue of whether the alleged hostile treatment was because of his race. Instead, Plaintiff argues, in conclusory fashion, that "there is more than sufficient evidence for a reasonable jury to conclude that Plaintiff's work environment was filled with discriminatory intimidation,

**Wright v. City of Syracuse, Not Reported in F.Supp.3d (2014)**

ridicule and insult that the terms and conditions of his employment were altered for the worse." (Dkt. No. 104 at 12 [Pl.'s Mem. of Law].) Accordingly, Plaintiff has not met his burden to identify any fact question for a jury to decide regarding his hostile work environment claim and summary judgment may be granted on this basis alone. However, in an abundance of caution, the Court has reviewed the record to identify any other evidence that could possibly support Plaintiff's hostile work environment claim.

In his affirmation, Plaintiff states that when Nolan was crew leader an employee called Plaintiff the N word in Nolan's presence, but Nolan asked Plaintiff to shake the other employee's hand to resolve the conflict, without disciplining the other employee. (*See* Dkt. No. 106 at 10, ¶ 56 [Pl.'s Aff.].) Plaintiff further asserts that, "[u]pon information and belief, Department of Personnel employee Terri Macri has made statements to other DPW employees that she does not approve of mixed race babies." (*Id.,* ¶ 60.) Other evidence includes Plaintiff's assertion that Nolan said that "no black man was ever going to make anything on my watch" in 2007. (*Id.,* at 8, ¶ 46.)

**\*22** To be sure, even assuming the admissibility of Plaintiff's double hearsay statements attributable to Terri Macri, their relevance is dubious considering they were made outside the presence of Plaintiff. *See, e.g., Greaves v. St. Luke's–Roosevelt Hosp. Ctr.,* 03–CV–7424, 2005 U.S. Dist. LEXIS 4082, at \*33 (S.D.N.Y. March 17, 2005) (rejecting plaintiff's claim of hostile work environment because, "[w]ith the exception of a single hearsay remark, made outside his presence, Greaves fails to point to any discriminatory insult or abuse"); *cf. Benjamin v. Metro. Transp. Auth.,* 07–CV–3561, 2012 WL 3188764, at \*12 (S.D.N.Y. Aug. 2, 2012) ("While some of Benjamin's fellow Plaintiffs also make allegations about a hostile work environment, the record does not indicate that Benjamin was aware of any comments made to other Plaintiffs, let alone was present to hear them and have them impact his own work environment."). Moreover, Plaintiff's assertion regarding another employee calling him the N-word in Nolan's presence is also of questionable relevance because, while Plaintiff fails to state with specificity when the statement was made, he asserts that it was made when Nolan was a crew leader, which would have been prior to the relevant time period at issue in this action. (*See* Dkt. No. 117, at 6 [Dep. of Andrew Nolan, Jan. 8, 2013].)

Nonetheless, even assuming the truth, relevance and admissibility of all of the aforementioned evidence, Plaintiff still cannot identify a question of fact regarding his hostile work environment claims. As indicated in Point II.C. 1.a. of this Decision and Order, occasional offensive racial comments are not sufficiently severe or pervasive in order to establish a hostile work environment claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims is granted.

**G. Whether Plaintiff's Due Process Claims Must Be Dismissed**

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 68–70 [Defs.' Mem. of Law]; Dkt. No. 124 at 15–16 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

First, the Court notes that the Third Amended Complaint contains an allegation that "Plaintiff maintained a property and liberty interest in his good name and reputation" which was deprived by Defendants. (Dkt. No. 45 ¶¶ 103–104 [Pl.'s Third Am. Compl.].) In his papers in opposition to Defendants' motion for summary judgment on his due process claim, Plaintiff makes no mention of a liberty interest in his reputation, nor does the record contain any evidence of an offensive statement that was made public. Accordingly, to the extent any substantive due process claim was intended by Plaintiff, it is dismissed from this action.

Second, to the extent Plaintiff alleges a procedural due process claim based on any employment action other than termination, those claims are dismissed. Courts in this Circuit hold that an employee does not have a constitutionally protected interest to be free from employment actions other than termination. *See Barnes v, Pilgrim Psychiatric Ctr.,* 860 F.Supp.2d 194, 204 (E.D.N.Y.2012) (citing cases).

**\*23** Finally, regarding Plaintiff's termination, it is clear that the grievance procedure set forth in the CBA provided Plaintiff the appropriate pre-deprivation hearing as required by the Due Process Clause. *See Adams,* 517 F.3d at 128. Regarding post-deprivation procedures, Plaintiff argues that the CBA "replaces N.Y. Civil Service Law § 75 and any other procedures to challenge the termination of employment." (Dkt. No. 104 at 17 [Pl.'s Mem. of Law].) To be sure, the CBA provides, in relevant part, that the grievance procedure outlined therein "shall apply in lieu of Section 75 and 76 of the Civil Service Law for any employee who

would be covered by those sections." (Dkt. No. 96–2 at 52 [Ex. B to Thompson Decl.].) However, there is nothing in the CBA or otherwise that prevents Plaintiff from seeking a post-deprivation hearing. "[T]he availability of an Article 78 proceeding after the fact provides all the process that is due." *Kruggel v. Town of Arietta,* No. 11–CV–1250, 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (quoting *Sebast v. Mahan,* 754 F.Supp.2d 423, 431–32 (N.D.N.Y.2010)).

For these reasons, Defendants' motion for summary judgment regarding Plaintiff's due process claims is granted.

### H. Whether Plaintiff's Claims Based on Discriminatory Assignments Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 43–45 [Defs.' Mem. of Law]; Dkt. No. 124 at 14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has failed to oppose Defendants' motion for summary judgment in this regard. As indicated above in Point II.B. of this Decision and Order, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond.

In any event, the Court would reach the same conclusion even if it were to subject the Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. The receipt of undesirable work assignments must be accompanied by a materially adverse change in employment, such as demotion or loss of wages, in order to be actionable. *See Henry v. NYC Health & Hosp. Corp.,* No. 13–CV–6909, 2014 WL 957074, at *5 (S.D.N.Y. Mar. 10, 2014). Here, Plaintiff complains that "he and other Black employees have been given less desirable assignments" such as those requiring work outdoors in the hazardous weather. (*See* Dkt. No. 42 at ¶ 28 [Pl.'s Third Am. Compl.].) At his deposition, however, Plaintiff conceded that it was part of his job to go out in the cold and shovel snow. (*See* Dkt. No. 108 at 116 [Pl.'s Dep.].) There is no evidence that such job assignments

were accompanied by a loss in job title or pay. Accordingly, the alleged discriminatory job assignments cannot form the basis of a discrimination or retaliation claim since they were not materially adverse. Therefore, Defendants' motion for summary judgment on any claim of discriminatory or retaliatory reassignment of job duties is granted.

### I. Whether Plaintiff's Claims Based on Discriminatory Denial of Promotion Must Be Dismissed

**\*24** After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 57–67 [Defs.' Mem. of Law]; Dkt. No. 124 at 6–9 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

In support of his discriminatory failure to promote claim, Plaintiff alleges that he asked Defendants Nolan and Wright for promotions and that, when asked why he did not promote black employees, Nolan responded, "A black man will never make anything on my watch." (*See* Dkt. No. 42 at ¶¶ 26–27 [Pl.'s Third Am. Compl.].)

The following facts are undisputed. The opportunities for a pay grade promotion just above Plaintiff's job title, Laborer I, include Laborer II, Motor Equipment Operator ("MEO") I and MEO II, all of which are within Plaintiff's bargaining unit. Each of these positions require a Commercial Driver's License ("CDL"), which Plaintiff never sought. Plaintiff also never applied for any of these pay grade promotions. The title of "Crew Leader" is a position within the Street Cleaning Bureau, which falls under a separate CBA between the AFSCME 1773 and the City. (*See* Dkt. No. 96–7 [Ex. G to Thompson Decl.].) Under that CBA, all Crew Leader vacancies must be advertised and filled by qualified Local 1773 members before being offered to members of other bargaining units, such as Local 400.

Although the City has no record of Plaintiff ever having applied for a Crew Leader position, Plaintiff asserts that between 2006 and 2010, whenever a bid was posted for a Crew Leader position, he submitted an application, but was never promoted to Crew Leader. However, at his deposition, when asked what positions he put in a bid for between 2006 and 2010, Plaintiff replied that he "put in a bid for a crew leader" and later that he bid for "a couple of" and "more than one bid" for Crew Leader. (Dkt. No. 108 at 96, 99.) [11]

Plaintiff went on to explain that there was one Crew Leader position in Sanitation, and another in Street Cleaning. Plaintiff said that Sanitation position went to Efren Maldonado, who had previously worked in Street Cleaning and Sanitation, and the other position went to Thomas Rubado, who came from the Aviation Department. Finally, when asked what reason he has to believe he did not get those jobs because of his race, Plaintiff testified that he believes he didn't get those positions because "they didn't like me." (*Id.* at 105.)

According to Jeffrey Wright, who was Commissioner through the end of 2009, the only Crew Leader positions that he appointed in the Street Cleaning Bureau during his tenure were filled by existing Local 1773 members, Thomas Rubado and Richard Shepherd. Since both were qualified, the position would not have been opened to other bargaining units. The only non Local 1773 member who filled a Crew Leader position during Wright's tenure was Efran Maldonado, a minority who was an MEO at the time of his promotion. Also, that position opened in the Department of Sanitation in 2006 and had entirely different job responsibilities than that of the Street Cleaning Bureau. (*See* Dkt. No. 97 at ¶¶ 48–49 [Decl. of Jeffrey Wright, June 13, 2013].)

 **\*25**   Nolan, Superintendent, asserts that he was not involved in formal hiring decisions, which are made by the Commissioner. (*See* Dkt. No. 98 at ¶ 13 [Decl. of Andrew Nolan, June 13, 2013].) Plaintiff disputes this, citing Nolan's promotion of Ray Garcia to the vacant position of "acting crew leader" in 2007. It was at that time that, Plaintiff asserts, Nolan made the comment that "no black man was ever going to make anything on my watch." (Dkt. No. 106 at ¶¶ 44–46 [Pl.'s Aff.].)

Jeffrey Wright, who was Commissioner through 2009, affirms that, in the day-to-day operation of the Street Cleaning Bureau, it becomes necessary to name an acting Crew Leader if the actual Crew Leader is out sick or on vacation. These positions are temporary and are made by the Superintendent, not the Commissioner. (*See* Dkt. No. 97 at ¶ 51 [Jeffrey Wright Decl.].) Wright further affirmed that "at some point in 2007," Plaintiff came to Wright and told him that he should be considered for promotion to Crew Leader; not for a specific opening, but more generally in the future. Then Commissioner Wright explained to Plaintiff that he needed to make himself more competitive, "including obtaining his CDL and applying for some of the intermediate positions such as Laborer II and MEO." (*Id.,* at ¶ 50.) Wright explained that, "[i]n other words, since a Crew Leader must supervise

laborers and heavy equipment and motor vehicle operators and be familiar with the operation of all of the equipment in the Bureau, it helps to have experience actually performing those jobs and operating that equipment." (*Id.*)

At his deposition, Plaintiff explains that he was told by Bobby Reed, a supervisor, that "next week you are going to be the acting crew leader" but then when that week arrived, Ray Garcia was the acting crew leader. (Dkt. No. 108 at 106–107 [Pl.s' Dep.].) Plaintiff agreed "that an acting crew leader is someone who is working out of title for a short period of time while somebody is either on medical leave or vacation." (*Id.* at 107:9–14.) Plaintiff also explained that during this short period of time, the acting crew leader is paid at the Crew Leader rate. Plaintiff testified that he felt that Nolan gave Ray Garcia the acting crew leader position because of racial animosity toward Plaintiff due to Nolan's comment that a black man wasn't going to make anything on his watch. (*Id.* at 108.) Plaintiff clarified that Nolan made this comment after he made Ray Garcia acting crew leader. (*Id.*)

In his opposition to Defendants' motion, Plaintiff cites one factual question that he argues warrants a denial of summary judgment. Specifically, Plaintiff argues that there is a question of fact regarding whether Nolan made the statement that no black man will ever make anything on his watch. Moreover, Plaintiff contends that even where Nolan was not the decision maker, under a Cat's Paw theory of liability, his racial animus may be imputed to the decision maker.

 **\*26**   As indicated in Point II.C. 1.b. of this Decision and Order, Plaintiff bears the burden at trial to show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Bir v. Pfizer, Inc.,* 510 F. App'x 29, 30 (2d Cir.2013). In order to establish a prima facie case of discrimination based on failure to promote, Plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications."

Plaintiff cannot establish a prima facie case of discriminatory failure to promote for several reasons. First, there is evidence that Plaintiff was not qualified to be a Crew Leader, given

his lack of experience and failure to obtain a CDL, which Plaintiff does not dispute. Next, as it relates to Plaintiff's claim that Defendants failed to promote him, instead promoting Mr. Rubado and Mr. Maldonado, to vacant Crew Leader positions, there is absolutely no evidence of racial animus underlying the decision to promote Mr. Rubado and Mr. Maldonado. In fact, Plaintiff testified that he was not promoted to either of these positions because "they didn't like me" but then later also testified that Mr. Rubado and Mr. Maldonado were in a position to get those jobs. (Dkt. No. 108 at 105, 106.) Moreover, even if Plaintiff could establish a prima facie case of discrimination on this basis, Defendants have identified legitimate, non-discriminatory reasons, which Plaintiff does not dispute, for promoting Mr. Rubado and Mr. Maldonado rather than Plaintiff: those gentlemen were qualified for the position and were members of Local 1773, which, pursuant to the CBA, required that the City promote them before opening the position up to members of other bargaining units, such as Local 400. Given the lack of evidence regarding racial animus attached to those promotions, Defendants are entitled to summary judgment in that regard.

Regarding Nolan's assignment of Ray Garcia to a temporary, acting crew leader position instead of Plaintiff, the Court notes that it is questionable whether such an assignment may be considered a promotion. *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2d Cir.2004) (concluding that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion). Nonetheless, Plaintiff does not identify any evidence suggesting that he was qualified for the acting crew leader position, while Mr. Garcia, who was an MEO II, three positions ahead of Plaintiff, was clearly qualified. Because Plaintiff cannot show that the acting crew leader position was given to someone less qualified than him, he cannot establish a prima facie case of discrimination based on failure to promote.

**\*27** For these reasons, Defendants' motion for summary judgment on Plaintiff's claims based on failure to promote is granted.

### J. Whether Plaintiff's Claims Based on Discriminatory Discipline Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 48–577 [Defs.' Mem. of Law]; Dkt. No. 124 at 9–12 [Defs.'

Reply Mem. of Law].) To those reasons, the Court adds the following point.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to discipline. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to the disciplinary actions taken against Plaintiff. It is undisputed that the only Defendant who was the decision maker regarding the disciplinary actions against Plaintiff was Commissioner Wright. [12] Moreover, other than a bald and unsupported assertion by Plaintiff in his response to Defendants' Local Rule 7.1 statement, there is no evidence that Nolan had anything to do with the Commissioner's decision to discipline Plaintiff. Finally, there is absolutely no evidence of racial animus or bias on behalf of Commissioner Wright against Plaintiff.

Moreover, for the reasons stated in Defendants' memoranda, Plaintiff has failed to adduce any evidence that similarly situated white employees were treated more favorably than Plaintiff in terms of discipline. (*See* Dkt. No. 100–8 at 51–55 [Defs.' Mem. of Law].)

For these reasons, Defendants' motion for summary judgment on Plaintiff's claims regarding discriminatory and/ or retaliatory discipline is granted.

### K. Whether Plaintiff's Claims Based on Discriminatory Termination Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated by Defendants in their memorandum of law in chief as well as their reply memorandum of law. (Dkt No. 100–8 at 14–25 [Defs.' Mem. of Law]; Dkt. No. 124 at 2–6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Plaintiff has not identified any evidence of discriminatory or retaliatory animus based on his race as it relates to his termination. The sole question of fact Plaintiff identifies, which is whether Nolan stated in 2007 that no black man would get promoted on his watch, is irrelevant to Plaintiff's termination. The evidence reflects that Defendant O'Connor, who was Commissioner at the time, made the decision to terminate Plaintiff. Even assuming that Defendants Thompson and Simone advised or encouraged O'Connor to terminate Plaintiff, there is no evidence of racial animus or

bias on behalf of O'Connor, Thompson [13] or Simone against Plaintiff.

The only person that Plaintiff has identified as having racial animus is Nolan. Nolan affirms that he did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. Nolan further affirms that O'Connor did not ask for his input regarding the termination. (*See* Dkt. No. 98 at ¶ 49 [Nolan Decl.].) O'Connor affirms that he was the sole decision maker in the determination to terminate Plaintiff. (*See* Dkt. No. 99 at ¶ 36 [Decl. of John M. O'Connor, III, June 13, 2013].). In making the decision to terminate Plaintiff, O'Connor states that he relied upon

*28 (a) the Police Report and the statements Guynell Wright made to the police that he knew he was violating DPW policy; (b) the fact that Guynell Wright was in the last stage of disciplinary progression; (c) the fact that Guynell Wright had been previously received significant discipline in 2007 for near identical conduct; and (d) a review of Guynell Wright's prior "thick" disciplinary file which reflected numerous prior major and minor violations and demonstrated a pattern of misconduct over time.

(*Id.* at ¶ 37.) In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies the assertion that Nolan did not initiate the discipline leading up to Plaintiff's termination, did not participate in the pre-disciplinary hearing and played no role in the decision to terminate Plaintiff. (*See* Dkt. No. 105 at ¶ 47 [Pl.'s Rule 7.1 Response Statement].) In support of his purported denial, Plaintiff cites his affirmation

that he personally observed O'Connor go to Nolan and Culkin for advice on how to perform his duties as Commissioner. (*See* Dkt. No. 106 at ¶ 42 [Pl.'s Aff.].) Plaintiff has failed to identify any evidence of Nolan's participation in his termination, either directly or by communication or encouragement of a decision maker.

For these reasons, Defendants' motion for summary judgment as it relates to Plaintiff's claims for discriminatory and/or retaliatory termination is granted.

Finally, the Court notes that Plaintiff has identified no evidence of a causal connection between his DHR complaints and the alleged adverse actions. There is no direct evidence of retaliatory motive on behalf of any decision maker. Moreover, there is no temporal proximity between Plaintiff's complaints and the adverse actions. For example, Plaintiff complained to DHR in March 2008, but the next adverse action did not occur until January 2009. Also, Plaintiff was terminated an entire year after his February 2009 DHR complaint. For these reasons, in addition to those asserted by Defendants in their memoranda of law, Plaintiffs' retaliation claims are dismissed.

Because the Court dismisses Plaintiff's claims for the absence of a question of material fact as to the substantive elements of those claims, the Court need not address the remainder of Defendants' arguments for dismissal, such as failure to exhaust and failure to file a notice of claim.

**ACCORDINGLY,** it is

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 95) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's claims are dismissed with prejudice. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1293527

---

**Footnotes**

Conclusions of law in a Local Rule 7.1 Statement, even where unopposed, are not deemed admitted. *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *1 (N.D.N.Y. July 13, 2011) (Homer, M .J.), *adopted in its entirety by,* 2011 WL 3439524 (N.D.N.Y. Aug. 5, 2011) (Scullin, J.).

Plaintiff asserts that he began working for the City on October 3, 1988 as a "Laborer I" for the Department's Sanitation Bureau. (*See* Dkt. No. 108, at 44–45 [Dep. of Guynell Wright, Jan. 18, 2013].) However, events which occurred prior to June of 2006 are irrelevant to the resolution of the pending motion since the longest statute of limitations applicable to any of the claims in this action is four years. *See James v. Countrywide Fin. Corp.,* 849 F.Supp.2d 296, 317–318 (E.D.N.Y.2012) (finding that four-year statute of limitations set forth in 28 U.S.C. § 1658(a) applies to employment discrimination and retaliation claims brought pursuant to 42 U.S.C. § 1981); *Asanjarani v. City of New York,* No. 09–CV–7493, 2011 WL 4343687, at * 10 (Aug. 18, 2011) (statute of limitations for employment discrimination claims brought pursuant to Section 1983 is three years); *Ruggerio v. Dynamic Elec. Sys. Inc.,* No. 12–CV–100, 2012 WL 3043102, at *6 (E.D.N.Y. Jul. 25, 2012) (citing 42 U.S.C. § 2000e–5(e)(f)) (claims are timely under Title VII if an administrative complaint is filed within 300 days of the alleged discriminatory act, and a judicial action is filed within 90 days of receipt of a rightto-sue letter by the administrative body); *Sloth v. Constellation Brands, Inc.,* 883 F.Supp.2d 359, 373 (W.D.N.Y.2012) (citing N.Y.C.P.L.R. § 214(2) (McKinneys 2008)) (under Section 296, the limitations period runs for three years from the date on which an action asserting NYHRL violations is filed, but this limitations period is tolled for the period between the filing of an administrative charge and the issuance of a right-to-sue letter).

Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") on March 3, 2008, in which he argued that his 20–day suspension by the City for fighting was disparate treatment based on race. On August 18, 2008, DHR dismissed the complaint based on a lack of probable cause. (*See* Dkt. Nos. 96–29 and 96–30 [Exs. CC and DD to Thompson Decl.].)

Plaintiff ostensibly filed a complaint with DHR on February 18, 2009, charging the City with race discrimination due to his termination. The DHR later dismissed the complaint citing a lack of evidence of unlawful discrimination. (*See* Dkt. No. 96–31 [Ex. EE to Thompson Decl.].)

Plaintiff's complaints were cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

As the Supreme Court has famously explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348 (1986) (citations omitted).

Plaintiff's counsel argues that here, this Court must apply the "universal" rule in the courts of the State of New York that allows a non-moving party to successfully oppose summary judgment with evidence that would be inadmissable at trial because some of Plaintiff's claims arise under New York law. (*See* Dkt. No. 104 at 1–2 [Pl.'s Mem. of Law].) Without commenting on the veracity of Plaintiff's counsel's interpretation of New York law in this regard, the Court notes that it is by now very well-settled law that "[t]he issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive, under the distinction created by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817 (1938) and its progeny, and accordingly is subject to federal rather than state law ." *Tingling v. Great Atl. & Pac. Tea Co.,* 02–CV–4196, 2003 WL 22973452, *2 (S.D.N.Y. Dec. 17, 2003), citing *Erie R. Co. v. Tompkins.* 304 U.S. 64, 58 S.Ct. 817 (1938) and *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) (applying federal law on defendant's burden at summary judgment stage to diversity action).

"The primary doctrinal differences between Title VII claims and employment discrimination claims pursuant to Sections 1981 and 1983 regard (1) the statute of limitations, (2) the requirement that Section 1981 or 1983

plaintiffs must show employment discrimination pursuant to an official policy or custom, (3) that individuals may be held liable under Sections 1981 and 1983, but not under Title VII, and (4) a Title VII claim may be established through proof of negligence, whereas Section 1981 and 1983 claims must be supported by evidence of intentional discrimination." *Jackson v. City of New York,* No. 11–CV–3028, 2014 WL 1010785, at *4, n. 10 (E.D.N.Y. Mar. 17, 2014) (citing *Patterson,* 375 F.3d at 225–227).

9       Although, as Defendants point out, this decision is a Report and Recommendation that was later vacated, the case was thereafter reassigned to another District Judge who adopted the Report and recommendation in full. See *See Brown v. JP Morgan Chase Bank,* No. 12–CV544, 2013 U.S. Dist. LEXIS 109700 (E.D.N.Y. Aug. 5, 2013).

10      Regarding these incidents of discipline, the Court notes Plaintiff's affirmation that in 1997, another black employee slapped his bottom in the restroom, which resulted in two separate physical altercations between Plaintiff and this other employee: one in the restroom and another later in the day when Plaintiff was on his way home from work. Plaintiff asserts that both he and the other employee were disciplined as a result. (*See* Dkt. No. 106 at 2, ¶ 8 [Pl.'s Aff.].) Plaintiff further asserts that in February 2007, Stanley Gardynski, a white employee, made humping motions with his groin at Plaintiff's head. Plaintiff admits that afterward, when Gardynski was provoking him again, Plaintiff hit him. Both Plaintiff and Gardynski were disciplined as a result. (*Id.* at 3, ¶ 13.)

11      Plaintiff also put in a bid for a gardener position in the Parks and Recreation Department.

12      In his response to Defendants' Local Rule 7.1 Statement of Material Facts, Plaintiff denies that Nolan was not the decision maker regarding the discipline he received between 2006 and 2009. (*See* Dkt. No. 105 at ¶ 68 [Pl.'s Rule 7.1 Response Statement] .) In support of this purported denial, Plaintiff asserts that Commissioner Wright relied on Defendants Nolan and Culkin to make the final determination regarding discipline. However, Plaintiff cites a portion of his deposition testimony that does not support this assertion. Accordingly, this fact is deemed admitted.

13      At his deposition, Plaintiff testified that he did not believe that O'Connor or Thompson decided to terminate him because he is black. (*See* Dkt. No. 108 at 222 [Pl.'s Dep.].) Plaintiff testified that he thought Thompson retaliated against him for making complaints of discrimination because Thompson "never helped me out" when Plaintiff would go to him with problems. (*Id.* at 222–223.) Finally, at his deposition, Plaintiff testified that the only involvement Simone had was being present at meetings and that "[h]e didn't do anything, really." (*Id.* at 247.)

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---